**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**UNITED STATES OF AMERICA**

**-vs-** **Case No. 6:01-cr-134-Orl-31DAB**

**ANTONINO EUGENE LYONS**
**a/k/a Nino**

# ORDER

This case is before the Court on Defendant Antonino Lyons' Amended Motion to Dismiss (Doc. 319), the United States' ("Government") Response (Doc. 324) thereto, and Lyons' Reply (Doc. 328). The Court heard oral argument on July 23, 2004. Upon consideration of the record, the Court grants Lyons' Amended Motion and dismisses all counts in this case because of the prejudice caused by the Government's numerous and flagrant *Brady*[1] and *Giglio*[2] violations and the prejudice caused by its later denials and delay.

## I. INTRODUCTION

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnest and vigor – indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

---

[1] *Brady v. Maryland*, 373 U.S. 83 (1963). "*Brady* requires the prosecution to turn over to the defense any exculpatory evidence in its possession or control." *United States v. Jordan*, 316 F.3d 1215, 1226 n.15 (11th Cir. 2003).

[2] *Giglio v. United States*, 405 U.S. 150 (1972). "*Giglio* requires the prosecution to turn over to the defense evidence in its possession or control which could impeach the credibility of an important prosecution witness." *Jordan*, 316 F.3d at 1226 n.16.

*Berger v. United States*, 295 U.S. 78, 88 (1935). The Court quoted this passage before in its Order of May 22, 2002 (Doc. 208) granting Lyons a new trial. In that order, the Court found that the Government violated *Brady* by failing to disclose evidence, in its possession and unavailable to Lyons, about one of the Government's key witnesses, David Mercer. The Government's suppression of that evidence deprived Lyons of an effective means to undermine Mercer's testimony, which linked Lyons to approximately 70 drug transactions and 340 kilograms of crack cocaine. (*Id.* at 20-21). The Court also found that the Government violated *Giglio* by knowingly allowing Mercer to testify falsely and by going so far as to cover up evidence that would have revealed some of Mercer's testimony as false.[3]

At that point, roughly midway through the proceedings, the Government had an opportunity to evaluate whether its prosecutorial duties had been met. Although this opportunity was by no means the first to assure that Lyons received a fair trial, it may be seen as the last.

Rather than take the revelations about the Mercer testimony as cause to reassess its conduct, the Government appealed the new-trial Order. The Government also obtained a stay of an Order (Doc. 233) that would have allowed Lyons to be released on bond pending a new trial. The Government's appellate brief that followed detailed the accounts of other witnesses, besides Mercer, who testified about Lyons' alleged drug activities. With those accounts, unquestioned and unreviewed, the Government argued that overwhelming evidence supported Lyons' convictions, and that the undisclosed Mercer information was immaterial. The Court of Appeals accepted that "Mercer's testimony was only one piece of a rather large picture" and held that the

[3]Mercer indicated that he received a $200 traffic ticket on a trip to get drugs from Lyons in Orlando, Florida. (Doc. 245 at 555). The prosecution offered to introduce the ticket on Mercer's redirect because the ticket was not in the courtroom. Instead of later introducing that ticket, which would have shown that Mercer received it on a trip to a wholly different location, the prosecution explicitly dropped the ticket from consideration. (*Id.* at 576).

record contained such overwhelming evidence as to allay any concern or lack of confidence in the jury's verdicts.[4] (Doc. 259).

In response to a Motion (Doc. 258) in the proceedings on remand, this Court ordered the Government to produce various materials for *in camera* review. (Doc. 272). It was no simple matter to extract an adequate response from the Government. Because of the Government's recalcitrance, it was only after a year, three document productions, and two exhaustive *in camera* document reviews that it could be said with any confidence that the "record is now as complete as it will ever be." (Doc. 300 at 16).

Soon thereafter, the Government conceded that it erred in failing to disclose *Brady* material with respect to a number of its witnesses. (Doc. 324 at 1). In fact, upon the Government's own Motion (Doc. 304), the jury's verdict on the drug-conspiracy count was vacated and the count was dismissed. Lyons, nevertheless, still stands convicted of other, less greivous, counts in this case, one for carjacking and several for trafficking in counterfeit merchandise. The Government now opposes dismissal or a new trial on the remaining counts and, once again, argues that any *Brady* or *Giglio* violations are immaterial. To that end, the Government proffers the dismissal of the drug-conspiracy count as rendering those violations immaterial. Again, however, the Government fails to account for the scope and impact of the deficiencies in its case.

The Government built its case against Lyons around a drug-conspiracy count, the support for which was contrived solely from testimony rendered almost exclusively from incarcerated

---

[4]The Court of Appeals could not have undertaken a factual inquiry into whether the Government withheld any additional *Brady* or *Giglio* materials. Indeed, that falls in the province of trial courts, and this Court, concerned as it was by the revelations about the Mercer testimony, saw no reason to dig deeper into the Government's case. Accordingly, the only issue on appeal was the undisclosed evidence about Mercer.

felons seeking sentence reductions. At trial, Lyons was faced with these witnesses, whose testimony touched all relevant counts. Lyons testified in his own defense. Given the nature of the evidence against him, his credibility and denials were his only reasonable defense. In convicting Lyons, the jury must have found that Lyons lied to them under oath. The jury likely also found that he was a drug lord who was predisposed to violence. Now, after years of Government denials and delay, it is clear that *Brady* and *Giglio* violations materially tainted the drug-conspiracy conviction. At issue is whether the Government can now save the day simply by dropping the concededly unlawful drug-conspiracy conviction, which directly implicated Lyons' credibility and character. Upon review of the record, the Court finds that the Government's misconduct so pervaded the case that dismissal of the remaining counts is warranted.

## II.
## A BRIEF PRE-TRIAL AND TRIAL HISTORY OF THE CASE

In 2001, Antonino Lyons, an African-American resident of Brevard County, Florida, was forty-one years old. He was married to an elementary school principal and was a prominent, and by all appearances respected, businessman in the Brevard County community. Other than an affinity for nice automobiles, he lived a modest lifestyle, in a home valued at approximately $60,000. He had no prior criminal convictions.

### A. The Drug Investigation

The earliest indication of a criminal investigation targeting Lyons may be found in an Assistant United States Attorney's ("AUSA") December 5, 1996 certified application for a pen register, purportedly to aid in an "ongoing investigation of Antonio Lyons and others as yet unknown, in connection with possible violations of [federal drug law]." (Doc. S-75 at Bates No. 1625). The application contained a certification that both the Brevard County Drug Task Force

and the FBI were conducting an ongoing criminal investigation targeting Lyons. (*Id.* at Bates No. 1626). A February 14, 1997, application for extension of the Lyons pen register indicates that this early investigation was ongoing. (*Id.* at Bates No. 1638). It was, however, apparently fruitless. No files or documents were kept, if they ever existed, and individuals with contemporaneous knowledge of the Government's activities would later disavow any recollection of this early investigation. Nevertheless, the Government would later assert that Lyons was the kingpin in a far-reaching drug conspiracy throughout this period and for more than a decade before 2001.

At the U.S. Drug Enforcement Administration's ("DEA") request, the U.S. Attorney's Office opened an official file concerning Lyons in early 1999. AUSA Bruce Hinshelwood, the lead prosecutor in this case, later recounted that it was not until mid-2000 that the matter became active, and "[o]ver the next year, I spoke to [DEA] Agent Frank Chisari and others about the progress of the investigation, which consisted primarily of identifying, locating, and interviewing various potential witnesses with useful information." (*Id.* at Bates No. 3414).

Though a drug-conspiracy count was the principal criminal allegation leveled against Lyons, the Government did not secure any wiretap evidence, tape recordings, telephone records, or physical evidence to support that count. In fact, a search of Lyons' home on December 20, 2000 uncovered no drugs or drug paraphernalia. Rather, the Government's only productive resource for "evidence" were the statements of individuals convicted and serving prison sentences for drug offenses. By mid-2001, Agent Chisari had spoken with no fewer than 13 prisoners who claimed to have engaged in or observed drug transactions involving Lyons.

Agent Chisari and AUSA Hinshelwood knew well the incentive for prisoner witnesses to testify at the time of the Government's drug investigation against Lyons. On July 25, 2001, they acknowledged to the Grand Jury:

AUSA Hinshelwood: And I want to make clear to the Grand Jury, their motivation in talking to you and agreeing to assist you is in a desire to get some relief from their sentences?

Agent Chisari: Yes.

AUSA Hinshelwood: That is, the deal is, if they provide you information and you can come to the U.S. Attorney's Office and convince us to do so, we will, in turn – they hope that we will, in turn, file a document with the court seeking a sentence reduction?

Agent Chisari: Truthful information. Yes.

(GJ T., pt. B, at 6).[5] And, to some extent, both Agent Chisari and AUSA Hinshelwood also knew of the risks inherent in the Government's chosen method of investigation. The same July 25, 2001 Grand Jury hearing included the following exchange:

Grand Juror: Do all these witnesses come to you or do you go to them?

Agent Chisari: All these witnesses came to me.

Grand Juror: They come to you and –

Agent Chisari: Well, when you interview one person, the word gets around if you're in prisons that I'm targeting somebody. So everybody that had anything to do with the people I'm targeting and they're in jail, the word gets around very fast. So everybody that wants cooperation, wants reduction, then you get calls. And that's how the word spreads.

AUSA Hinshelwood: And to be fair, Mr. Chisari, sometimes people who didn't have anything to do with the people you're targeting approach you?

Agent Chisari: That's my job. That's where my expertise comes in.

(*Id.* at 29-30). Agent Chisari described his purportedly expert investigative method as "putting pieces together in a puzzle and *working and working* witnesses. So once the word was out that Lyons was a target in the bureau of prisons, we utilized that. That was my method of putting this

---

[5]There are six sealed Grand Jury Transcripts ("GJ T.") related to the July 25, 2001 session. For ease of reference, the Court has designated them with letters. Part B begins at 3:32 p.m.

case together." (*Id.* at 41)(emphasis added).[6] AUSA Hinshelwood made a point to elicit testimony from Agent Chisari about the accuracy of this method, and Agent Chisari responded by giving as "one good example" how he pieced together corroborating details to check the veracity of David Mercer's statements.[7] (*Id.* at 30-31). Other investigative methods, after all, had proven unproductive or unavailable to uncover any direct proof of Lyons committing drug violations. (*Id.* at 38-42).[8]

---

[6]At the time, Agent Chisari's investigative method was not new, nor were the concerns it engenders. Indeed, the 1990s saw an upsurge in critical commentary on the Government's use of prisoners and defendants as witnesses. With the advent of a significant increase in prison sentences, especially for drug offenses, and with the scarce mechanisms under the U.S. Sentencing Guidelines for prisoners and defendants to obtain sentence reductions, critics and legal commentators noted a powerful increase in the incentives for prisoners and defendants to turn snitch and a related increase in the risk that that "substantial assistance" would include false testimony. *See* Frank O. Bowman, III, *Departing is Such Sweet Sorrow: A Year of Judicial Revolt on "Substantial Assistance" Departures Follows a Decade of Prosecutorial Indiscipline*, 29 STETSON L. REV. 7, 13-16 (1999). Furthermore, in 1998, a panel of the Tenth Circuit handed the Government a sensational, albeit short-lived, defeat when, in *United States v. Singleton*, 144 F.3d 1343, 1358 (10th Cir.) *rev'd en banc* 165 F.3d 1297 (10th Cir. 1999), the court held that a Government promise to file a motion for downward departure in exchange for testifying violated a federal anti-bribery statute. The court suppressed the testimony and ordered a new trial because the taint – "the temptation inherent in a witness accepting value . . . . to color or falsify one's testimony in favor of the donor" – impermissibly impugned judicial integrity. *Id.* at 1360. Although later reversed *en banc*, *Singleton*, if nothing else, registered serious concerns shared by courts and commentators about the reliability of witnesses who have a strong incentive to tell the Government something that may inspire a sentence reduction.

[7]This is the same David Mercer discussed in the introduction and elsewhere in this Order.

[8]Right or wrong, the practice of granting criminals freedom in exchange for prosecutorial "assistance" is part of the common-law tradition. In May 1701, Captain William Kidd was tried in London for murder and piracy, and he was convicted on the testimony of the real pirate, Mr. Bradinham. During Bradinham's perjured testimony, Captain Kidd interrupted: "Mr. Bradinham, are you not promised your life, to take away mine?" This prompted the Judge to intervene: "He is not bound to answer that question. He is very fit to be made an evidence for the King. Perhaps there can be no other than such as are in his circumstances." RICHARD ZACKS, THE PIRATE HUNTER 376 (Hyperion 2002). Shortly thereafter, Captain Kidd was hanged and Bradinham received his promised pardon. *Id.* at 392-95.

**B. The Grand Jury Proceedings**

After years of investigating Lyons for evidence of drug trafficking, the Government presented "evidence" to the Grand Jury. The presentation did not include any witnesses who testified based on personal knowledge, but rather rested solely on the hearsay, and at times hearsay upon hearsay, testimony of Agent Chisari. Chisari simply testified before the Grand Jury about interviews he and other Government agents held with various witnesses. With that, on July 25, 2001, the Grand Jury returned a one-count Indictment (Doc. 1) against Lyons, as the alleged kingpin in a drug-conspiracy spanning more than a decade.

After additional presentations to the Grand Jury, on August 22, 2001, the Government filed a Superseding Indictment (Doc. 8) and, on October 3, 2001, a Second Superseding Indictment (Doc. 37). Lyons was charged, ultimately, with the following Counts: (1) conspiracy to possess cocaine with intent to distribute; (2) possession of a firearm during the conspiracy alleged in Count 1; (3) attempted possession of cocaine with intent to distribute; (4) possession of a firearm during the crime alleged in Count 3; (5) attempted carjacking; (6) carjacking; (7)-(17) trafficking in counterfeit goods; and (18) possession of counterfeit currency with intent to defraud. The heart of the Indictments, however, remained in Count 1, the drug-conspiracy count, which carried the possibility of life imprisonment.

**C. Lyons' Arrest and Detention**

The Government arrested Lyons on August 23, 2001, and on August 27, 2001, U.S. Magistrate Judge Glazebrook held a pretrial detention hearing. Judge Glazebrook found that, rather than providing evidence from which to assess the weight of evidence against Lyons, "the government, more or less, simply asked the Court to trust the government that the weight of evidence against Lyons is significant." (Doc. 25 at 2). Based on a comparison of the Government's (mostly hearsay) proffer to the evidence of Lyons' strong ties to the community,

negative drug urinalysis, and clean record, Judge Glazebrook ordered Lyons' pretrial release upon certain enumerated conditions. (*Id.*) That order, however, was immediately stayed pending review by the District Judge. (Doc. 20).

At the Government's insistence, this Court reviewed the conditional release order in light of the rebuttable presumption, set forth in 18 U.S.C. § 3142(e), that a person charged with the drug offenses with which Lyons was charged poses a risk of flight and danger to the community warranting pretrial detention. (Doc. 34 at 2). While the evidence of Lyons' strong ties to the community, negative drug urinalysis, and lack of a prior criminal record gave the Court pause, the Court (unfortunately) did not share Judge Glazebrook's skepticism of the Government's position. Based primarily on the Government's proffer concerning: (1) Lyons' possession of weapons; (2) his alleged propensity toward violence and utterance of threats (recounted through hearsay testimony citing unnamed sources); and (3) the seriousness of the drug charges, the Court accepted that no conditions of release would reasonably assure Lyons' presence at trial or adequately protect the safety of the community. (*Id.* at 4-5). Lyons thereby began what would be a 33-month imprisonment in a local county jail.

**D. The Trial**

The trial commenced on November 5, 2001. It began with the Government's opening statement, which included the claim that Lyons "had a diverse portfolio of criminal activities ranging from cocaine trafficking to carjacking, selling counterfeit goods to using counterfeit currency, even on some occasions using counterfeit currency to pay for cocaine." (T. 13).[9] During the trial, the jury heard evidence directed primarily to the following three issues:

- Did Lyons conspire, for more than a decade, to traffic in illegal drugs?
- Did he commit certain crimes at a Hampton Inn on the night of June 14, 1998?
- Did he knowingly traffic in counterfeit merchandise?

[9]Consecutively paginated trial transcripts ("T.") are filed as Docs. 243-52.

**1. The Government's Presentation of Its Case**

The bulk of the Government's evidence at trial came in the form of testimony from 29 witnesses being held in federal, and in one instance state, custody for drug-related felonies. These witnesses were self-admitted drug dealers who testified to having at least one and sometimes a long-running series of drug transactions involving Lyons. These witnesses often described one-on-one drug transactions with Lyons. With rare exception, the timing of the alleged transactions was so vague as to render an alibi defense impossible. Lyons' public businesses were usually identified as locations at or near where the alleged transactions took place. And, as an aspect of Lyons' activities, one witness, Antonio Holly, testified that Lyons asked him to commit murders. A clear majority of the Government's felon witnesses were held in facilities where a number of them could discuss their prospective testimony. About half of these witnesses had cooperated with the Government before; and, of those, most had received sentence reductions for prior cooperation, wherein they failed to mention any drug transactions involving Lyons. At trial, several hid their eagerness to testify, none admitted to receiving any promises or actual sentence reductions for their testimony, but almost all acknowledged that they would appreciate a sentence reduction for their testimony. Although these witnesses were impeachable, their number was clearly offered to make up for their individual shortcomings.[10]

In regard to the episode at the Hampton Inn on the night of June 14, 1998, David Sejour, one of the Government's felon witnesses, testified to committing an armed robbery in which he invaded a hotel room where Lyons and two other individuals, Jeanty Jacques and Karlis Fenelus, were present. Jacques, another felon witness, testified that the robbery was a set up; he arranged a fake drug deal with Lyons, and when Lyons showed up with the money, Jacques had Sejour

[10]The excerpt from the Government's closing argument, quoted infra p. 13-14, makes this clear. In addition, when faced with a similar pool of witnesses in a prior case, AUSA Hinshelwood opined in regard to the special problems and weaknesses of that case that "[a]ll of the witnesses are convicted felons, self-admitted drug dealers, or both. There are, however, a lot of them." (Doc. S-75 at Bates No. 3138).

positioned to rob him. Sejour, a close friend of Jacques, said he was not aware of the robbery having anything to do with drugs. Fenelus, another close friend of Jacques, stated that Lyons was there to pay Jacques, in his capacity as a concert promoter, for a musical artist who was scheduled to play that night at Lyons' night club. Jacques and Fenelus indicated that Sejour took perhaps more than $100,000, then fled the room with Lyons in chase. Jacques indicated that Lyons retrieved a gun from a car in the hotel parking lot, and then Lyons manhandled a man who was sitting in a car near the lobby entrance. Jacques opined that Lyons initially thought the man in the car was Sejour. Fenelus testified that Lyons pulled a gun on the man sitting in the car. Paul Brack, the victim, indicated that he was there sitting in his car that night, and a man (who he could not identify) threatened blow his f***ing head off then took his car. Brack did not see a gun, but he testified that one of the man's hands was under his shirt. According to Sejour, Lyons snatched the driver out of the car, called for someone to guard the driver, and then used the car to chase after Sejour, who thereafter managed to escape into a bordering wooded area. Gloria Barton Western, another witness, testified that she was parked in a nearby lot that evening, and Lyons tried unsuccessfully to commandeer her car, claiming that he had an emergency and he was not stealing her car. Jacques testified that, at some point during this episode, he tried to drive away from the hotel, and Lyons, with gun in hand, told armed thugs, "Don't let this f'ing guy leave; and if he even make a step, kill him." (T. 1630). At some point, the police arrived and, after cordoning the area, eventually apprehended Sejour in the woods. Whatever the events, Brack later declined to press any charges against Lyons for the incident with the car that night.

In regard to the counterfeit clothing counts, the prosecution called, as foundational witnesses, Anthony Caruso, a detective with the City of Cocoa Police, and Tony Howell, a Special Agent with the U.S. Customs. Both had prior specialized training to aid in identifying counterfeit merchandise, and both testified about purchasing (and identified at trial) items of clothing from

Lyons' stores. Howell conceded that, even with his training, he was not certain whether the items he purchased were counterfeit. (T. 506). The Government also called, as witnesses, five representatives of various trademark holders. Based on their expertise, many of the items purchased from Lyons' stores were identified as counterfeit. Nevertheless, virtually all of the trademark representatives testified, or the Government otherwise stipulated, that there were genuine items among those purchased from Lyons' stores.[11] Furthermore, all of the trademark representatives indicated that at least some sophistication or expertise might be necessary to identify the remaining items as counterfeit. During the Government's case, the only layperson who testified as to the clothing at Lyons' stores was Antonio Holley, one of the Government's felon witnesses; he stated, without any clear predicate, "I used to purchase counterfeit clothing from [Lyons] for my store. . . ." (T. 1142).

**2. Lyons' Testimony**

As a principal part of his defense, Lyons took the stand. Lyons testified as to his history, his upbringing, his childhood aspiration to own a clothing store, and his prior jobs and businesses. Lyons addressed virtually all of the testimony against him. Lyons denied ever having purchased or sold drugs. (*See, e.g.*, T. 1826, 1833). He denied ever having sold counterfeit goods and, specifically, denied Antonio Holley's claim to the contrary. (T. 1838, 1850). Lyons went on to address the Hampton Inn episode in detail. He denied that it involved an attempted drug transaction; claimed he was there to pay a musical artist for a concert that evening at Lyons' night club; and claimed, with some corroboration, that he was not carrying enough money to match the deal on the terms about which Jeanty Jacques testified (T. 1858-59, 1865-66). Lyons stated that

---

[11]Carol Blanchet, a representative of Reebok International, Inc., is the exception, but she only testified as to a single used item of clothing that was seized from Lyons' home. (T. 400-03, Ex. 33-A).

he had a valid concealed weapon's permit for the gun which was in the bag containing the money. (T. 1855-56). As to the events after the robbery, Lyons testified that he did not have a gun at that point, indicating that things happened too quickly. He ran out of the hotel, and he grabbed a man in a car who he thought was the getaway driver. (T. 1863). Lyons recounted that he said "We've got you" and yelled to another, "Don't let him go. Call the cops." (T. 1863). He actively disavowed any memory of threatening to blow the man's f***ing head off. (T. 1864).

### 3. The Close of Trial

As a means to refute Lyons' defense, the Government argued at the close of trial that the Jury should consider all the issues together in light of the testimony on the drug-conspiracy count. According to the Government, all the issues were linked to the reliability of the witnesses who testified as to the drug-conspiracy count. Specifically, AUSA Hinshelwood's told the Jury:

> . . . you've got two choices, you've got two explanations: Either he's a misunderstood businessman or he's a drug dealer.
>
> And let me say this, too. Look at all twenty-five [sic][12] of the government's witnesses. You've got to consider all of them, consider them one at a time, consider them as a group, because you've got to consider all the evidence. You've got to disbelieve every single one of those witnesses' sworn testimony. You've got to just take it all out, because if you believe one of them, just one, that means Antonino Lyons is lying and he's a drug dealer.
>
> And if he's lying, then it follows from that he's been dealing drugs, as put out in count one. He was attempting to get drugs from Mr. Jacques on June 14th, as set out in count three. He used guns to do that, as set out in count four. He did a - - committed a carjacking in the aftermath of that. And, in all likelihood, these series of transactions over a sixth-month period were far from an isolated mistake, but constituted a pattern of trafficking in counterfeit merchandise.

(T. 2463-64).

[12]The prosecution actually presented 31 witnesses who testified as to drug activity.

After the closing arguments and later deliberations, the jury reached its verdict.[13] They found Lyons guilty on the drug-conspiracy count (1), the carjacking count (6), and counterfeit-clothing counts (7)-(16); but they acquitted Lyons on the attempted drug possession and associated weapons counts (3)-(4) related to the alleged fake drug transaction at the Hampton Inn. Accordingly, the Jury concluded that the vast majority of Lyons' denials, under oath, were lies.[14]

#### 4. The Undisclosed *Brady* And *Giglio* Materials

When Lyons took the stand in his defense, and when the Jury set about reaching its verdicts, they did so without the benefit of a great deal of relevant exculpatory evidence held by the Government. In regard to the drug-conspiracy count, the Government failed, for instance, to disclose evidence indicating that David Mercer and Frederick Ward, allegedly two of Lyons' highest volume customers, may not have bought drugs from Lyons. (*See* Doc. 208 at 14-15 (discussing Mercer); Doc. 282 at 37-38 and Doc. 300 at 24-25 (discussing Ward)). Nor, for instance, did the Government disclose that Frantz Jean-Mary, allegedly Lyons' highest volume supplier, was arrested after a detailed investigation involving recorded conversations, buys orchestrated with confidential informants, and other surveillance revealing relatively small (sub kilogram) sales; Lyons was not implicated in that investigation and its findings undermine Jean-Mary's claim that he supplied Lyons with 10 kilograms of cocaine every two weeks. (*See* Doc. 300 at 26). And, as an example of undisclosed information about witnesses who allegedly took

---

[13]During trial, the Court dismissed the counterfeit-currency count (18) on the Government's *ore tenus* motion. (*See* T. 1684). The Court granted a judgment of acquittal as to the drug-conspiracy-related weapons count (2), the attempted-carjacking count (5), and one of the counterfeit-clothing counts (17). (Doc. 109)

[14]Apparently, the only denials the Jury credited were ones related to the alleged fake drug transaction at the Hampton Inn. Lyons' denials in that regard were corroborated by circumstantial evidence related to the amount of money allegedly in his possession. Furthermore, Karlis Fenelus and David Sejour, participants in the event and close friends of the alleged mastermind, Jeanty Jacques, denied any knowledge of a fake drug transaction. (T. 1351, 1449)

part in more minor drug deals, AUSA Hinshelwood did nothing when four felon witnesses, including Lyons' own cousin, testified falsely that the Government sought them out (and not vice-versa) to testify against Lyons. In front of Hinshelwood and the Grand Jury, Agent Chisari had earlier testified that the same felon witness (and 9 others) approached Chisari after word spread in the prisons that the Government was targeting Lyons. (*Compare* T. 253 (Crayton), T. 389 & 391 (Wyns), T. 424 (Johnson), and T. 1052-53 (Ridley), *with* GJ T., pt. B, at 29 (Chisari)).[15]

As to felon witness testimony that covered more than drug sales, the Government failed, for instance, to disclose problems with Antonio Holley. As previously mentioned, Holley testified that he used to purchased counterfeit clothes from Lyons. (T. 1142). Holley testified that later his relationship with Lyons escalated and on at least 10 separate occasions he purchased a kilogram of cocaine from Lyons. (T. 1144-45). Holley also testified that Lyons offered to pay him to kill Jeanty Jacques in 1998 and another associate in 1999. (T. 1150-52, 1155). On cross examination, when asked why he thought Lyons would have selected him to commit a murder, Holley indicated that he was known for his loyalty, and he had shown his loyalty to Lyons by returning to purchase large amounts of cocaine from him. (T. 1167). Holley indicated that, when he was arrested in 1999, he told federal agents that Lyons supplied drugs to him. (T. 1176-77). Holley also testified that he had identified Lyons as a supplier during his testimony in a prior federal trial, i.e., *United States v. Ladoczky*, 6:00-cr-49-ORL-19C (M.D. Fla. 2000). (T. 1176).

Unbeknownst to the defense, a November 22, 1999 Report on Investigation ("ROI") from Holley's post-arrest debriefing revealed that Holley identified his principle drug suppliers, but he did not mention Lyons. (Doc. S-75 at Bates No. 2802). And, in the *Ladoczky* trial, Holley never

---

[15]Chisari was present during the trial and could have relayed this point. Although the Court harbors serious doubt as to Agent Chisari's bona fides for, *inter alia*, the raft of undisclosed evidence his self-described "expert" investigative methods supposedly failed to uncover, the Court assumes that it was the felon witnesses who perjured themselves at trial and that Agent Chisari did not lie to the Grand Jury. Obviously, it bolstered the witnesses credibility not to appear so eager to testify.

mentioned Lyons. His testimony in *Ladocsky* did reveal, however, that Holley had previously lied to the federal investigators about his relationship with the defendant in that case. *Ladoczky*, *supra*, Doc. 103 at 124-28, 168. As the *Ladocsky* trial was not transcribed until 2003 and the ROI was not disclosed, Lyons could not reasonably have discovered this evidence.

Perhaps the most demonstrably wilful suppression of evidence, however, occurred in regard to Jeanty Jacques' testimony. Jacques, a federal prisoner since June 22, 1998, testified at length about the Hampton Inn episode, discussed above. After giving his account of the fraudulent drug deal-cum-robbery, Jacques recounted how Lyons ran to his car, retrieved a gun, assaulted a man he thought was the robber, then took that man's car. (T. 1622-24). As previously indicated, Jacques testimony also cast Lyons as a violent person, one who allegedly threatened Jacques at gunpoint. Furthermore, when asked whether he was looking for a sentence reduction for his testimony, Jacques denied having any such discussions with the Government, and he said:

> Let me put it this way. I don't care if I get a sentence reduction or nothing. That man pull that gun on me, I really don't care no more. So if they plan to give me a sentence reduction or whatever, that's up to them if they're going to do that; but, no, I ain't looking for no sentence reduction.

(T. 1677).

Unbeknownst to the defense, on July 25, 2000, the Government had filed a <u>sealed</u> motion for a sentence reduction, the merits of which were to be decided on the completion of Jacques' "assistance in an ongoing investigation being conducted by the United States Attorney's office for the Middle District of Florida." *United States v. Jacques*, Case No. 98-6103-cr-Seitz, S.D. Fla., Doc. 67 (Sealed). An AUSA in Miami had already discussed the motion with Jacques' counsel. *Id.* In addition, AUSA Hinshelwood, the lead prosecutor in *Lyons*, was ordered to attend a status conference in *Jacques* shortly before the *Lyons* trial. *Jacques*, *supra*, Doc. 76. At 6:07 p.m. <u>on the day Jacques gave his testimony in the *Lyons* trial</u>, AUSA Hinshelwood emailed the AUSA in Miami to "please do what you can" for Jacques and opined that a 50% sentence reduction was

appropriate. (Doc. S-75 at Bates No. 3309). Nevertheless, AUSA Hinshelwood did nothing when Jacques testified about not having any discussions concerning a sentence reduction. Apparently, AUSA Hinshelwood had no interest in disclosing evidence that would undermine testimony that he saw, at the time, as "the centerpiece of the government's prosecution . . ." (*Id.*)

## III.
## MATERIALITY ANALYSIS

The forgoing is a significantly condensed history of the case through the trial and includes a relatively small topical sample of the undisclosed evidence. Nevertheless, among other things, it shows that tainted testimony explicitly touched more than the drug-conspiracy count. The Court sees no need to recount here the various other *Brady* and *Giglio* materials the Government failed to disclose. A review of U.S. Magistrate Judge Baker's *In Camera Ex Parte* Report and Recommendation (Doc. 282) and Supplemental Report and Recommendation (Doc. 300) exposes the myriad violations that collectively reveal a prosecution run amuck. Those analyses, hereby incorporated by reference, and this Court's subsequent review of the record leave the Court with a firm conviction that, had the undisclosed *Brady* and *Giglio* materials been properly evaluated pre-trial, the Government may well have foregone presenting the drug-conspiracy count in the first instance or, at the very least, would have presented its case in a vastly different and far less compelling manner.

In the course of a criminal prosecution, the Government has a continuing duty to honor a defendant's constitutional rights, which, according to *Brady*, requires the Government to disclose any evidence in its possession or control that is material either to guilt or punishment. 373 U.S. at 87-88; *Jordan*, 316 F.3d at 1226 n.15. In this regard, the prosecutor must disclose evidence that could, in the eyes of a neutral and objective observer, alter the outcome of the proceeding. *Jordan*, 316 F.3d at 1252. *Giglio* holds that "[w]hen the reliability of a given witness may well be

determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule." 405 U.S. at 154 (citations and internal quotation marks omitted).

*Brady* and *Giglio* impose active duties on prosecutors prior to trial. A prosecutor is duty-bound to ascertain whether government agents and the police have evidence favorable to the defendant. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). A prosecutor must also decide whether such evidence should be disclosed to the defendant. *Id.* at 439. This decision turns on the materiality or force of the undisclosed evidence, which is to be viewed in the aggregate. *Id.* at 436. Accordingly, there should be no doubt that, consistent with a general duty to secure justice, a prosecutor bears an initial duty timely to uncover all evidence in the Government's possession that may favor the defendant. *See id.* at 436-37.

Materiality, for *Brady* and *Giglio* purposes, does not turn on whether there is sufficient evidence to convict. *Kyles*, 514 U.S. at 434. Evidence may be material even if it appears more likely than not that a trial will result in conviction. *Id.* at 434-35. Materiality turns on whether, in the absence of certain evidence, a presumptively innocent defendant will receive a fair trial. *See id.* The test is whether the undisclosed evidence "undermines confidence in the outcome of the trial." *Id.* (citation omitted). The standard of materiality is less stringent, however, if the Government knowingly used perjured testimony or failed to correct testimony it learned was false. In that case, the test is whether it is reasonably likely that the falsehood could have affected the jury's verdict. *United States v. Arnold*, 117 F.3d 1308, 1315 (11th Cir. 1997). If the Government fails to disclose material evidence under *Brady* and *Giglio*, that is a constitutional violation which requires an affected conviction to be set aside. *Kyles*, 514 U.S. at 435-36. It is, however, possible for such a *Brady* or *Giglio* violation to affect fewer than all the counts in a multi-count case. *See, e.g., United States v. Wayne*, 903 F.2d 1188, 1192 (8th Cir. 1990).

In this case, by some mixture of negligence, recklessness, and wilfulness, the Government utterly failed in its prosecutorial duties.[16] The Government's recent filing of a Motion (Doc. 304) to vacate the drug-conspiracy conviction and dismiss the count merely confirms what had already become evident: i.e., a reasonable prosecutor, acting consistent with the duties of that office, likely would not have brought the drug-conspiracy count at all or, otherwise, would never have presented the case in this fashion.[17]

Dismissal of the drug-conspiracy count has rendered moot the issue of whether there were *Brady* or *Giglio* violations as to that count. Unquestionably, there were. An issue remains, however, as to whether the undisclosed evidence was material to the other counts, that is, whether the *Brady* and *Giglio* violations were limited to the drug-conspiracy count.

---

[16]Fundamentally, unaccountable behavior plagued the Government's case. For example, in regard to Torrey Clements, another felon witness, the Government has not produced a single report, note, or document that would indicate that any Government agent checked out, or documented, Clements' story before putting him on the stand. (*See* Doc. 300 at 30-31). *See also* discussion of earliest drug investigation *supra* at pp. 4-5. Moreover, given the character and amount of undisclosed evidence that has surfaced, the Court refuses to accept any excuse the Government may have for its failures. The Government has a duty to establish procedures and regulations to insure communication of all relevant information on each case to every lawyer who deals with it. *See Giglio*, 405 U.S. at 154. Proper and verifiable vetting should be performed on every witness the Government sees fit to call at trial.

As an aside, the Court is skeptical that any vetting could be sufficient when the Government utilizes federal prisoners to put the word out that it is targeting someone. (GJ T, pt. B, at 29-30, 41). It is perfectly conceivable that desperate prisoners would cooperate with each other to polish up their stories before talking to investigators for the first time about a target. It could be their only way to freedom.

[17]If the Government's voluntary dismissal of the drug-conspiracy count is not clear evidence that it was fundamentally flawed in its inception, the circumstances and conspiracy law tend to support that conclusion. Shorn of the tainted testimony, the count likely would have rested on a handful of felon witnesses' uncorroborated testimony about discrete buy-sell transactions. Even accepting such unreliable testimony, an agreement of a buyer to buy and a seller to sell drugs, without any prior or contemporaneous understanding beyond the mere buy-sell transaction, does not a conspiracy make. *See United States v. Mercer*, 165 F.3d 1331, 1335 (11th Cir. 1999). For an expanded discussion of this point, see the *In Camera Ex Parte* Report and Recommendation (Doc. 282 at 9-10, 63-64).

At the close of the Government's case, Lyons character had been impugned, and his credibility was his only reasonable defense. For the most part, this follows from the manner in which the Government supported the drug-conspiracy count. Conspiracies involve knowing and intentional conduct; they require "a meeting of the minds to commit an unlawful act." *See United States v. Toler*, 144 F.3d 1423, 1426 (11th Cir. 1998). To prove a conspiracy, the Government had relied exclusively on its numerous, mostly felon, witnesses to prove Lyons' state of mind. In their testimony, however, were allegations not only that Lyons engaged in extensive drug activities, but that Lyons often carried out his drug activities under the cover of his clothing stores, he peddled counterfeit clothes in those stores, he had threatened associates at gunpoint, and he tried to arrange the murders of certain associates. Lyons almost certainly chose to testify in response to the felon witnesses' testimony. Given the record at the close of the Government's case, his silence would likely have guaranteed a life sentence. In that way, the Goverment's case put Lyons' credibility and his character squarely at issue. And, on the record the Government's violations rendered incomplete, Lyons' credibility and character were destroyed.

In regard to the carjacking count (6), the jury was asked to decide whether, at the time Lyons demanded or took control of Brack's car, Lyons "'intended to cause death or serious bodily harm' . . . [as] judged objectively from the conduct of [Lyons] as disclosed by the evidence and from what one in a position of the alleged victim might reasonably conclude." (Doc. 115 at 20); *see also* Criminal Pattern Jury Instruction 73 (11th Cir. 2003). If the Jury had believed Lyons' characterization of the event, his conduct would appear tantamount to a surprise apprehension by a man, who, in a confusing and rapid sequence of events, grabbed his suspect, proclaimed "We've got you," and called for an observer to summon the police and not to let the suspect escape. It would not be unreasonable for a jury to find that an objective person in Brack's position may have interpreted the event in this manner. It would, however, defy reason and human nature to expect a

jury to believe this scenario on the word of a man portrayed as a violent drug lord and a man who the jury found to have lied under oath.[18]

Were it not for the Government's *Brady* and *Giglio* violations, there is a reasonable probability that the Jury could have found Lyons to be a respectable businessman who truthfully characterized the events of that evening and, accordingly, to be innocent of the carjacking charge. This conclusion is bolstered by the conclusion that, if the Government had complied with its duties, the drug-conspiracy count may well not have been an issue, or otherwise would have been a far less compelling factor, in this case. Although the Government has now recanted that principal count and cites that dismissal as a basis to find its violations immaterial, the Government cannot benefit from any doubt it thereby seeks to raise. The Government cannot now change the fact that, through aggravated violations of its prosecutorial duties, it destroyed Lyons' character and credibility, and, with that, confidence in the Jury's verdict on the carjacking count.

The same holds, if not more so, for the counterfeit-clothing counts (7)-(16). The Jury was asked to decide whether Lyons knowingly and intentionally trafficked or attempted to traffic in counterfeit goods. (*See* Doc 115, at 21); *see also* 18 U.S.C. § 2320. Even with specialized training to identify counterfeit goods, the law enforcement officers who purchased clothing from Lyons' stores selected genuine clothing as well as counterfeits. And the trademark representatives who testified indicated that at least some sophistication or expertise might be necessary to identify the counterfeits. Had Lyons' credibility not been denigrated by tainted

---

[18]In this Court's Order (Doc. 138) denying judgment of acquittal, the Court upheld the jury's verdict on the carjacking count (6) by accepting all reasonable inferences and credibility choices that tend to support the jury's verdict and by asking whether "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." (Doc. 138 at 2, citing *United States v. Bell*, 678 F.2d 547, 549 (5th Cir. Unit B 1982)). The record has since changed considerably. The undisclosed evidence that has come to light negates the basis of that Order (Doc. 138). Again, a sufficiency-of-evidence standard is not the test for whether *Brady* and *Giglio* violations are material. *Kyles*, 514 U.S. at 434-35.

evidence,[19] there is a reasonable probability that the Jury could have found that Lyons made legitimate mistakes. It is inconceivable that the Jury could fairly decide this issue once convinced that Lyons was a lying drug dealer. This is not simply a common-sense deduction. This is precisely the characterization of Lyons and the mental leap to which the Government's tainted and invalidated drug-conspiracy count was directed. As quoted previously, AUSA Hinshelwood explicitly told the Jury in his closing that all of the evidence is intertwined and that, if the Jury accepts any of the Government's evidence on the drug-conspiracy count, Lyons is a lying drug dealer who lied about all the other counts in the case.[20] The Court thus finds that the Government's *Brady* and *Giglio* violations tainted all remaining counts in this case and are, therefore, material.[21]

## IV.
## POST-TRIAL HISTORY OF THE GOVERNMENT'S CASE

After trial, the Court, unaware of any undisclosed evidence, denied Lyons' new trial and judgment of acquittal motions. Yet, on April 1, 2002, Lyons filed a Motion for Reconsideration (Doc. 165), claiming that the Government had violated its *Brady* obligation with respect to a felon witness, David Mercer. In its Response (Doc. 169), the Government denied that it had withheld certain materials – a report and undercover tape recordings indicating that Mercer had made prior statements inconsistent with his trial testimony. At an April 9, 2002 hearing on Lyons's motion,

---

[19]Antonio Holley's unpredicated claim that Lyons sold him counterfeit clothes is undermined by the undisclosed evidence and likely would not have come out. Holley apparently was called to testify as to the drug-conspiracy count alone.

[20]*See* quotation *supra* p. 13.

[21]The implications of the Government's violations go beyond those previously discussed. For instance, would the counts in this case have been tried together without the drug-conspiracy count; would Lyons have waived his right not to testify in each separate case; and, in those cases where he may have testified, would he have laid himself so bare? Likely, no. These (and probably other) implications further undermine confidence in the Jury's verdicts.

AUSA Hinshelwood denied Lyons' claim, and said "I don't know how much stronger I can put it. My interviews, Mr. Chisari's interviews, we've reviewed his notes and his reports, are totally consistent with the trial testimony." (Doc. 181 at 17). When the Court asked to review those notes and reports *in camera*, Hinshelwood immediately objected and, with reference to (among other things) his prior assurances, he argued that Lyons had not made a threshold showing to justify any concern. (*Id.* at 18-19). The Court was not satisfied with Hinshelwood's assurances or denials.[22] Although, during the April 9, 2002 hearing, Lyons had filed a Motion (Doc. 175) to force the Government to produce materials as to "each and every witness called to testify for the Government,"[23] the Court was focused on some evident inconsistencies and ordered the Government to produce various materials only as to Mercer. (Doc. 179).

After reviewing the materials produced, the Court concluded that the Government had failed to turn over *Brady* and *Giglio* materials as to Mercer, and that the nondisclosure was

---

[22]Additionally, the Court was not impressed with Hinshelwood's expressed concern about the Court "mucking around in [Government] reports." (*Id.* at 37).

[23]In no sense was this the first call for *Brady* and *Giglio* materials. For example, early in this case, the Court entered its standard Criminal Scheduling Order (Doc. 18), which required the Government to disclose *Brady* and *Giglio* materials no later than 11 days before trial. As an additional example, early in trial, the following exchange occurred:

[Lyons' Counsel]: Your Honor, my co-counsel has reminded me, based on some of our review of the appellate cases, that in order to preserve Jencks, Brady, and Giglio violations or accusations of that, that it is necessary for me at the end of each witness's testimony to request from the government that material every time. Do you want me to do that at bench or just before the jury?

AUSA Hinshelwood: For the record, Your Honor, as far as I'm concerned, he can have a standing request. I've thoroughly gone over all of the documents and records and reports that I have, and I know – and I've also questioned the witnesses as to whether or not any Jencks material, which was a particular concern of mine, was in existence. I'm assured there is none. All that I know of has been turned over.

(T. 269-70).

material, warranting a new trial. (Doc. 208).[24] A premise of the Order was that, in a case built on the credibility and testimony of felon witnesses, evidence of false testimony could lead the jury "to question the credibility of the Government, as well as the other felon witnesses who, although not promised, where obviously expecting Rule 35 motions for their assistance in obtaining a conviction against Lyons."[25] (*Id.* at 23-24). As the drug-conspiracy count was the reason Lyons was initially detained pre-trial, the Court also ordered that Lyons be released pending the new trial. (Doc. 233). The Government quickly obtained a stay of Lyons' release (Doc. 239), and it timely prosecuted an appeal of the Court's new trial order.

The premise of Government's appeal was that the records were not *Brady* or *Giglio* materials, or, alternatively, that the records were not material to Lyons' convictions. (Doc. 266 at 27-28). "Mercer was only one of <u>many</u> witnesses whose testimony established the conspiracy," according to the Government. (*Id.* at 28). Its appellate brief plodded through the felon witnesses' testimony distilled down to a litany of drug-transaction details all presented as gospel. (*Id.* at 3-9). Mercer's was ordered as the last (perhaps suggesting that it was the least) of the Government's drug-conspiracy evidence. (*Id.* at 9-11).

The Court of Appeals found that the Government had failed to turn over *Brady* materials as to Mercer but found, however, that "Mercer's testimony was only one piece of a rather large picture." (Doc. 259 at 9, 11). It noted, furthermore:

---

[24]The Court ordered new trial only as to the drug-conspiracy count and the carjacking count. At that point, unlike the Government, the Court was not in a position to know the actual scope of the undisclosed materials.

[25]This reference was to explicit promises. The currency of the Rule 35 process appears to be "promises" in the sense of "soft words of hope." *See* R. Michael Cassidy, *"Soft Words of Hope:" Giglio, Accomplice Witnesses, and the Problem of Implied Inducements*, 98 NW. U. L. REV. 1129 (2004). In the instant case, some of the felon witnesses (and, in some instances, their attorneys) later demanded or requested their "promised" sentence reductions. (*See* Doc. 300 at 12-13). Most of the felon witnesses, including even the apparently undeserving, got their reductions in the end. (*See, e.g., id.* at 23-24; Doc. 282 at 35-36). No doubt, prospective felon witnesses get the message.

> We have great doubt that the record would support a conclusion that the prosecutors knew during trial that this testimony was false or that the prosecutors knowingly failed to correct that testimony. It appears that *the failure* to produce this material *was the result of negligence or as the district court labeled it "sloppy investigative work.*"

(*Id.* at 13 n.3)(emphasis added). From the incomplete record the Government put before it, the Court of Appeals concluded that there was no reasonable likelihood that disclosure of the problems with Mercer's testimony would have affected the jury's verdicts. (*Id.* at 13).

Upon remand, Lyons filed an Amended Motion for Disclosure to Defendant or for *In Camera* Review by the Court of Government Interview Notes and Reports (Doc. 258) for all Government witnesses. The Government, in turn, objected (Doc. 261) and filed a Motion (Doc. 262) to enforce a forfeiture of assets and sentence Lyons. (Doc. 262). Based upon Lyons' presentence report, the Government sought to incarcerate Lyons for life, obtain possession of virtually all his assets, and obtain two judgments against him for a total of more than $6 million. The Court held a concern, however, that if Mercer's testimony was tainted, there was a distinct possibility that the Government may have failed in its obligations concerning other witnesses as well. On April 17, 2003, the Court deferred the Government's motion, and ordered the Government to produce, for *in camera* review by U.S. Magistrate Judge Baker, a broadly-drawn class of documents related to the felon witnesses. (Doc. 272).

About a month later, the Government produced, under seal, a submission consisting of 494 Bates-stamped pages of materials and a general index. Upon review of this first production, Magistrate Judge Baker noted: "the relatively slim production, considered in light of the history of this case, creates a concern that not all responsive material has been produced and appropriately identified." (Doc. S-20). The Court ordered the Government to supplement its first production with sworn verification responsive to specific enumerated requirements, and the Court noted:

> While the Court has listed several examples of the omissions apparent from the documents themselves, this list is not exhaustive. The Court expects the

> Government to review the Order requiring production and to review each and every document produced to date in order to verify that appropriate steps have been taken to locate *all* referenced and related items and to explain the absence of any that have not been submitted as well as the reasons for any lack of reports that would be expected in the usual course of interviewing witnesses and preparing them to testify at trial.

(*Id.*) On August 11, 2003, about four months after the initial order for production of documents and after three extensions of time, the Court received a supplemented (second) production as complete as the Government cared to make it.[26]

After a painstaking review of the Government's first and second productions, Judge Baker issued a 66-page *In Camera Ex Parte* Report and Recommendation ("R&R") on November 21, 2003. (Doc. 282). Principally, the R&R presented a witness-by-witness account detailing what the Government's productions contained and, in many instances, what was absent. Although the R&R revealed various undisclosed *Brady* and *Giglio* materials, Judge Baker found the Government's productions incomplete and the excuses for an incomplete production inadequate: "Considering that the Government has had numerous opportunities to provide a complete record, or adequate explanation regarding any omissions, its failure to do so is inexplicable." (*Id.* at 62). The R&R included recommendations that the Government be ordered to submit additional materials and that the Court set procedures to address materiality and the appropriate remedy in an adversarial setting. (*Id.* at 65-66).

Objections to the R&R were due December 8, 2003, and the Government filed, on that date, a sealed Motion (Doc. S-65) for additional time to respond. The Court granted the Government an extension up to January 5, 2004 to respond, and when that date arrived, the Government filed another sealed Motion for additional time to file objections or, alternatively, to reconsider the R&R. (Doc. S-69). On January 6, 2004, the Court denied the further request,

---

[26]The Government indicated that it had withheld various materials, including prosecution memoranda, correspondence and "administrative" materials.

confirmed and adopted the R&R, and ordered the Government to produce the "additional documents referred to in . . . the Report and Recommendation . . . for in camera review by January 20, 2004." (Doc. 280). The Government had an opportunity to identify and show cause as to whether portions of its earlier productions should be redacted before disclosure, and a hearing was set for January 27, 2004. The Court concluded that:

> It has been almost eight months since the government was ordered to produce these documents. Despite numerous extensions of time the government has failed to comply with the Orders of this Court. Its request for yet more time rings hollow. Further delay is no longer an option. Rather, it is time for the government to face up to its obligations and justify its conduct in an adversarial setting, where the Defendant and his counsel are afforded an opportunity to participate.

(Doc. 280). It was only then that the U.S. Attorney's Office removed AUSA Hinshelwood from handling the case and assigned alternate counsel.

On January 16, 2004, as its third production, the Government filed numerous Bates-stamped documents (757 to 3488), *ex parte*, under seal, and with objections. (Doc. S-75). And, on January 20, 2004, the Government filed under seal a Motion for Reconsideration (Doc. S-77) of the Court's January 6, 2004 Order, and a Motion to File Objections to the R&R. (Doc. S-78). A copy of the Government's proposed objections was attached to the sealed pleadings, and, for the first time, the Government conceded that "errors were made," and that "in retrospect, some of these materials should have been provided in some fashion to defense counsel."

On January 23, 2004, the Court granted, in part, the two sealed motions and gave the Government until January 30, 2004 to file, in the public record, its objections to the R&R. (Doc. 285). The January 27, 2004 hearing went ahead as scheduled, and the Government did not later file objections. At the hearing, a deal was reached that the Government would produce to the Court and to Lyons redacted copies of its third production by February 6, 2004, and Judge Baker

was to review the entire (third) production and submit a supplemental report and recommendation. (Doc. 287).

On April 23, 2004, Judge Baker issued the a 38-page Supplemental Report and Recommendation ("SR&R") (Doc. 300). This occurred about a week after the Government and Lyons filed a Joint Motion (Doc. 298) to stay the proceedings, purportedly to allow ongoing settlement negotiations and to serve the interest of preserving judicial resources.

The SR&R set forth an exhaustive analysis of the Government's third production. Beyond filling gaps in the original R&R's witness-by-witness analysis, the SR&R observed that the "character and number of documents related to this investigation that have gone missing or were never even created in the first place is remarkable," and further that "[g]iven the scope and seriousness of the drug charges and the absence of any hard evidence, the Government's apparent failure to document its case carefully suggests a considered effort to avoid accountability." (Doc. 300 at 11, 13). Large gaps remained in the record.[27] (*See generally id.*) Nevertheless, it was evident that material *Brady* and *Giglio* violations had occurred.

Soon afterward, the Government filed a Motion (Doc. 304) to vacate the Jury's verdict as to the drug-conspiracy count and to dismiss that count. The Court granted the Motion by Order (Doc. 315) dated May 21, 2004. Lyons was thereafter released on May 24, 2004. All tolled, Lyons had served 33 months in county jail. The Government later stated that if Lyons were to be sentence on the carjacking conviction, the Government would recommend a sentence of time served. (Doc. 324 at 1 n.1).

---

[27]The Court later Ordered (Doc. 303) the Government to produce to the Court sealed transcripts of the Grand Jury proceedings. It is those transcripts which reveal evidence (Agent Chisari's testimony) indicating that four felon witnesses testified falsely at trial about the circumstances leading to their cooperation, i.e., testifying at trial. *See* discussion *supra* pp. 14-15 and note 15. Otherwise, the state of the record remains unchanged.

## V.
## REMEDY ANALYSIS

The usual remedy for a *Brady* or *Giglio* violation is to set aside any affected convictions, *Kyles*, 514 U.S. at 435-36, and that generally contemplates an order for new trial, *see, e.g., Giglio*, 405 U.S. at 155. It is, however, within a district court's inherent power to dismiss an indictment on grounds of prosecutorial misconduct. *Jordan*, 316 F.3d at 1248-49. Although dismissal of an indictment for prosecutorial misconduct is an extreme sanction, it is a sanction within a court's discretion if sufficiently egregious prosecutorial misconduct has occurred and has prejudiced the defendant. *See id.* at 1249; *United States v. O'Keefe*, 825 F.2d 314, 318 (11th Cir. 1987).

In the instant case, the Government's misconduct and the prejudice to Lyons merely began as a deprivation of his right to fair trial. Lyons had a right to due process and a right to adequate assistance of counsel – rights designed to produce a just result, be that a conviction (and loss of liberty) or an acquittal. U.S. CONST. amend. V-VI. By failing to disclose a raft of evidence material to an adequate defense, the Government's initially deprived Lyons of these constitutional rights and his liberty. If, within a reasonable period after trial, the Government had revealed its *Brady* and *Giglio* violations, a new trial order may have been an appropriate remedy. The Government, however, perpetuated an unjust deprivation of Lyons' liberty throughout this case, despite clear constitutional duties, despite obvious concerns about the Government's investigative and prosecutorial methods, despite actual notice of *Brady* and *Giglio* problems, and with unconscionable delay and prejudice to Lyons as well as to the judicial process. In fact, within the period the Government failed in its duties and unreasonably multiplied these proceedings, Lyons has already served the maximum sentence the Government has called for on the remaining counts.

If the Government's prosecutors in this case had made an honest effort timely to comply with their constitutional duties, they would have confronted (and indications are that they did confront) various items of exculpatory evidence that should have been disclosed. Even if faced

with a significantly smaller subset of the undisclosed materials, a reasonable prosecutor would have at least questioned whether *Brady* and *Giglio* required disclosure and whether more materials of that nature existed. Faced with reasonable doubt as to whether to disclose materials, an appropriate course of action is for the prosecutor *sua sponte* to submit the materials for *in camera* court inspection. *Jordan*, 316 F.3d at 1252. Yet, here, where the need to disclose the materials should have been clear, the Government suffered this Court to endure repeated failures to produce an adequate production for *in camera ex parte* review. The Government's protracted course of misconduct caused extraordinary prejudice to Lyons, exhibited disregard of the Government's duties, and demonstrated contempt for this Court. Accordingly, the Court finds it appropriate to dismiss the remaining counts, as a new trial would be an insufficient remedy.

This nation's adjudicatory system is not a tool finely tuned to obtain convictions, but a system designed to foster respectable justice. Although the Government, as the gatekeeper of certain exculpatory evidence, may contrive a case without any honest attempt to comply with its duties, the Court refuses to be the Government's rubber stamp of single-minded injustice, however expedient that would be. This Court readily concedes its own failure to dig deeper into the Government's case when the problems with Mercer's testimony initially came to light. That will be marked down to experience. Yet, while the Government scored an appellate victory on a varnished record, the Government would be well-served to guard the esteem of its offices with greater vigilance, especially after it is shown that exculpatory information was withheld, at best, by its agents' sloppy investigative work or, at worst, by their knowing failure to meet constitutional duties. The events of this case also suggest that the Government could benefit from more well-informed judgment in the first instance, when deciding whether to bring a case weighted on suspect evidentiary foundations.

## VI.
## CONCLUSION

Based on the foregoing, the Court finds that the Government committed *Brady* and *Giglio* violations material to all remaining counts in this case, and the Government's unwarranted denials and delay prejudiced Lyons and the judicial process to such a degree that dismissal of the remaining counts is appropriate. It is therefore

**ORDERED** that Lyons Amended Motion to Dismiss (Doc. 319) is **GRANTED**, and Counts 6 and 7 through 16 of the Second Superseding Indictment (Doc. 37) are **DISMISSED** with prejudice.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on this 30th day of September, 2004.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

United States Marshal
United States Attorney
United States Probation Office
United States Pretrial Services Office
Counsel for Defendant
ANTONINO EUGENE LYONS
A/k/a Nino