# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

**UNITED STATES OF AMERICA**

**-vs-** **Case No. 6:01-cr-134-Orl-31DAB**

**ANTONINO EUGENE LYONS**

---

## *IN CAMERA EX PARTE*
## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This cause comes on for consideration upon review of the Government's submissions, filed under seal, in response to the Court's April 17, 2003 Order (Doc. No. 272) granting Defendant's Motion for Production of Investigative Notes and Reports (Doc. No. 175) and Defendant's Amended Motion for Disclosure to Defendant or for *In Camera* Review by the Court of Government Interview Notes and Reports (Doc. No. 258).

### *I. BACKGROUND*

The factual and procedural history of this matter is set forth in great detail in prior Orders and in the Eleventh Circuit's unpublished opinion. For present purposes, the following matters are relevant. On July 26, 2001, Defendant Antonio Lyons was indicted on one count of conspiracy to possess and distribute cocaine base (also known as "crack") and cocaine hydrochloride ("powder cocaine") (Doc. No. 1). On August 22, 2001, the Government filed a Superseding Indictment (Doc. No. 8), asserting numerous additional charges. Lyons was arrested on August 23, 2001, and a detention hearing was held on August 27, 2001, before the Honorable James G. Glazebrook, United States Magistrate Judge (Doc. No. 30). At that hearing, John J. Schultz, Special Agent with the

282
564

Florida Department of Law Enforcement ("FDLE") testified that the FDLE assisted U.S. Customs, Cocoa Police Department and the DEA "for a lengthy time" on this investigation (Doc. No. 30 at 10).

On October 3, 2001, the Government filed a Second Superseding Indictment (Doc. No. 37), charging the following: Count 1–conspiracy to possess crack cocaine and powder cocaine with intent to distribute; Count 2–possession of a firearm during the conspiracy alleged in Count 1; Count 3–attempted possession of crack cocaine and powder cocaine with the intent to distribute; Count 4–possession of a firearm during the crime alleged in Count 3; Count 5–attempted carjacking; Count 6–carjacking; Counts 7 through 17–trafficking in counterfeit goods; and Count 18–possession of counterfeit currency with the intent to defraud. Consistent with local practice and the Discovery Order entered by the Court (Doc. No. 18), the Government and Lyons agreed to exchange all *Brady,*[1] *Giglio,*[2] and *Jencks*[3] material.

Trial was held in November 2001. As summarized by the court of appeals:

> At trial, thirty witnesses testified to Lyons' numerous drug dealings in central Florida from 1989 to 2000. One witness testified that he bought two kilograms of crack and eight kilograms of powder cocaine from Lyon every two or three weeks from mid-1994 through May 1996; one witness testified that he bought about eighteen ounces of powder from Lyons about every two weeks from January 1997 through September 1998; three witnesses testified that they bought cocaine from Lyons on four occasions; two witnesses testified that the[y] bought cocaine from Lyons on three occasions; two witnesses testified that they bought nine ounces of crack from Lyons on two different occasions; two witness[es] testified that they bought cocaine from Lyons at least ten times; one witness testified that he twice sold a kilogram of powder to Lyons; one witness testified that he sold kilograms of powder cocaine to Lyons on four different occasions. Their testimony as well as the testimony of other witnesses

---

[1] *Brady v. Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

[2] *Giglio v. United States,* 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972).

[3] Jencks Act, 18 U.S.C. § 3500.

> described how Lyons bought and sold cocaine in varying quantities and different forms (i.e., powder and crack cocaine) through this extended period.

*United States v. Lyons,* Case No. 02-13452 (unpub.) (11th Cir. Mar. 4, 2003) (Doc. No. 259). All of the witnesses who testified with respect to the drug charges were convicted felons or close associates or relatives of the convicted felons. The Government did not introduce any wiretap evidence, tape recordings, telephone records, evidence of undercover transactions, physical evidence or testimony from investigating officers with respect to the drug charges.

At the close of the Government's case, the Court granted the Government's motion to dismiss Count 18 and granted a judgment of acquittal as to Counts 2, 5, and 17, reserving ruling on Defendant's Motion for Judgment of Acquittal as to Count 6 (Doc. Nos. 98 and 100). The jury returned a verdict of Not Guilty as to Counts 3 and 4, and Guilty as to Counts 1 (drug conspiracy), 6 (carjacking), and 7 through 16 (trafficking in counterfeit merchandise) (Doc. No. 118). Defendant filed a timely Motion for Judgment of Acquittal Notwithstanding the Verdict and a Motion for New Trial (Doc. No. 125), which the District Court denied (Doc. No. 138).

On February 27, 2002, Lyons filed a Second Motion for New Trial, based on asserted violations of *Brady* and *Giglio* with respect to the testimony of one of the felon witnesses – David Mercer (Doc. No. 144). The motion was denied (Doc. No. 155), and Lyons moved for reconsideration (Doc. No. 165). The Court granted the motion for reconsideration (Doc. No. 172) and held a hearing on April 9, 2002 (Doc. No. 174). During the hearing, Lyons filed a Motion for Production of Investigative Notes and Reports (Doc. No. 175), which sought investigative notes with regard to David Mercer and "with regard to each and every witness called to testify for the Government." *Id.*

The District Court granted the motion, in part, and ordered the Government to produce the investigative notes and summaries as to David Mercer, but did not rule on Lyons' request for the Government to produce documents as to "each and every witness called to testify for the Government." (Doc. No. 179). Pursuant to that Order, the Government produced certain materials, including tapes, transcripts, agent reports and notes, and after review, the Court ordered some of these submissions (but not all) be disclosed to Lyons (Doc. Nos. 186 and 190). After oral argument and a review of the documents, the District Court concluded that there were *Brady* and *Giglio* violations and granted Lyons' motion for a new trial as to Counts 1 and 6 (Doc. No. 208).

The Government appealed, and argued that the records were not *Brady* or *Giglio* material, or, alternatively, that the records were not material to Lyons' convictions or prejudicial to him. The Eleventh Circuit agreed that the disclosed records were, indeed, *Brady* material, but, citing to the "overwhelming" evidence provided by the thirty witnesses, held that there was no reasonable probability that the jury's verdict would have been different if this material had been disclosed to Lyons prior to trial. *Id.* at 9-11. The Eleventh Circuit reversed the order granting a new trial and remanded for appropriate proceedings consistent with the jury verdict and the opinion (Doc. No. 259).

Following the issuance of the appellate opinion and mandate, Lyons filed an Amended Motion for Disclosure to Defendant or for *In Camera* Review by the Court of Government Interview Notes and Reports of all Government Witnesses (Doc. No. 258). The Government filed a Response (Doc. No. 261), and a Motion to Rule on Forfeitures and to Set Date for Sentencing (Doc. No. 262). Following a hearing, the District Court deferred ruling on the Government's motion, granted Lyons' motion and ordered the Government to produce for *in camera* review by the United States Magistrate Judge, the following:

(a) any and all investigative, debriefing, and written trial preparation materials for Gerald Crayton, Larry Frazier, Eric Berger, Curtis Wyns, Darren Johnson, Altrevious Byrom, Dwight Bouey, Stephanie Godfrey, Brian Watkins, Marcus Randolph, Louis Pimentel, William Collins, Frederick Ward, Gregory King, F. Franz Jean-Mary, Curtis Murray, Roderick Smith, Michael Tukes, Robert Britton, Cory Wilson, Carlos Ridley, Odell Williams, Torey Clements, Daniel Beauvis, Antonio Holley, Baxter Watts, Lorenzo Taylor, Roosevelt Thomas, Laverne Harvey, David Sejour, Karlis Fenelus, Jonathan Holley, and Jeanty Jacques. Such materials shall include, but are not limited to notes, reports, intra-and inter-office correspondence or memoranda, inter-agency memoranda, documents, summaries, tape recordings, CD Roms, transcripts, electronic communications, agreements and use immunity orders, etc., made by any Government agency, including but not limited to the Drug Enforcement Administration, U.S. Customs, Secret Service, Federal Bureau of Investigation, U.S. Marshals Service, Bureau of Alcohol, Tobacco, and Firearms, the U.S. Attorney's Office, and any other state, federal, or local authority acting on the Government's behalf, such as but not limited to, the Orange County Sheriff's Office, Orlando Police Department, Metropolitan Bureau of Investigation, Cocoa Police Department, Organized Crime Drug Enforcement Task Force, Florida Department of Law Enforcement, High Intensity Drug Trafficking Area Money Laundering Task Force, and Brevard County Sheriff's Department.

(b) any and all statements by the witnesses in paragraph (a) as defined in the *Jencks Act,* 18 U.S.C. § 3500 (e) (1), (2), & (3) and Federal Rule of Criminal Procedure 26.2(f)(1), (2), & (3).

(c) any and all interviews or meetings with any witnesses or potential witnesses against Lyons conducted by or in the presence of Special Agent Frank Chisari including but not limited to, any and all notes, records, intra- and inter-office correspondence or memoranda, inter-agency memoranda, documents, summaries, tape recordings, CD Roms, transcripts, electronic correspondence, agreements and use immunity orders, etc.

(d) any and all attempted or completed drug transactions with Lyons [footnote omitted] leading up to and encompassing any planning sessions or debriefings, including but not limited to any notes, records, intra- and inter-office correspondence or memoranda, inter-agency memoranda, documents, summaries, tape recordings, CD Roms, transcripts, videotapes, electronic correspondence, etc.

(Doc. No. 272).

Pursuant to this Order, the Government produced a submission, consisting of 494 pages of documents (Bates stamped) and a general index, all filed under seal. Upon review of the submission,

the undersigned noted that "the relatively slim production, considered in light of the history of this case, creates a concern that not all responsive material has been produced and appropriately identified." (Doc. No. S-20). The Court identified particular examples to support its conclusion that the submission was incomplete. The Court then ordered the Government to supplement its response by submitting *ex parte and under seal* a statement, sworn or verified by an appropriate and authorized representative of the Government, including the following:

1. Certification that the response (as supplemented) completely and accurately complies with the requirements of the April 17, 2003 Order (Doc. No. 272).

2. Identification and indexing of any previously submitted documents (whether under seal or otherwise) relied on by the Government as part of its compliance with the Order.

3. A narrative specifically detailing the steps taken to assure that all agencies, agents, officers and attorneys involved in the case have made appropriate searches and produced all materials required by the Order.

4. As to any document or other item the omission of which raises doubts about the completeness of the response, an explanation of the absence or non existence of the item. *Id.*

The Court made it clear that it expected to review a complete record and noted:

> While the Court has listed several examples of the omissions apparent from the documents themselves, the list is not exhaustive. The Court expects the Government to review the Order requiring production and to review each and every document produced to date in order to verify that appropriate steps have been taken to locate *all* referenced and related items and to explain the absence of any that have not been submitted as well as the reasons for any lack of reports that would be expected in the usual course of interviewing witnesses and preparing them to testify at trial.

(Doc. No. S-20).

The Government requested and received access to documents it previously submitted under seal, and requests for extensions of time to comply with the Court's Order were granted. On August 11, 2003, the Government submitted its Ex Parte Response to Court Order of June 6, 2003 Submitted Under Seal ("the Supplemented Response"). The Supplemented Response included additional materials, Bates stamped (attached to Doc. No. S-31); a general index, witness by witness (attached to Doc. No. S-30); a Summary of Actions Taken in Response to Court's Order (Doc. No. S-31); and thirty-two Declarations of Assistant United States Attorneys, law enforcement agents of various state and federal agencies and related personnel, regarding the sufficiency of the Government's Supplemented Response (Doc. Nos. 32 to 63).

The Government represents that the record is now as complete as the Government cares to make it.[4]

## *II. Legal Standards*

The presiding District Judge has directed review of the Supplemented Response materials in order to determine whether any additional *Brady*, *Giglio*, or Jencks Act violations are apparent.

Put simply, *Brady* "requires the prosecution to turn over to the defense any exculpatory evidence in its possession or control." *United States v. Jordan,* 316 F. 3d 1215, 1226, n. 15 (11th Cir. 2003). As the District Court has noted, *Brady* and its progeny require disclosure of favorable evidence for mitigation, exculpation, guilt, or punishment. *Brady,* 375 U.S. at 87; *United States v. Agurs,* 427 U.S. 97, 103 (1976); *Kennedy v. Herring,* 54 F. 3d 678, 682 (11th Cir. 1995); *Calley v. Callaway,* 519 F. 2d 184, 221 (5th Cir. 1975 (*en banc*)). To establish a *Brady* violation, it must be

[4]In its Declarations, the Government notes that it has "excluded" from its submission various materials, including prosecution memoranda, and correspondence and memoranda which the Government deems "administrative" in nature. The Court discusses these omissions herein.

shown: 1) that the Government possessed evidence favorable to the defendant; 2) that the defendant did not possess the evidence and could not obtain it with any reasonable diligence; 3) that the prosecution suppressed the favorable evidence; and 4) that had the evidence been disclosed to the defendant, there is a reasonable probability that the outcome would have been different. *United States v. Lyons, supra* at 8, *citing United States v. Woodruff,* 296 F. 3d 1041 (11th Cir. 2002).

*Giglio* "requires the prosecution to turn over to the defense evidence in its possession or control which would impeach the credibility of an important prosecution witness." *United States v. Jordan,* 316 F. 3d at 1226, n. 16.

The Jencks Act (18 U.S.C. § 3500) mandates that a statement by a prospective prosecution witness to an investigative agent or the grand jury be provided to the defense after the witness has testified on direct examination. *See* Rule 26.2, Federal Rules of Criminal Procedure; *Jordan,* 316 F. 3d at 1251. A "statement" is defined as "1) a written statement that the witness makes and signs, or otherwise adopts or approves; 2) a substantially verbatim, contemporaneously recorded recital of the witness's oral statement that is contained in any recording or any transcription of a recording; or 3) the witness's statement to a grand jury, however taken or recorded, or a transcription of such a statement." Fed. R. Crim. Pro. 26.2(f). *See also* 18 U.S.C. § 3500(e).

The Government's obligations under *Brady* are not limited to the prosecutor's own knowledge– *Brady* includes evidence "known only to police investigators and not to the prosecutor." *Kyles v. Whitely,* 514 U.S. 419, 438 (1995) (prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf, including the police). Moreover, a prosecutor has a duty to refrain from knowingly using perjured testimony and must correct what he subsequently

learns is false testimony. *Giglio*, 405 U.S. at 153-4; *see also United States v. Bailey*, 123 F. 3d 1381, 1397 (11th Cir. 1997).

The Court applies the above standards in the context of Lyon's conviction for conspiracy to possess cocaine with intent to distribute it. The Court notes that Lyons was not charged in Count 1 with any actual or specific possession of cocaine. Unlike the substantive offense, to support a conviction under the federal drug conspiracy statute, the Government must only prove "1) an agreement between the defendant and one or more persons; 2) the object of which is to do either an unlawful act or a lawful act by an unlawful means." *United States v. Mercer*, 165 F. 3d 1331, 1333 (11th Cir. 1999).[5] Neither actual possession nor actual distribution is a necessary element of the crime. *United States v. Diaz*, 190 F. 3d 1247, 1253 (11th Cir. 1999).

The crucial existence of a conspiratorial agreement distinguishes this charge from a simple buyer-seller transaction. As stated by the Eleventh Circuit: "Where the buyer's purpose is merely to buy and the seller's purpose is merely to sell, and no prior or contemporaneous understanding exists between the two beyond the sales agreement, no conspiracy has been shown." *Mercer*, 165 F. 3d at 1335 (internal citations omitted). Although proof of an agreement is necessary, no formal agreement need be shown. Rather, the Government may demonstrate by circumstantial evidence or inferences from conduct of alleged participants "a meeting of the minds to commit an unlawful act." *United States v. Toler*, 144 F. 3d 1423, 1426 (11th Cir. 1998).

Because it is often easier to prove conspiracy than the substantive offense, a conspiracy count has long been noted as "the darling of the modern prosecutor's nursery." *Harrison v. United States*,

---

[5]This is the same David Mercer whose testimony in the present case was the subject of the appellate opinion in *Lyons*.

7 F. 2d 259, 263 (2d. Cir. 1925). Although conspiracy is construed broadly by the courts, in a typical drug conspiracy case involving numerous buyers and sellers, it is not enough to simply establish that all involved shared a common goal of profit from drug sales. *See United States v. Glinton,* 154 F. 3d 1245, 1251 (11th Cir. 1998). In *Glinton*, the Eleventh Circuit Court found that in order to constitute a single conspiracy, there must be a single enterprise which sets up a common goal connecting each defendant. *Id.* While it is not necessary to show that all of the conspirators were involved in each transaction and knew each other, the conspirators "must have been aware of each other and must do something in furtherance of some single, illegal enterprise." *Glinton*, 154 F. 3d. at 1251, n. 5 (internal citations omitted.)

The government's disclosure obligations must also be considered with respect to issues relevant to sentencing and forfeiture. *See, generally, United States v. Gomez,* 164 F. 3d 1354 (11th Cir. 1999) (addressing the appropriateness of including drug sales outside the conspiracy charge in calculating a base offense level), and *United States v. Simpson,* 228 F. 3d 1294, 1301 (11th Cir. 2000) (improper to attribute 144 grams of cocaine to defendant based on vague and uncertain testimony.)

### *III. Analysis of the Government's Submission*

The analysis of the Supplemented Response necessarily includes consideration of what the Government produced and, importantly, what the Government did not produce. The Court will therefore address the completeness of the record, including a general analysis of the production as a whole, and conclude this portion of the Report and Recommendation with a witness by witness analysis of items produced.

**A. Completeness of the Record**

As explained above, the Court's impression of the Government's initial production was that it was incomplete. This impression has not changed after review of the Supplemented Response. As set forth above, the Court's Orders regarding production were quite comprehensive, and yet whole categories of information are missing with no explanation or with inadequate or inaccurate explanation.

*Trial Preparation and Rule 35 Materials:* Item (1) (a) of the April 17, 2003 Order called for investigative, debriefing and trial preparation materials from all state, federal and local agencies. Despite the broad scope of this Order, the Government has not submitted *any* prosecution memoranda regarding Lyons or any of the felon witnesses, intra or inter-office memoranda or correspondence regarding recommendations for Rule 35 reductions for substantial assistance for the felon witnesses; or any correspondence from witnesses to prosecutors, or between defense attorneys (who represented witnesses in this case) and the prosecutors in this case.

The Government acknowledges that prosecution memoranda exist for Lyons and in the cases of the witnesses named in the Court's Order. According to the Declaration of the First Assistant United States Attorney (Doc. No. S-31), the Government has excluded memoranda "prepared to seek approval of the initial prosecution, and those prepared to seek authorization to apply to the Court for sentence reductions based on cooperation." As grounds, the Government states that "these memoranda explicitly discuss the prosecutorial decision-making of the Department of Justice, and explicitly discuss policies and procedures which the United States Attorney seeks to protect." *Id.*

According to the United States Attorney's Manual, Chapter 9-27.400, a motion filed by the Government pursuant to Rule 35(b) is to be interpreted as a substantial assistance pleading, and

"authority to approve such pleadings is limited to the United States Attorney, the Chief Assistant United States Attorney, and supervisory criminal Assistant United States Attorneys, or a committee including at least one of these individuals." Review of the public docket sheet records of the felon witnesses reveals that, to date, at least twenty one of the witnesses that testified against Lyons were rewarded with Rule 35 motions filed by the Government on their behalf. The grounds set forth in the various motions for Rule 35 reduction all rely on the fact that the witnesses testified against Lyons. While the motions (for the most part) post-date the trial, and thus, could not have been submitted to the defense for use at trial, the existence of any contemporaneous promise or deal between the felon witnesses and the Government would certainly be *Giglio* and *Brady* material and, to the extent these pre-trial "understandings" were set forth in in-house memoranda seeking approval of sentence reduction motions, those documents are relevant to this Court's inquiry. It is fair, therefore, to conclude that the Government is withholding *from the Court* a significant amount of relevant information, based on a vague assertion of privilege.

The Government cites no basis for asserting an ad-hoc prosecutorial decision-making privilege in this context. First, it is important to note that the disclosure was ordered by the Court and was to be made solely *to the Court.*[6] The Government cites no authority for its novel position that it has a privilege to disregard a Court Order requiring *in camera* production. There is no suggestion that the Court lacked authority to order the production of these items, and, indeed, any such suggestion would be contrary to the case law. To the extent the Department of Justice is attempting to assert a

---

[6]As the April 17, 2003 Order makes clear, this Court is to review the documents *in camera* and make findings in a Report and Recommendation, filed under seal. The Government then has 10 days to file, also under seal, any objections to the findings. After reviewing the Report and any objections to it, the District Court will take the matter under consideration and issue an Order. If the Court determines that there are *Brady* or *Giglio* violations, the Court will allow the Government to suggest appropriate redactions for disclosure of the materials.

deliberative process privilege, such a privilege is not absolute, and its application with respect to a particular piece of withheld information is for the Court to decide. *See United States v. Reynolds,* 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953) (holding that the Court itself must determine whether the circumstances are appropriate for the claim of privilege; control over the evidence in a case cannot be left to the discretion of executive officers); *In re Sealed Case,* 121 F. 3d 729, 737 (D. C. Cir. 1997) (deliberative process privilege is a qualified one and can be overcome by a sufficient showing of need); *Grand Central Partnership, Inc. v. Cuomo,* 166 F. 3d 473, 482 (2d Cir. 1999) (purely factual material contained in deliberative memoranda is not protected). Moreover, the privilege is routinely denied when there is reason to believe the documents sought may shed light on government misconduct. *In re: Sealed Case,* 121 F. 3d at 738. While this Court is not prepared to find that documents that are not before the Court necessarily indicate government misconduct occurred, in the present context of an *in camera* review in the wake of a finding that *Brady* material was withheld by the Government – an unreviewable presumption of propriety with respect to the Government's withholding of the information is not warranted. The Court therefore **FINDS** that the Government has failed to comply with the terms of the Court's April 17, 2003 Order in failing to produce prosecution memoranda and other material regarding the Rule 35 motions.

*Correspondence:* In its Order requiring supplementation, the Court noted the unexplained lack of any produced correspondence.[7] In response, the Government has submitted various Declarations which attempt to explain the absence of any correspondence by stating, in essence, that agents and prosecutors do not correspond with witnesses as a general rule. Thus, apparently the

[7]Certain correspondence was produced at trial. The Court assumes the Government's failure to include any additional correspondence between witnesses and the Government is the Government's way of saying that no additional correspondence exists.

Government would have this Court believe that it was able to arrange for the interview, testimony, and subsequent filing of Rule 35 motions for the felon witnesses, all without receiving or sending a single piece of paper. The Court rejects such a conclusion.

First, the record itself belies the Government's position. Indeed, certain witnesses testified as to correspondence sent to the prosecutor regarding their testimony. *See, e.g.,* Testimony of Larry Frazier at pp. 281-88; Testimony of Brian Watkins at pp. 610-635 and defense exhibits 4a-4f; Testimony of Curtis Murray at pp. 858-866 and defense exhibits 5b-c.[8] It simply defies common sense to believe that in the course of a lengthy, complicated investigation, involving numerous agencies, only these few letters were generated or received by anybody.

As it is not unusual for prisoners to send letters to the Government, as here, in the hopes of bettering their own situation,[9] and in a case such as this where most of the witnesses are themselves represented by attorneys with respect to their own situation, the Court would expect substantial correspondence. The lack of same or adequate explanation for its absence is troubling.

The Court is also troubled by the Declaration of DEA Special Agent Frank Chisari, case agent as to investigation and prosecution of Lyons on the drug charges. In his statement, Chisari declares, under penalty of perjury, that: "Throughout this investigation I did not engage in written correspondence with any government witness, whether incarcerated or not. I have received information from witnesses. To the extent that this information was pertinent to this particular case, I incorporated it in my case file." (Doc. No. S-36). While stated in comprehensive terms, this avowal fails to identify any particular information or documents. To the extent this statement was intended

---

[8] Of course, this correspondence was apparently properly delivered to the defense pre-trial by the Government.

[9] Indeed, the Court itself has received several unauthorized letters from prisoners.

to suggest that no such materials exist, it is inaccurate. The Court takes notice of the public records contained in *United States v. Frantz Ceau Jean Mary,* Case No. 6:96-cr-72-Orl-19JGG, pending in this division. Specifically, Doc. No. 287 in that case is a paper filed by Jean-Mary's defense attorney, attaching a November 15, 2002 letter from the attorney to Frank Chisari. In pertinent part, the letter reads as follows:

> Re: Frantz Jean Mary
> . . .
> *United States v. Antonio Lyons*
>
> Dear Frank:
>
> This letter is to follow up on my previous notes to both you and AUSA Hinshelwood with regard to the above-captioned trial. It is my understanding that six witnesses who also testified against Nino have already been released. . . . Under these circumstances, Mr. Jean-Mary would also appreciate your assistance in assuring that he is not deported to Haiti.
>
> Sincerely,
> Neil M. Schuster

This document was filed in response to the Government's Motion for Reduction in Sentence for Mr. Jean Mary, filed *after* the Government filed its Supplemented Response herein. The letter, which post-dates the trial but pre-dates the Court's April 17, 2003 Order, is pertinent witness correspondence and, as such, should have been produced to the Court. Moreover, the letter references "previous notes" to both Chisari and the prosecutor. None of those notes have been produced to the Court. In view of the foregoing, Chisari's declaration that he did not "engage in correspondence" is misleading.[10]

---

[10]The Court recognizes that the letter in question post-dates the date of the trial and, as such, the Government may take the position that it did not review its files for any later materials, but limited its production solely to pre-trial documents. The April 17, 2003 Order was not specific as to the date range of items that should be produced. While the focus of the Court is necessarily on what the Government knew at or prior to trial, to the extent post-trial documents bear on these issues, they should have been produced. Moreover, Lyons has yet to be sentenced, and forfeiture issues remain pending. The Government's obligations under *Brady* are therefore continuing.

*Jencks material:* In view of the avowed practice, as set forth in the Declarations of the law enforcement agents, of *not* recording witness statements, the Court accepts the dearth of signed, written or transcribed statements of the felon witnesses in the Supplemented Response, with the exception of the absence of any grand jury testimony. Such testimony is a statement, within the meaning of Jencks,[11] and, if any of the felon witnesses testified to the grand jury, their statements should have been produced to this Court.

The Government's Supplemented Response is silent with respect to grand jury testimony, and none is listed in response to the Court's April 17, 2003 Order. A review of the public record of cases in this division, however, shows that several of the felon witnesses were produced for testimony before an Orlando grand jury, during the relevant time period and testified against Lyons. *See, e.g., United States v. King*, Case No. 6:00-cr-54-Orl-19 at Doc. No. 153, Exhibit A; *United States v. Wyns*, Case No.: 6:95-cr-218-Orl-22 at Doc. No. 154; *United States v. William Bernard Collins*, Case No. 6:96-cr-143-Orl-22 at Doc. No. 172. In view of the lack of any physical evidence regarding the drug charges and the absence of any testimony offered at trial by law enforcement agents on these counts, in order to support indictment of Lyons, it is reasonable to assume that the prosecutor must have presented to the grand jury the only evidence the Government had on this issue, namely, the testimony of the felon witnesses and their close associates.[12]

*Notes of meetings or interviews with Special Agent Frank Chisari:* The production includes some formal reports and what appear to be some handwritten notes by Special Agent Chisari. By

[11]*See* standards of law discussion above.

[12]Information from the felon witnesses could be presented to the grand jury by way of hearsay summaries from investigating agents. However, the near absence of agent notes from witness interviews suggests that there was no reliable method for presenting such information to the grand jury.

contrast, almost every felon witness testified that he had spoken with Agent Chisari at least once prior to his testimony. Moreover, there is reason to believe that Chisari received correspondence from the witnesses or their attorneys, as shown above, and he personally appeared and testified on behalf of a felon witness, in support of a Rule 35 motion. *See* Doc. No. 777 in *United States v. Larry Frazier,* 6:93-cr-71-Orl-19DAB.

For his part, Chisari declares that he "normally takes rough notes which may be used as the basis for a final DEA Report of Investigation." Declaration of Frank Chisari (Doc. No. S-36). In the same statement, however, Chisari notes that he "participated in several interviews in the preparation of this case for prosecution in which [he] did not take notes or prepare reports or make a recording." In view of Chisari's complete involvement as the principal agent on the case[13] it is curious that such a sparse paper trail was generated and produced.

*Documentation of any attempted or completed drug transactions with Lyons [Item (1) (d) of the April 17, 2003 Order]:* The Government has formally responded that "no such materials are known to exist." (Doc. No. S-30 at 5), and numerous declarants have stated that they are unaware of any such attempted or completed drug transactions. Apparently, the issue was raised in a Customs Report 009 at p. 3, submitted to the Court as one of the attachments to Doc. No. S-13. Therein, Agent Daigle stated that "attempts by local, state and federal agencies to initiate investigations against LYONS failed because of the inability of confidential sources to gain direct access to LYONS." The Government has produced a Declaration of Agent Daigle, in which he avers that he is unaware of any specific instance in which any agency had attempted to make a drug purchase from Lyons, and that

[13] *United States v. Frazier, supra,* Doc. No. 777, at 12-13.

"[t]his statement referred to the alleged role of Antonio Lyons in conducting transactions in larger amounts, which insulated him from normal investigative methods." (Doc. No. S-38 at 5)[14]. *See also* the Declaration of Melbourne Police Detective Tony Gaskew (Doc. No. S-42). Gaskew "clarifies" that a report which stated that an undercover meeting was arranged "with the subject of this investigation, Antonio Lyons" was in error, and the true purpose of the meeting was an undercover investigation regarding Mark Alston. He does not explain how this error occurred.

*Other Interview and Meeting Notes:* Virtually every law enforcement agent, regardless of agency (state, local or federal), declared that it is the normal practice for the lead agent, interviewer or investigator to take notes during meetings and interviews. *See* Declarations of Bentivegna (Doc. No. S-33); Bianchi (Doc. No. S-34); Chisari (Doc. No. S-36); Daigle (Doc. No. S-38); Englert (Doc. No. S-41); Gaskew (Doc. No. S-42); Gilbert (Doc. No. S-44); Gruden (Doc. No. S-45); Hawkins (Doc. No. S-46); Hill (Doc. No. S-47); Jones (Doc. No. S-50); Madeam (Doc. No. S-52); Lawrence (Doc. No. S-53); Ramey (Doc. No. S-59); Schultz (Doc. No. S-61) and Sparkman (Doc. No. S-63). Despite an acknowledgment across the board as to the normal practice of law enforcement personnel, and in view of the breadth of this investigation and the large number of interviews that took place, the paucity of notes produced is striking.

The Government does not directly address this issue, but the declarations indicate several possible scenarios. 1) No other notes were, in fact, taken. "Frequently, a given interview or meeting will result in no notes or reports being prepared or retained, particularly when the subject is trivial or unrelated to an existing investigation, matter, or case." (Declaration of Richard Sparkman, Doc. No.

---

[14]The assertion that Lyons dealt only in large quantities is inconsistent with the testimony of several of the government's witnesses who described small transactions.

S-63). 2) The notes were taken but later destroyed. *See* Declaration of John Shultz, noting that Special Agent Charles Riley, a principal investigator in this matter for the FDLE, "destroyed various notes relating to the Lyons investigation immediately after preparation of the formal reports." 3) The notes were taken and were not destroyed, but the Government cannot find them. *See* Declaration of Bruce Hinshelwood, prosecutor in this case, "I believe that the materials now submitted to the Court are the only materials responsive to the Court's order, *within the limitations of agency database and document retrieval systems.*" (Doc. No. S-48, at 9 [emphasis added]). 4) The notes were taken, currently exist and are readily available, but the Government has chosen not to produce them. Although the Court's April Order unambiguously ordered the Government to produce "any and all investigative materials" for the named witnesses, according to the cryptic comment in AUSA Carolyn Adams' Declaration:

> After reviewing the materials obtained from the law enforcement agencies and the files of the United States Attorney's Office, we have included in our submission to the Court the following materials which were in existence prior to the trial of this case:
>
> A. Any investigative, debriefing, and written materials, whether reports or handwritten notes, *created or used in the preparation of the trial* in the instant case, related to the witnesses named in the Court's Order.
>
> B. Where there was a reference in a previous report, or a witness testified about, a previous interview, we have attempted to locate a report of that interview. Where we located a report we have included the report in our submission *if it would be included under (A) above, if there was mention of the present defendant, or if the report arguably impeaches the witness's testimony.* Where we could not locate any report of interview, we have attempted to explain the absence.

Doc. No. S-32, at 7-8 [emphasis added]. The italicized qualifier appears to indicate that rather than producing all notes of an interview, the Government reviewed the notes and only produced them if, in the Government's opinion, they were created or used in the preparation of trial, if Lyons was mentioned in the notes by name, or if the report "arguably impeaches" the witness' testimony.

The difficulty in this approach, of course, is that, by the Government's own admission, it purposely does *not* review all interview notes of a witness in preparation for trial.[15] Thus, interview notes in existence, but not reviewed by the prosecutor, were certainly used in the *investigation,* but were not necessarily used or created "in the preparation of the trial." In the context of *Brady* however, the prosecutor is charged with the collective knowledge of the investigation and cannot avoid his responsibility to disclose *Brady* material by simply refusing to review notes of the investigation.

Moreover, the absence of a mention of Lyons in the interview notes does not necessarily mean the notes are not relevant. For example, as is the case with one felon witness here, the witness testified at trial that he debriefed with an agent about Lyons after the witness was arrested. Investigative notes of that interview showed no mention of Lyons at all. The failure of the notes to reflect what the witness swore was discussed is certainly pertinent.

Lastly, the Government's acknowledgment that it would produce documents to the Court if they "arguably impeached" a witness' testimony is problematic. At this stage of the proceedings, it is for the Court, and not the Government, to determine whether a document arguably impeaches testimony. The Court's April 17, 2003 Order contained no such qualifiers. All notes of interviews of the felon witnesses should have been produced without exception or qualification.

In contrast to law enforcement agents' practice, apparently prosecutors interviewing potential witnesses generally do not take notes. *See* Declarations of present or former prosecutors Adams (Doc. No. S-32); Cream (Doc. No. S-37); Gibbs (Doc. No. S-43); Hinshelwood (Doc. No. S-48); Perez

[15]See Ms. Adams' Declaration at p. 7, where she notes that "It is not customary or even practical to request all agency reports of any and all interviews ever conducted of a particular witness."

(Doc. No. S-57); and Perry (Doc. No. S-58).[16] Nor, apparently, do they generate any trial preparation materials.

In fact, in one Declaration, the Court is informed that the prosecutor in question:

1. interviewed many of the felon witnesses, but "has no way to create" a list of who was interviewed;

2. believes that she probably did not take notes of these numerous interviews;

3. has a practice of making typewritten outlines for use in direct examination from discussions with case agents, review of their reports and the prosecutor's own notes, "if any," but cannot recall if outlines were made for this case, and

4. any notes or outlines that may have existed must have been purged when she cleaned out her file "after the verdict." Declaration of Anita Cream, Doc. No. S-37.

Ms. Cream rejects the idea of note taking, declaring that she "generally rel[ies] upon [her] own memory supplemented by agent's notes," and yet she cannot recall which of the witnesses she interviewed, or if she made notes of the interviews, or if she made outlines for the witnesses she examined, or what she did with any notes or outlines she may have made.[17]

In summary, the Court finds that the Government has failed to produce extant prosecution memoranda, Rule 35 memoranda, and correspondence. The Government has not produced grand jury testimony; nor has the Government offered any explanation for its failure to do so. Trial preparation

---

[16]This practice is not without exception. *See* Declaration of former prosecutor Paul Byron (Doc. No. S-35).

[17]Equally odd, even though Ms. Cream avers that she is the prosecutor in charge of handling the forfeiture phase of the trial, which has yet to occur, she states that she "purged" her file after the verdict. The Court finds the practice of destroying trial preparation materials in a criminal matter immediately after the verdict to be unwise, to say the least. Nonetheless, it is not the role of this Court to comment on how the Government prosecutes its cases, in general. At issue is only whether the absence of any notes or trial preparation materials constitutes evidence of any misconduct.

materials from the prosecuting attorneys, such as notes from witness interviews, are conspicuously absent, and, while the Government has produced some papers from various investigators and the lead agent, Frank Chisari, the Court finds it likely that additional documents exist or existed, but were not produced. The record is, therefore, incomplete.

**B. Witness by Witness Review**

The Court approached the Supplemented Response by reviewing the following materials for each listed witness: 1) the trial testimony of the witness, as well as trial exhibits; 2) the documents identified by the Government as responsive to that witness; and 3) the docket sheets and related pleadings, transcripts or papers of the individual criminal cases of the felon witnesses, which the Government did not produce, but which the Court obtained from the Court records. An analysis of each witness follows.

***1. Gerald Crayton***

Crayton testified[18] that he was taken into federal custody on July 23, 1990 (T. 229). Crayton testified that, in 1989, he had bought two kilos of powder and sold them to Lyons (T. 231-32). According to Crayton, he purchased the drugs for $16,000 a kilo and sold it to Lyons for $18,000. After selling the drugs, Crayton stated, both Lyons and Crayton "cooked it up" from powder into crack (T. 232-35).

On cross examination, Crayton acknowledged that he had been giving information to law enforcement agencies about drug trafficking since the 1980's (T. 236-37). In 1993, he began giving assistance to the United States Attorney's Office regarding drug cases (T. 242). Crayton testified that

[18]References to trial proceedings are identified T. ___.

he did not give the Government any information about Lyons in 1993 (T. 243) because nobody asked him about Lyons (T. 250). When asked how it was that Crayton came to be testifying for the Government in this case, he stated that he "came back from prison on a writ and . . . was interviewed by some of the drug agents." (T. 248). He was contacted by Frank[19] in October or November 2000.

The documents presented by the Government regarding Crayton are not inconsistent with respect to the purported drug transactions. However, two of the documents (Bates stamped 00012 and 00495) arguably fall under *Giglio*. Bates 0007 through 0012 are handwritten notes of an interview of Crayton by Frank Chisari and FDLE agent Chuck Riley, conducted "in the company of AUSA Bruce Hinshelwood" at his office on November 14, 2000 (Bates 0004 and 0007).

The notes state:

"Giglio material (false statements)

(W)[20] was debriefed by SA Ramey about a corrupt police officer from Cocoa PD - statements were false - Need ROI[21] which reflects these statements."
(Bates 00012).

Bates 00495 appears to be that ROI.[22] This document establishes that Crayton previously made, and repeated to the agents, allegations about a corrupt police officer. The agents then gave Crayton a polygraph examination. After the agents discussed the results of the polygraph with Crayton, he admitted lying about the police officer.

---

[19]Presumably, this is Special Agent Frank Chisari, as the witness pointed him out as sitting at the government's table (T. 248).

[20]Assumed to be abbreviation for "witness".

[21]Report of Investigation

[22]Agent Ramey's Declaration (S-59) is consistent with Crayton's statements that he did not implicate Lyons in drug dealing when Crayton started his cooperation with law enforcement.

There can be no real question that these documents are, as acknowledged, *Giglio* material. Certainly, evidence that Crayton had previously lied to the Government and wrongfully accused someone of illegal activity would be proper impeachment of the credibility of Crayton. As the information was contained in handwritten notes of Agent Chisari (and, indeed, was omitted from the formal ROI ), there would be no way for Lyons' counsel otherwise to obtain it. The Court finds that the documents are *Giglio* materials and should have been produced to the Defendant.

***2. Larry Frazier***

Mr. Frazier testified that he has been in federal custody since July 2, 1993 (T. 260). Frazier testified that he did not purchase any drugs directly from Lyons, but, in 1987, Lyons "introduced me to this guy [Clyde] off the cruise ship and I was dealing through him." (T. 262). During the time period 1989 through 1993, Frazier stated that he bought from Clyde every Monday and Friday, so he made "maybe 15 or 20 or 30" purchases during that time (T. 265). On cross examination, Frazier said that in 1993, upon his arrest, he entered into an agreement with the Government to cooperate. As part of his plea agreement, Frazier testified that he debriefed with agent Mike Hill in 1993 and told Hill about Lyons (T. 274-75). Motions for substantial assistance were filed by the Government on Frazier's behalf (T. 276 and Defendant's Trial Exhibit 1-A). Frazier also told of a Rule 11 proffer with AUSA Byron (T. 277-78). Frazier testified, in essence, that he hopes the Government will file a Rule 35 motion with respect to his testimony in *Lyons*, but he knows the Government does not have to (T. 280-82). The Government's production with respect to this witness is notable for several reasons.

Bates 00015 through 00018 is an ROI by Chisari, referencing a October 16, 2001 interview with Frazier. According to this document, Frazier was introduced to Claude[23] in 1987, began purchasing cocaine from him, and "their relationship continued for approximately 6 months." Bates 00017. In 1989, Frazier was arrested on a violation of parole violation charge and was sentenced to 30 months in prison. During sometime in 1991 through July 1993, Frazier resumed purchases of Cocaine HCL "from Andre Martinez" who had been residing in Miami until Frazier was released from prison. *Id.* The ROI is based on and consistent with the handwritten notes at Bates 00019-00022.[24]

These documents should have been produced as *Brady/Giglio* material in that the indictment covers only conduct alleged to have begun in 1989. According to the statements in this interview, the introduction was made in 1987 and the relationship with Clyde/Claude lasted "for approximately six months." Thus, even if the introduction was made the very last day of 1987, six months later would be 1988. Moreover, contrary to his trial testimony, the statements in this report indicate that Frazier was arrested and jailed in 1989 and, upon being released, resumed purchases from a previous supplier, Martinez. Thus, if the statements in this document are correct, any purchases from Clyde/Claude are outside the scope of the indictment.

The non-disclosure of this ROI is particularly problematic because the issue of whether this was activity in the period covered by the indictment was raised by defense counsel to the Court at the time, and the prosecutor affirmatively stated: "[B]ased on my interview with Mr. Frazier is Nino

---

[23]The transcript refers to him as "Clyde."

[24]Although the ROI was completed December 4, 2001, the handwritten notes were taken October 16, 2001, before the trial.

Lyons introduced him in '87 as a source of supply. He continued purchasing from '89 into–the time period '89 to '93 time period from Clyde, who would be a co-conspirator and he's responsible for his actions during that period." (T. 263-4). Moreover, defense counsel formally requested Jencks, *Brady* and *Giglio* material at the conclusion of Frazier's direct examination, and the prosecutor told the Court:

> For the record, your Honor, as far as I'm concerned, he can have a standing request. I've throughly gone over all of the documents and records and reports that I have, and I know– and I've also questioned the witnesses as to whether or not any Jencks material, which was a particular concern of mine, was in existence. I'm assured there is none. All that I know of has been turned over. (T. 269-70).

The documents are troubling in another aspect, as well. Bates 00019 (handwritten notes, apparently from Chisari) includes a notation "Needs Rule 35 ASAP Do [sic] to get out May 2002." Bates 00023 is a witness interview sheet which notes that Frazier "would like to stay in Lake County." Not surprisingly, less than three weeks after the Lyons verdict, the Government filed a Motion for Reduction in Sentence in *United States v. Frazier,* 6:93-cr-71-Orl-19DAB, Doc. No. 767, citing Frazier's testimony in the Lyons case and the fact that he "brought forward at least three other witnesses." In a motion for further reduction, filed by Frazier, Frazier's counsel noted that "it is anticipated that the government's agents will appear and testify about the extent and significance" of his cooperation (Doc. No. 772).

Indeed, at the hearing, Frazier had no greater friend than the Government. In response to the Court's inquiry regarding Frazier's testimony in the Lyons case, Mr. Hinshelwood, the lead prosecutor in the Lyons case, told Judge Fawsett that: "Mr. Frazier testified that he had engaged in some cocaine transactions directly with Mr. Lyons back in the early 1990s." (*Frazier,* Doc. No. 777, at 3). As summarized above and as set forth in the transcript of the Lyons case, Frazier did no such

thing. Frazier never testified to *any* transaction directly with Lyons. In fact, he testified to exactly the opposite – stating that he did *not* directly purchase any drugs from Lyons (T. 262).

Agent Chisari also testified on Frazier's behalf at the hearing. Pointedly, Chisari was asked about a conversation with Frazier *before* Frazier testified in the Lyons trial. Because Frazier was due to be released shortly if he finished a drug program, and testifying in Lyons would prevent him from doing so, Chisari testified that he told Frazier "he was crazy to testify under the circumstances." (Doc. No. 777 at 19.) The following exchange then took place:

Mr. Hernandez [Frazier's attorney] : Did you assure him the Government would bring him back for a Rule 35 if he was --

The Witness [Chisari]: I told him I'd be there personally.

*Id.*

Later, Mr. Hernandez questioned further:

> Of course. I'm not suggesting that the agent told him, promised him something was going to happen, but you did say you were going to ask the Court to reduce his sentence?"
>
> The Witness: I told him I would use every possible means I could. I mean if he was going to testify in this thing, that I will use every possible means I could as an agent, to be present at any type of reduction, to help him out during any type of post-release type situation with probation and parole.

*Id.* at 20-21.

The production is notable for what was not produced, as well. Although Frazier testified that he briefed Agent Hill in 1993 about Lyons, no notes or reports have been produced from Hill. Further, Frazier is not mentioned in the Declaration submitted by Agent Hill (Doc. No. S-47). And, although Frazier mentioned that he made a Rule 11 proffer with AUSA Paul Byron, Byron declares

that he destroyed the notes taken of the proffer, but that he does not recall Frazier mentioning anything about Lyons. (Doc. No. S-35.)

***3. Eric Berger***

Mr. Berger was a non-prisoner witness who testified for the Government with respect to trademark issues. The Government produced no documents with respect to Mr. Berger, and it is assumed that his inclusion among the list of felons and their associates was in error.

***4. Curtis Wyns***

Wyns testified that he came into federal custody on February 1, 1996 (T. 362). At trial, Wyns stated that he had four drug transactions with Lyons between 1992 and 1995 and provided details (T. 364 *et seq.*). Wyns testified as to his plea agreement and his numerous debriefings with various agents. According to Wyns: "They [the Government] asked me about Mr. Lyons when I first come in. I refused to talk about Mr. Lyons. After they asked me about Mr. Lyons, if you got your dates right, I signed that. They never asked me about Mr. Lyons again until '99. When they asked me about Mr. Lyons in '99, I told them about Mr. Lyons in'99, after I signed that agreement." (T. 391). In return for his testimony, Wyns stated that he hoped the Government would put in a Rule 35 motion, "but I haven't been promised nothing." (T. 394).

According to the trial exhibits, the Government represented in a prior Rule 35 motion filed on Wyns' behalf that Wyns "has been interviewed on at least fifty separate occasions, either in person or via telephone, by agents of the FBI or BCSO." (Defendant's Exhibit 2A). The Government produced fewer than a dozen reports on Mr. Wyns. Of the reports produced, the Court noted no apparent inconsistencies with the trial testimony.

A review of the case file of *United States v. Wyns,* Case No. 6:95cr218-Orl-22JGG, however, includes a Motion to Compel Rule 35 in Accordance with the Local Rules, filed by Wyns, *pro se*, on September 18, 2002 (Doc. No. 154 in that case). In that paper, Wyns notes, with supporting documentation, that he was writed out of prison on March 3, 2000 to testify before the Grand Jury against Lyons. His testimony before the Grand Jury (if it occurred) is Jencks material, but has not been provided to the Court. Moreover, in a September 13, 2002 letter to the United States Attorney, attached as an exhibit to his motion, Wyns states that he testified in the grand jury proceedings against Lyons, and "in exchange for the defendant's cooperation, the United States Attorney's Office (A.U.S.A. Hinshelwood) agreed to recommend a reduced sentence for the defendant in his sentence." Wyns also notes that he testified against Lyons in November 2001, "as agreed."

These documents post-date the trial, but, to the extent they indicate an agreement formed prior to the Lyons trial, they contradict Wyns' testimony that "I haven't been promised nothing."

***5. Darren Johnson***

Johnson testified that he has been in federal custody since 1996 and he "never had drug dealings" with Lyons (T. 408-09). He did state that he had two conversations with Lyons about the price of cocaine in Miami (T. 410-12). The documents tendered by the Government in the Supplemented Response are inconsistent in that Johnson told agents that he had many conversations with Lyons, as opposed to just the two he testified to later. Bates 00060-63. This information is not exculpatory and, while it could technically be impeachment evidence, the Court finds it unlikely that, in these circumstances, the defense would impeach a witness with this particular prior statement.

To date, the Government has not filed any motion to recognize Mr. Johnson's assistance with respect to the Lyons case. Mr. Johnson did receive a 125 month reduction in his sentence pursuant

to an earlier motion by the Government under Rule 5K1.1, based on assistance in other cases. That motion was filed and ruled on at the same time (May 2000) that Mr. Johnson was first being debriefed by agents regarding his contacts with Lyons.

***6. Altrevious Byrom***

Byrom came into federal custody in 1997 (T. 437). At trial, Byrom testified to four or five drug transactions with Lyons, including 1) buying a "couple of ounces" at the store in Cocoa; 2) two purchases with Mr. Watkins, with each buying a kilo at Magic Mall; 3) buying half a kilo at a basketball tournament. (T. 440-44). Byrom testified that he conversed in general with Lyons regarding what would happen if he told law enforcement about Lyons' drug dealing, but Lyons never threatened him or his family. (T. 449-52).

The documents produced by the Government in the Supplemented Response contradict the trial testimony in several aspects. Bates 00075-78 is a July 14, 1999 Investigative Report filed by FDLE agent Charles Riley. Although Byrom testified that Brian Watkins purchased two kilos from Lyons, the report states that "Watkins approached Lyons with the intent of purchasing cocaine" but "Lyons refused to discuss cocaine sales activity with Watkins because of Watkins' previous criminal record." Bates 00076. This document is consistent with the FBI report at Bates 00086, which is also impeachment evidence as to Byrom.

Moreover, Byrom testified at trial that no threats were issued by Lyons; but he stated to the agent, in Bates 00086, that Lyons threatened to have Byrom and his family murdered if Byrom were to ever identify Lyons as one of Byrom's suppliers. Also, although Byrom testified that he bought a couple of ounces of cocaine from Lyons, in the report he states that Lyons told him that Byrom

would have to purchase a full kilogram of cocaine before Lyons would deal with him, in that Lyons would not deal in a quantity less than a kilogram. Bates 00080.

The significance of this discrepancy is difficult to assess. It is noteworthy that the government's explanation for disregarding file references to failed attempted undercover drug transactions with Lyons is that he only dealt in large quantities, whereas if this witness and others are to be believed, Lyons dealt in small and large drug quantities.

***6. Dwight Bouey***

At the time of the trial, Mr. Bouey was a state prisoner, in custody since 1999 (T. 508-9). He testified to three separate drug transactions involving Lyons (T. 510-18). On cross examination, Bouey testified that he had no idea how he came to be involved in the Lyons case (T. 523). According to Bouey, he thought he was going to be attending a state court proceeding "until the U.S. Government showed up." *Id.* Bouey stated that he had not spoken with anyone representing the United States with regard to this case until he was brought to the federal courthouse Monday (November 5) of the week he testified (T. 524-25).

The Supplemented Response consists of only two documents, which appear to be handwritten notes from a November 7, 2001 interview with Bouey (Bates 00089-91). The substance of the interview notes themselves are consistent with the testimony, but the date of the interview raises questions. According to the official transcript, Bouey testified on November 7, 2001, the very day reflected by the interview notes (Doc. No. 245), whereas Bouey testified he was interviewed two days earlier.

The discrepancy between Bouey's account and the notes as to when he was interviewed is unexplained. There also is nothing in the government's submission that provides any indication as

to how or why Bouey was brought over from state prison to testify without ever having been interviewed about his relationship with Lyons. Considering the logistics, cost and security concerns inherent in transporting felons from the state system, it is inconceivable that Bouey would have been randomly brought to federal court without the prosecution having some documented basis for believing he would be willing and able to offer reliable and material testimony.

*7. Stephanie Godfrey*

Ms. Godfrey was not a prisoner but a friend of felon witness David Mercer (T. 577). Godfrey testified that she accompanied Mercer on car trips from St. Petersburg to Orlando three times, in a rental car. On two of the trips, Godfrey saw Mercer meet with Lyons in a parking lot (T. 578-87). On cross-examination, Godfrey stated that she never rented any cars for Mercer in her name. (T. 588).

In an Investigative Report and a ROI (Bates 00092-95 and 00096-97), Godfrey advised Agents Riley and Chisari that she did, in fact, lease vehicles for Mercer's use on other out of town trips. As such, these documents are inconsistent with Godfrey's testimony and, if made available, could have been used to impeach her credibility.

*8. Brian Watkins*

Mr. Watkins was a federal prisoner since 1997 (T. 598). Watkins testified as to two drug transactions with Lyons–both at the Magic Mall with Altrevious Byrom, for two kilos at $20,000 a kilo. (T. 601-4). Watkins testified that he had no understandings with the Government to try to get his own sentence reduced (T. 606).

The documents produced to the Court by the Government are inconsistent in part with the testimony. The ROI Customs Report (Bates 00528-71) gives different details regarding the amount

of the purchase ($21,000 for the second purchase) and the location of the buy. The inconsistencies are not major, however.

The handwritten notes produced (Bates 00109) refer to ongoing cooperation with another agent, Tim Jones, and suggest that the Government obtain "copies of Jones 6's on Watkins debriefing." The Government's submission, however, includes no copies of Jones' notes or ROI's. No explanation is offered as to why these documents were not produced. Moreover, the Declaration of Special Agent Clarence Lawrence (Doc. No. S-53) reveals that he interviewed Watkins, along with DEA Special Agent Lenora Morris. Lawrence notes that he did not prepare notes of that interview, as Agent Morris was the lead agent in that investigation. Agent Morris' declaration does not mention Watkins (Doc. No. S-56), however, and no notes or ROI's were produced regarding that interview.

***9. Marcus Randolph***

At the time of trial, Mr. Randolph had been in federal custody almost five years (T. 640). Randolph testified to three drug transactions with Lyons in 1995 (T. 641-54). He stated that he had briefed the Government three times – with Frank Chisari, Mr. Norr, and Ms. Morris, as well as his Rule 11 proffer (T. 661-68). He testified that he spoke to Morris about when the Government was going to catch Damon Carwiser, "the reason I am here now." (T. 665-6). On cross-examination, Randolph testified that he hoped the Government would file a Rule 35 motion, but the Government made no promise to do so (T. 669-72).

The documents produced by the Government consist of handwritten notes dated October 10, 2001 and October 22, 2001 (Bates 00119, 00120, 00114-18). While the content of the notes are consistent with the substance of the testimony, at the top of Bates 00114, a handwritten notation appears: "Need Rule 35 for: Carwiser? - Quncy - Watkins-Lyons." On the bottom of Bates 00120,

a notation "Talk to Bruce" appears. The Court interprets these remarks as the Government acknowledging the appropriateness of a Rule 35 motion to be filed on Randolph's behalf. Indeed, the Government did file a Rule 35 motion, on July 24, 2003 (*United States v. Randolph,* Case No. 6:97-cr-11; Docket No. 82). While the notation itself does not necessarily mean that a Rule 35 reduction was promised to the witness, it certainly is indicative of a discussion that cooperation would likely lead to a motion being filed.

The production does not include any notes purporting to be from Morris, Norr, or any Rule 11 proffer. In her Declaration, Agent Morris states that she did not take notes of Randolph's conversation but provided Randolph's name to Frank Chisari. (Doc. No. S-56).

***10. Louis Pimentel***

Mr. Pimentel had been in federal custody since August 1, 1996 (T. 674). He testified at length about several drug transactions he had with Lyons (T. 679-701). Pimentel candidly admitted at trial that he started cooperating with the Government in order to get his sentence reduced (T. 744).

The documents produced by the Government with respect to this witness are not inconsistent with the testimony, although they refer to other notes and reports that have not been produced.[25] The public record contains items of interest with respect to Mr. Pimentel. In *United States v. Pmentel,* Case No. 6:96-cr-126-22, on January 8, 2001, Pimentel filed a Petition for Rehearing (Doc. No. 131 in that case), seeking, in essence, his own substantial assistance motion for downward departure, based on his cooperation in other cases. The Government responded to the motion on January 22, 2001, that "the defendant's cooperation does not rise to the level of substantial assistance." This,

[25]For example, Bates 00121 *et seq.* refers to a traffic ticket (00128), cooperation with DEA agent Dave Crenshaw and the MBI (00121), and the need to obtain hotel records (00126).

perhaps, explains the reference on the witness interview sheet, as follows: "want to talk to Bruce." (Bates 00143). Shortly after testifying in this case, the Government filed a Rule 35 motion on Pimentel's behalf (Doc. No. 135, *Pimentel* case).

Although there is no marked inconsistency apparent, the record appears incomplete with respect to this witness. The handwritten notes contain areas where an obvious post-it note covered some of the writing. Moreover, as noted in the footnote, certain items are referenced (such as an MBI investigation and subsequent arrest), but no documents pertaining to those events have been produced.

***11. William Collins***

Mr. Collins has been a federal prisoner since September 1996 (T. 749). He testified that he met Lyons in 1988 (T. 750), and he last purchased drugs from Laverne Harvey. He also testified that he did not have direct dealings with Lyons concerning drugs, nor did he ever see a drug transaction take place in his presence (T. 754).

Compared to the other witnesses, the Government produced a plethora of information regarding Collins. The documents are inconsistent with the testimony regarding the amounts of drugs bought from Harvey and the prices (*see* Bates 00144; Bates 00148-49; Bates 00152-54 and Bates 00163). But, in large measure, the information Collins gave to the authorities was worse for Lyons than Collins' testimony at trial.

The public record reveals that Collins was released on a writ to testify before a Grand Jury, with respect to Lyons. *United States v. William Bernard Collins,* Case No. 6:96-cr-143-22; Docket No. 172. The Government did not produce his Grand Jury testimony to the Court. Moreover, in a Motion for Specific Performance filed by Collins in his case on April 21, 2003, he states that in 2000, in connection with being interviewed for the Lyons case, AUSA Hinshelwood reassured Collins that

he would "definately [sic] receive a Rule 35(b) for his Continuing Assistance." *Id.* This promise was allegedly made in the presence of Chisari and FDLE Agent Riley. The Government filed no response to that motion (*Collins*, Doc. No. 173). The Court then ordered the Government to file a response to Collins' motion by May 30, 2003. *Id.* Curiously, on May 21, 2003, Collins filed a Motion to Withdraw his motion, stating that he would give the Government "the opportunity to complete there [sic] agreement." *Id.*; Doc. No. 174. On June 11, 2003, the Government filed a motion for reduction, noting Collins' testimony in Lyons "contributed to the guilty verdict." (Doc. No. 176). Even though Collins had already received two other sentence reductions, the Court granted an additional departure, at the Government's urging (Doc. No. 178). The fact and circumstances of this modification of Collins' sentence are peculiar.

Considering the relatively minor role Collins' testimony had at trial – after all, Collins did not testify to any direct dealings with Lyons, nor did any occur in his presence, and the total amount of drugs Collins says he purchased from Harvey was less than a kilo – the Court finds it odd that the Government would file an additional Rule 35 motion for Collins, especially considering that the Government did not file Rule 35 motions for some other witnesses, whose testimony was far more direct and damaging to Lyons. The Court also notes the Government's failure to dispute Collins' assertion that he had an agreement with Hinshelwood in *2000*, prior to his testimony in Lyons, that he would receive additional reduction for cooperating with the Lyons investigation. The Rule 35 motion was not filed until after Collins' motion for specific performance (making this allegation) was withdrawn.

***12. Frederick Ward***

Mr. Ward has been in custody since October 1998 (T. 759-60). Ward testified that he bought 18 ounces of powder cocaine at least every two weeks from Lyons, from January 1997 until September 1998, and then sold it to others (T. 763-71). On cross examination, Ward noted that he was on house arrest from July 1996 until July 1998 (T. 773). He stated that he told the state court judge that he was doing undercover work with Lt. Bobby Mutter of the Titusville Police Department (T. 775-76). Ward testified that he was hopeful for a Rule 35 motion (T. 780).

The documents produced in the Supplemented Response are markedly inconsistent with the testimony. In an ROI of Ward's May 1999 proffer interview, which was attended by DEA agents, Ward's public defender and AUSA John Gibbs, Ward stated that "he stopped selling drugs from July 1996 to July 1998 because he was on house arrest." Bates 00582-83. Moreover, Ward identified three sources of supply for the cocaine he purchased from 1992 to 1996, and Lyons is not mentioned as one of the three sources. *Id.* Ward stated that he bought cocaine from Odell Williams every two weeks in July 1998, until his arrest in October. No mention of Lyons is made in the proffer. This document is *Brady/Giglio* material, containing exculpatory evidence that contradicts Ward's testimony. No explanation is offered as to why it was not produced to the Defendant, or why the Government allowed the witness to testify in substantial contradiction to this proffer. The materiality of the breach is self-evident. The Court notes that the Eleventh Circuit cited this testimony as part of the "overwhelming evidence in support of Lyons' convictions."

The other notable document appears to be handwritten notes from Agent Chisari taken October 16, 2001 at the Lake County Jail. The notes state that the witness "has already received 1st Rule 35 – 2 levels" and "Ward has only the Lyons case for next reduction." Bates 00164. Ward told Chisari

that he "wants to be held over until Rule 35 is completed." *Id.* Indeed, on February 7, 2002, the Government filed a Motion for Reduction in Sentence for Mr. Ward, based on his "significant contribution to the conviction of Antonino Lyons." *United States v. Ward,* 6:98-cr-258-Orl-19KRS, Doc. No. 35. The Government should have disclosed what is at least arguably a pre-arranged deal regarding Ward's testimony.[26]

The Court also notes that additional materials referenced at trial or in the documents are missing. For example, the ROI notes that a DEA6 was completed, but it was not produced. In his Declaration, Chisari states that in fact, no DEA 6 was prepared. Doc. No. S-36. No information was presented with respect to the Titusville Police Department and Detective/Lt. Mutter, and no additional notes or drafts were presented with respect to other people present at the proffer and interview.

***13. Gregory King***

Mr. King has been a federal prisoner since April 2000 (T. 784). He testified at trial that he bought cocaine from Lyons on three separate occasions in 1998 and 1999 (T. 785-90). The first transaction was for ¼ kilo, the second was for ½ kilo and the third was a full kilo. *Id.* King stated that he cooperated with the government at the outset (T. 792-94). According to King, he told the Government about "everybody I ever dealt with" including Lyons (T. 794). In return for his testimony, King stated he expected "nothing at all" to happen, and he is not expecting any Rule 35 motion (T. 802-3).

The documents produced by the Government tell a different story. Bates 00169 appears to be handwritten notes of uncertain date and authorship. At the top of the document appears: "Need Rule

[26]The Court notes that Ward's prior proffer regarding Williams as the source of his supply was used by agent Jones in a search warrant application (Case 6:00-3042-01) and Ward was instrumental, according to the Government, in getting Williams convicted. *See* 6:98-cr-258, Docket No. 29 – the Government's first motion to recognize substantial assistance.

35 Before Being Released" (double underline omitted). While notes and a ROI from Chisari (dated August 2 and September 6, 2001 respectively) are fairly consistent with the testimony, Bates 00586 is an ROI of the Proffer Statement given by King on May 4, 2000. At the Proffer, which was held at the United States Attorney's Office and attended (according to the Report)[27] by AUSA Hinshelwood, Agent Jones and King's public defender, King stated that he knew Lyons and talked to him several times about buying cocaine "but that he never did." Bates 00588. King also stated that he traveled to Miami once a week between May 1998 and October 1999 in order to buy 2-3 kilos of powder cocaine a trip. Bates 00589. Obviously, these statements are *Brady/Giglio* in nature.

Even more troubling, the public record reveals that King filed a Motion on June 3, 2002 "requesting the status of defendant's promised Rule 35 motion." *United States v. King,* Case No. 6:00cr54-Orl-19C, Docket No. 150. In the motion, King states that he has cooperated with the Government and has not received the Rule 35 motion promised to him. Attached to the motion is a letter dated March 14, 2001 from King's attorney, Thomas Dale, to AUSA Hinshelwood asking about the "promised downward departure motion for Mr. King." This correspondence was not produced to the Court by the Government. In a separate motion, King contends that he had a verbal agreement with Hinshelwood and Chisari regarding testifying in *Lyons.* (*King,* Doc. No. 153). In a response filed June 10, 2002, the Government denies that it made any such promise and states that it will evaluate King's assistance "following final disposition of U.S. v. Lyons." (*King,* Doc. No. 151). Two weeks later, the Government filed its Motion for Reduction of Sentence (Doc. No. 155), citing, among other things, the testimony in *Lyons.* The motion also refers to Mr. King's attempted undercover

[27] In his Declaration, Hinshelwood asserts that he left shortly after the beginning of the Proffer. Doc. No. S-48.

purchases after his arrest. This arguably contradicts his trial testimony in this case that "I was never asked to do any of that." (T. 794)

***14. Franz Jean-Mary***

Mr. Jean-Mary had been in federal custody since 1996 (T. 807). He testified that he began selling drugs to Defendant in 1994, when he sold 10 kilos to Lyons (T. 811-15). He stated that every two to three weeks from mid-1994 until May 1996, he sold 10 kilos of cocaine to Lyons (T. 815-821). Jean-Mary, who testified with the aid of a Creole interpreter, stated that he hoped for a sentence reduction, but he wasn't promised anything. (T. 834).

The Government submitted a total of two documents on this witness. One (Bates 00180) consists of a page and a half of handwritten notes (presumably those of Chisari) showing an interview date of October 30, 2001. The other is an undated witness interview sheet (Bates 00182) which appears to be in the same handwriting. While these notes do not reflect inconsistencies with the testimony, they are sparse documentation indeed with respect to a witness who allegedly supplied approximately 520 kilos of cocaine to the Defendant in exchange for approximately eight million dollars.

This is especially true considering, as stated above, that there is a history of correspondence between counsel for the witness and the agent. *See* discussion regarding the Government's failure to turn over relevant correspondence contained in *United States v. Frantz Ceau Jean Mary,* Case No. 6: 96-cr-72-Orl-19JGG, above. Clearly, some discussion was going on with respect to the terms of the cooperation, in view of the witness' prior cooperation and prior Rule 35 reduction.

***15. Curtis Murray***

Mr. Murray came into federal custody in April 2000. (T. 841). He testified that he bought a half a kilo of powder cocaine from Defendant in 1999 (T. 845).

The Government produced only two documents with respect to this witness, Bates 00183, a witness interview sheet dated October 30, 2001 and Bates 00184-85, handwritten notes of the same date. Bates 00184-5 does not mention Lyons at all. Bates 00183 gives details of the buy consistent with the testimony and indicates: "Threats made by Lyons: No."

The public record reveals that the Government filed a Motion for reduction of sentence based on Murray's testimony in *Lyons*. *United States v. Murray,* Case No. 6:00-cr-54-Orl-19JGG, Doc. No. 143. Interestingly, in granting the March 21, 2002 motion, the Court found that Murray testified against Lyons "at risk to himself and after receiving harassment." (*Id.,* Doc. No. 149). The basis for this observation is unclear since there was no mention of threats or harassment in Murray's single documented interview or in his testimony.

***16. Roderick Smith***

Mr. Smith testified that he has been in federal custody since February 16, 1999 (T. 871). Smith testified to two drug deals with Lyons (T. 873). The first was in early 1998, when the witness bought two kilos of powder cocaine (T. 877-78) and the second was for two kilos in mid-1998 (T. 880). Smith testified that he was transported from Talledaga, where he was incarcerated, down to Lake County Correctional facility, and did not know the reason for the transport until after he arrived (T. 888-89). While at Lake County, Smith talked to Frank Chisari (T. 894) and that was the first time he discussed Lyons with any federal agent or prosecuting attorney (T. 895). Later, Smith claimed that when he was arrested, he told his arresting agents in the MBI about Lyons (T. 898-99).

The Government produced only a witness interview sheet (Bates 00192) indicating an interview on October 10, 2001; and handwritten notes (Bates 00186) dated October 22. No formal ROI or other report was produced. Both documents are consistent with the witness' testimony. The October 22 notes contain the notation:

> Received - Rule 35 2000
> [ Lyons case only thing pending] additional Rule 35
> Was kicked out of drug program because of writ was supposed to get 18 months for drug program and half way house
> Needs Rule 35 reduction to time served

The public record confirms that Smith was, indeed, rewarded with a prompt motion for reduction in sentence. *United States v. Smith,* Case No. 6:99-cr-21-Orl-22JGG, Doc. No. 65.

The Supplemented Response also contains the Affidavit/Prosecution Summary of the MBI (state agency) (Bates 00591-605). Although Smith testified that he briefed the MBI on Lyons, no mention of Lyons is contained in this detailed document, which includes Smith's discussion of his source of supply.

***17. Michael Tukes***

Mr. Tukes came into federal custody on July 21, 1999 (T. 908). Three months prior to being arrested, Tukes bought 18 ounces of cocaine from Lyons, according to his testimony (T. 910-14). On cross examination, Tukes testified that he spoke with Agent Hawkins, Agent Chisari and his prosecutor (Matt Perry) and that he expected to get time off for testifying against Lyons. (T. 919-25).

In the Government's Supplemented Response, as above, only a witness interview sheet (Bates 00195) and a page and a quarter of handwritten notes (Bates 00193-94) were produced. Considering that Tukes testified that he spoke with Agent Hawkins, Chisari and his prosecutor, the Court would expect additional documents to exist. While Chisari prepared only the rough notes produced (Doc.

No. S-36) and Perry remembers nothing about interviewing Tukes (Doc. No. S-58), in Declaration, Agent Hawkins acknowledged that he interviewed Tukes, and he took notes and prepared a report of the interview and provided copies to the United States Attorney's Office (Doc. No. S-46). Those documents, however, are not included in the Government's submission.

Tukes received his expected Rule 35 motion, based in part on his testimony against Lyons, on January 16, 2002. *United States v. Tukes,* Case No. 6:99-cr-157-Orl18A, Doc. No. 63.

***18. Robert Britton***

Mr. Britton has been in federal custody since January 2001 (T. 977). At trial, Britton testified that he bought drugs from Lyons on three occasions (T. 980-88). Cross examination concentrated on Britton's lengthy criminal history.

The Government produced three documents. The first (Bates 00606-13) appears to be notes from a meeting held in the United States Attorney's Office on April 3, 2001. The second (Bates 00196-200) appears to be notes from an interview with Chisari and others. Although this note references a completed Interview 6 (thought to refer to a ROI), no formal report was produced to the Court. The third (Bates 00201) is a one page handwritten note with no date. While the notes indicate certain inconsistencies (namely regarding the place of the transactions and their order), the inconsistencies are minor and do not appear to amount to *Brady* violations. Unlike many of the other felon witnesses, Britton described his relationship with Lyons in his first documented meeting with federal officials and not just in connection with trial preparation in this case.

Although Britton testified that he expected the Government to file a Rule 35 motion (T. 1006), to date, none has been filed.

***19. Cory Wilson***

Mr. Wilson came into federal custody on April 28, 1997 (T. 1010). Wilson testified to two drug transactions in 1997 with Lyons (T. 1011-18). Wilson stated that he briefed with Agent Lampley and Tony Gaskew prior to entering his plea but did not tell them about Lyons (T. 1026-28). He mentioned that he briefed Chisari about Lyons, however, about three months prior to trial and again right before trial (T. 1028-29). Wilson stated that he was hoping to get a sentence reduction in exchange for his testimony (T. 1031).

The Government produced handwritten notes from Chisari dated April 18, 2001, referencing an interview held with Hinshelwood at the United States Attorney's office (Bates 00202-07); a formal ROI of the April 18, 2001 interview (Bates 00208-12); and handwritten notes dated October 10, 2001 (Bates 00213). Of interest is a notation at the bottom of Bates 00213 that reads: "Note: call Roger Butcher [Wilson's attorney] wants to stay here wants to talk to him." Otherwise, the Court finds nothing notable about the documents.

The public record reveals that Wilson, too, received a Motion for Reduction in Sentence, filed on June 26, 2003 (*United States v. Wilson,* Case No. 6:97-cr-142-Orl-18JGG, Docket No. 35).

***20. Carlos Ridley***

Mr. Ridley was arrested, out on bond, and then back in federal custody beginning in January 2000 (T. 1034). Ridley testified that he had dealings with Lyons present but "I can't say that I ever had any hand to hand drug dealings with him." (T. 1036). The first transaction occurred early to mid-1999 at Wendy's, and Lyons' "acquaintance" gave Ridley an 1/8 of a kilo of cocaine powder, for $2,800 (T. 1036-40). According to Ridley, two weeks later, Ridley went to see Lyons at a friend's house and Lyons' friend gave Ridley a 1/4 kilo of cocaine for $5,200 (T. 1040-43). A third

transaction occurred at Wendy's, as well; Lyons was not present, but Lyons sent his friend to sell 1/8 of a kilo for $2,700 (T. 1043-45).

On cross examination, Ridley testified that his deadline to provide substantial assistance was December 31, 2001 (T. 1046-48). Ridley stated that he did not tell the Government about Lyons until he was approached by Frank Chisari (T. 1052-53), although he had been attempting to provide the government with substantial assistance regarding others while out on bond.

The Government produced three documents with respect to Ridley. Bates 00214-19 appears to be handwritten notes of a February 1, 2001 interview; Bates 00220-25 is the formal ROI of the interview; and 00226 is the witness interview sheet. Bates 00214 is incomplete, as the document only contains pages 1, 2, 4, 6, 8 and 10. Moreover, on page 00219, information is covered up by what appears to have been a post it note that was not removed in the copying process. The formal ROI contains information that is slightly inconsistent with the testimony. According to the document, the first purchase was for a 1/4 kilo, next was for an 1/8 and last was a 1/4. Bates 00226 describes four deals, not three, as testified. This document also recites that Ridley had previously cooperated with DEA, "giving information regarding his past drug activities." Bates 00220. The nature and substance of that previous information (including whether Lyons was mentioned) is not documented.

In addition to the missing pages and the post it note information, the documents reference that Agent Shultz of the FDLE attended the interview, but no notes or reports were produced from the FDLE with respect to Ridley. Also missing are any notes from a Rule 11 proffer. Finally, Ridley testified that he was attempting to set up drug buys for the Government. The Government did not produce any documentation regarding any such attempts.

Ridley was rewarded for his cooperation by the Government's filing of a motion for reduction in sentence, based on his testimony in *Lyons*. *United States v. Ridley,* Case No. 6:99-cr-177-Orl-22KRS. (Doc. No. 123).

***21. Odell Williams***

Mr. Williams has been in federal custody since September 2000 (T. 1074). He testified that he purchased drugs from Lyons on one occasion, in 1998 (T. 1076). On cross examination, Williams stated that he briefed Mr. Hinshelwood and agents, but (like many of the felon witnesses) did not tell them about Lyons before he entered his plea (T. 1084-6). Although no promises were made, Williams testified that he hoped to receive a sentence reduction for testifying (T. 1091).

The Government produced three documents for Williams. Bates 00227 appears to be interview notes taken by Chisari at the Lake County Jail on August 2, 2001. Bates 00231 is the formal ROI of that interview. Bates 00234 is the witness interview sheet, dated October 10, 2001. The documents are consistent with the testimony.

The public record reveals that the Government filed a motion for reduction in sentence, based on Williams' testimony in Lyons, on June 25, 2003 (*United States v. Williams,* Case No. 6:00-cr-54-Orl-19C, Doc. No. 154).

***22. Torey Clements***

Mr. Clements came into federal custody in June 1999 (T. 1101). He testified that in November 1998, he and a friend went to Lyons' clothing store on Colonial and his friend bought a ½ kilo of cocaine from Lyons (T. 1102-04). On cross examination, Clements testified that he was debriefed by the Government when he entered his plea agreement (T. 1116). He stated that he met with AUSA Julie Savell, and met "two or three times" with other Government representatives; namely AUSA

Matt Perry, Agent Willie Hawkins, and "the lady sitting right there in the middle"[28] (T. 1116-23). It also appears that another person, believed to be Frank Chisari, was present at one of the meetings (T. 1123). It appears from the answers during cross examination that Clements did not mention any involvement with Lyons during his initial cooperation with the government and only came forward when he heard about the Lyons prosecution from other inmates.

Despite meetings with four or five Government representatives, the Government produced absolutely nothing with respect to Mr. Clements. Not one note, not one report, not even the ubiquitous witness interview sheet. Although the Court previously noted its concern about the lack of any information regarding Clements, the Government failed to clarify the situation in its Supplemented Response and offers no explanation.

Although Clements mentioned that he met with AUSA Savell, the Government has produced no notes taken by Ms. Savell, nor is there a Declaration presented by Ms. Savell, explaining why no documents were produced. Clements also was interviewed by AUSA Matt Perry. In Declaration, Perry advises that he "vaguely" recalls the meeting, but it was brief and he did not take notes. (Doc. No. S-58). His recollection is that Lyons was not mentioned at that time, providing some confirmation for the inference that Clements' implication of Lyons at trial was an afterthought.

Clements stated that he talked with Agent Hawkins. In Declaration, Hawkins confirms that he did, indeed, meet with Clements *and* he prepared reports and took notes of the interview, *and provided copies of the notes and reports to the United States Attorney's Office* (Doc. No. S-46 [emphasis added]). Despite the existence of such notes and reports, and the United States Attorney's

[28]Believed to be AUSA Cream.

obvious knowledge and custody of the notes and reports, they have not been produced to the Court, and no explanation has been offered as to why they were withheld.

In addition, Clements testified that he spoke with Ms. Cream, and, apparently, Frank Chisari. AUSA Cream handled the direct examination of Clements at trial. And, as pointed out above, Ms. Cream stated in Declaration that she relies on her memory and the agent's notes for trial preparation. Yet Cream declared that she cannot recall who she interviewed and Agent Chisari produced no notes to the Court and does not mention Clements in his Declaration. Agent Hawkins declared that he took notes and reports of the interview, but the notes and reports "did not reflect mention of Lyons, since this was not my case." (Doc. No. S-46). The question therefore remains – how did the Government know to call Clements as a witness? If AUSA Cream relies on agent's notes and no agent's notes exist, how could she prepare for the examination?

The Court notes that Mr. Clements already had a Rule 35 motion pending at the time of his testimony. *United States v. Clements,* Case No. 5:99-cr-12(S1)-Oc-10A, Docket No. 187. In February 2002, the United States filed a supplemental motion, noting that Clements testified at two separate federal trials in Orlando. (*Clements,* Doc. No. 201). This motion was filed by AUSA Julie Savell. The Court finds the Government's response to the Court's Order completely unacceptable, with respect to this witness.

***23. Daniel Beauvis***

Mr. Beauvis came into federal custody in February 2001 (T. 1126). Through an interpreter, Beauvis testified that he met Lyons in the Seminole County Jail in August or September (T. 1127) and they had a conversation regarding Lyons' dealings with Mr. Jean Mary (T. 1128-32). On cross examination in broken English, Beauvis stated that other inmates were talking about testifying against

Lyons, and Beauvis approached Chisari and told him about Lyons' conversation in the Seminole County jail (T. 1137).

The Government produced Chisari's notes dated October10, 2001 (Bates 00237); the formal ROI (Bates 00235); and the witness interview sheet (Bates 00239). The documents are consistent with the testimony. Although the ROI references the presence of Agent Bianchi, in Declaration, Bianchi states that he does not recall the interview and made no notes of it. (Doc. No. S-34).

Shortly after trial, on December 6, 2001, the Government filed a motion for reduction of sentence for Mr. Beauvis (*United States v. Beauvis,* 6:01-cr-28-Orl-19KRS).

***24. Antonio Holley***

Mr. Holley came into federal custody in November 1999 (T. 1140). During trial, Holley testified that he engaged in drug transactions with Lyons "at least ten times." (T. 1142). Holley testified that he bought a total of 12¼ kilos of powder cocaine from Lyons between 1998 and 1999 (T. 1140-59). Holley also testified that Lyons asked him if he would kill one of the drug suppliers, Haitian Mike, for $20,000. (T. 1150-52). Holley testified that he was asked by Lyons, in 1998, to kill another dealer named Jesse James, and Holley was ready to do that (T. 1155).

On cross examination, Holley testified to being debriefed in 1999 after his arrest by Agent Lee Medine [*sic*] and Sergeant Fanley and stated that he told the Government about Lyons being his supplier (T. 1174-77). Holley also testified that he was a witness in the trial of *United States v. Ladoczky* and, in that trial, he mentioned Mr. Lyons in his testimony (T. 1175-77).

In marked contrast to the scarce documentation produced by the Government on most of the felon witnesses, the Government produced numerous documents with respect to Mr. Holley, including several ROI's, FDLE Investigative Reports, Chisari's handwritten notes, and Customs Reports of

Investigation. The documents themselves reference other items that should have been produced, such as the December 14, 1999 DEA 6 by Agent Lee Madeam (*see* Bates 00614) and the trial and grand jury testimony referenced in the witness interview sheet (Bates 00290). Also missing are notes or reports from the arresting agent.

Because of the vagueness of Holley's statements as to the details of the actual deals, it is difficult to say whether these documents contain *Brady* material or not. Certainly, there are some inconsistences (for example, at trial, Holley testified that he was "ready" to kill Jesse James to show his loyalty to Lyons, but in a statement to the investigators, he stated that he declined to go. Bates 00259), and the documents reveal other transactions and suppliers that may or may not be inconsistent with his testimony.

The Government did address the missing transcript of the *United States v. Ladoczky* case, and a review of the public record shows that the transcript has since been filed. Contrary to his testimony in *Lyons*, Holley did not discuss Lyons in his testimony in that case. *See United States v. Ladoczky,* Case No. 6:00-cr-49-Orl-19KRS, Doc. No. 102 and 103. He did, however, testify that he was interviewed by Agent Madeam in November 1999 and December 1999 *and he was not truthful in his interview. Id.,* Doc. No. 103 at 124-128, and 168. Thus, on June 14, 2000, the Government had the sworn testimony of Holley that he had been untruthful in his initial interviews. This is *Giglio* material, which was unavailable to the defense as, at the time, the testimony had not been transcribed.[29] Interestingly, not only did the Government not inform the defense that Holley had previously lied in his DEA interviews, but, as noted above, the Government failed to produce to this

[29]According to the docket sheet, Holley's testimony was filed in August and September 2003.

Court the evidence of those lies – the notes or reports of Agent Madeam's early interviews. Considering that Holley testified in *Lyons* that he briefed Madeam on Lyons after his arrest, these reports are relevant (regardless of whether they contain mention of Lyons) and should have been produced.

On September 18, 2003, the Government filed a motion to reduce Mr. Holley's sentence, based, in part, on his testimony in *Lyons*. *United States v. Holley,* 6:99-cr-202-Orl-19JGG, Doc. No. 47. That motion was granted in part.

***25. Baxter Watts***

Mr. Watts was arrested in December 1998, was allowed out on bond, and then returned to federal custody in May 1999 (T. 1230). At trial, Watts testified to purchasing a half of a kilo of cocaine which was delivered by Lyons and to having a conversation about drugs with Lyons (T. 1232-35). On cross examination, Watts said that he debriefed with Agents Joe Gallagher and Will Englert (T. 1242), in addition to talking to Frank Chisari and AUSA Hinshelwood (T. 1244-45).

The Government produced a lone, undated, unidentified piece of paper, containing a very basic summary of Watts' testimony. (Bates 00291). There are no other investigative materials whatsoever produced in the Supplemented Response, no notes or formal reports, no Rule 11 proffer reports, and no adequate explanation for their absence. Chisari's Declaration notes his normal practice of note-taking, and no exception is claimed with respect to Mr. Watts (Doc. No. S-36). Agent Englert states in Declaration that he did, in fact, interview Watts, and he prepared an intelligence report and provided a copy to the United States Attorney's Office (Doc. No. S-41). Although Watts testified that he debriefed DEA agent Gallagher, no record of that debriefing was provided, nor did the Government

provide an explanation from Agent Gallagher or the DEA as to why no notes or reports were produced.

The Government filed a motion for reduction in sentence for Mr. Watts, less than a month after his testimony in *Lyons*. *United States v. Watts,* Case No. 6:98-cr-261-Orl-18KRS, Doc. No. 87.

***26. Lorenzo Taylor***

Mr. Taylor testified that he came into federal custody in Fall 1997 (T. 1289). He testified to being involved in five drug deals with Lyons, in 1996 (T. 1290-97). On cross examination, Taylor stated that he received a phone call in October 2001 "out of the blue" from AUSA Hinshelwood, asking if he wanted to testify about Lyons (T. 1306-9).

The Government produced a one page witness interview sheet, dated October 16 (Bates 00292). While the interview sheet is internally inconsistent (listing four transactions and then five), the document is so informal that the inconsistency may well be a transcription error. The Court sees nothing in this particular document that raises a *Brady* issue.

Of greater concern, of course, is the lack of any other investigative materials. According to the Declaration of AUSA Hinshelwood, an unnamed "private citizen" contacted the prosecutor in September 2001 and advised him that Lorenzo Taylor might have pertinent information about Lyons. Hinshelwood then called Taylor (who was in federal prison at the time) and asked him about Lyons and whether he would be willing to testify. According to Hinshelwood, "I next saw Lorenzo Taylor shortly before he testified. I took no notes since the testimony he had was relatively simple to present." (Doc. No. S-48).

The Public Record shows that on December 1, 2001, the Government filed a motion for reduction in sentence for Mr. Taylor. *United States v. Taylor,* Case No. 6: 97-cr-91-Orl 22DAB, Doc. No. 302.

***27. Roosevelt Thomas***

Mr. Thomas came into federal custody in August 1999 (T. 1323, 1327). At trial, he testified to two drug deals with Lyons in 1998 (T. 1323-27). On cross examination, Thomas stated that he was debriefed by Agent Kevin McLaughlin and another agent in January 2000, and he told them all about his dealings with Lyons (T. 1328-30). He also stated that the Government was supposed to file a motion for reduction in his sentence "for what happened over there in Tampa" and he was not sure as to whether he would receive a reduction for his assistance in *Lyons* (T. 1332-33).

In the initial production, the Government submitted only the one page witness interview sheet (Bates 00293). In the Supplemented Response, however, the Government produced the ROI completed by Agent McLaughlin (Bates 00618-24).[30] According to this document, Thomas was interviewed on December 7, 1999, and "Thomas denied being involved in cocaine trafficking with Antonio Lyons, also known as 'Nino'." Bates 00622. Given the candid discussion of extensive drug dealing throughout the rest of this interview, the denial of dealings with Lyons powerfully undercuts Thomas' accusation at trial and directly contradicts his assertion that he had named Lyons from his earliest cooperation with the government.

It appears from the declaration of Chisari that the Government is taking the position that it did not know about the document prior to trial. Of course, *Brady* applies to collective knowledge, and

[30]According to Chisari, the failure to produce the document in response to the April 17, 2003 Order was due to oversight. Doc. No. S-36.

not simply the knowledge known only to the prosecutor. Considering that the document was properly indexed for Lyons and Thomas, it seems reasonable to assume that the prosecution team could readily have accessed the information, had it made any effort to check out Mr. Thomas' story, prior to putting him on the stand.

Also troubling is the status of Thomas' Rule 35 motion at the time of the trial. Thomas testified (on November 14, 2001) that the Government was supposed to file a Rule 35 motion on his behalf, relating to assistance rendered in Tampa, and it's coming up (T. 1332). The defense counsel asked: "Do you have any idea what they are going to ask for for a sentence reduction?" Thomas answered "No, I don't, sir." (T. 1333). In fact, the Government's motion for reduction of sentence had not only already been filed by the time Thomas testified, but was, in fact, *granted* prior to the testimony. *See United States v. Thomas,* Case No. 8:99-cr-128-T-24EAJ, Doc. Nos. 235, 237. Of particular interest, Thomas was present, along with his attorney, at the November 8, 2001 hearing in Tampa, and his attorney made a proffer (which the Court granted) requesting that the Court depart further than the four level reduction requested by the Government. *Thomas,* Doc. No. 237.

The Court does not have the benefit of the transcription of the Rule 35 hearing, so it is not known whether the basis of the further downward departure was Thomas' intention to testify in *Lyons*. If so, that fact should clearly have been disclosed to the defense. Even if *Lyons* was not the basis for further departure, however, the Court is troubled by the Government's failure to correct what it must have known was a false statement by Thomas. As Thomas was personally present at the Tampa hearing, he certainly knew that the motion was filed, heard and granted. As the Government filed the motion, and its representative was also present at the hearing, the Government also knew. Therefore,

the Government should not have allowed its witness to misstate the status of those proceedings; and, having done so, should have promptly corrected the false testimony.

Theoretically, the defense could have learned that Mr. Thomas had misstated the status of his sentence reduction proceedings, because the hearing is a matter of public record. However, the hearing was held November 8, 2001 – after the *Lyons* trial had already begun.[31] Pretrial preparation is just that; once trial is underway, the defense could not have reasonably continued to search the public records with respect to all of these felon witnesses to see if the Government had filed anything else.

***28. Laverne Harvey***

Mr. Harvey came into federal custody in mid-1996 (T. 1334). He testified that in 1996 he bought cocaine "about two times" from Lyons at prices he did not clearly remember. (T. 1335-36).

The Government produced numerous documents in its Supplemented Response. While some are consistent with the testimony (Bates 00294, for example), some are inconsistent, with the documents being worse for Defendant than the actual testimony (*see, e.g.,* Bates 00574-76, which states that Harvey made four to five purchases from Lyons in 1995, as opposed to the testimony of 2 purchases in 1996). The public record shows that, to date, the Government has filed no motion for reduction relating to Harvey's testimony in *Lyons,* although there is a cryptic reference to an on-going investigation, that may pertain to Lyons, in a motion filed by the Government for Harvey's benefit in 1997.

[31]Trial commenced on November 5, 2001.

***29. David Sejour***

Mr. Sejour (a/k/a Larry Wilson) came into federal custody sixteen months prior to trial (T. 1346). He testified that he came to Orlando from Miami, at the request of Jeanty Jacques, for the purpose of robbing Lyons at the Hampton Inn on June 14, 1998 (T. 1350). He denied being aware of any drug related activity in connection with what he had been asked to do (T. 1350-51). Sejour provided details of the robbery (T. 1351-75). Sejour was arrested for the robbery, tried and acquitted.

The documents produced consist of handwritten notes prepared by Chisari of an interview dated November 9, 2001 (Bates 00303). The Court notes that this was *after* trial had already commenced. No formal ROI was produced, nor was any other investigative material produced.

The public record reveals no motion for Rule 35 reduction in sentence, to date. Indeed, some eight months prior to trial, the Government filed a motion for upward departure, based in part on this witness' criminal history and use of false names.

***30. Karlis Fenelus***

Mr. Fenelus, a convicted felon who was not in custody at the time of trial, testified that he was a close friend of Jeanty Jacques a/k/a Jesse James (T. 1419, 1452). Fenelus was present during the robbery at the Hampton Inn and testified as to his version of what occurred (T. 1420-53). His version was not entirely consistent with that of Mr. Sejour.

The Government produced several documents, including investigative reports from the United States Customs Service, the FDLE and Chisari's notes and ROI of a May 11, 2000 interview with

Fenelus. (Bates 00528-56; 00321-29; 00330-42; 00314-20).[32] The documents provide additional details, and certain inconsistencies appear, but the inconsistencies are relatively minor.[33]

***31. Jonathan Holley***

Mr. Holley, on probation for a marijuana charge, testified that he was the brother of prisoner Antonio Holley (T. 1584, 1594). Holley testified to an incident where he brought a bag of money to his brother at his brother's house and saw Mr. Lyons cooking crack. (T. 1585-90).

The documents produced show a few inconsistencies (Holley testified that Antonio Holley was his brother; in the FDLE report Antonio Holley is identified as a first cousin (Bates 00403)), but were generally consistent with the testimony. Although the documents reference a diagram that was not produced by the Government, the omission does not appear to be critical.

No pertinent information appears in the public record.

***32. Jeanty Jacques a/k/a Jesse James***

Mr. Jacques came into federal custody on June 22, 1998 in Miami (T. 1602). Jacques testified at length regarding his version of events relating to the Hampton Inn robbery (T. 1604-1631). On cross examination, defense counsel attempted to impeach the witness, using a United States Customs Service Report that the Court assumes must have been tendered to defense counsel by the Government (Trial Exhibit - Defense 47d). The witness testified that during his first interview with the FBI, he told them that it was a drug deal (T. 1668). Of significance, the following exchange occurred at trial:

---

[32]Document Bates 00409-17 appears to be a duplicate of Bates 00321-29.

[33]For example, Fenelus testified that he was aware that Mr. Sejour was arrested by the police but was not aware that Sejour was prosecuted for the robbery (T. 1448-49). In the FDLE report, Fenelus stated that he "was aware that Sejour was eventually found not guilty of the robbery." (Bates 00329).

> Q. Did you ever have any discussion with any government agent about getting your sentence reduced?
> A. No.
> Q. Are you looking for a sentence reduction based on your testimony against Mr. Lyons today?
> A. Let me put it this way. I don't care if I get a sentence reduction or nothing. That man pull that gun on me, I really don't care no more. So if they plan to give me a sentence reduction or whatever, that's up to them if they're going to do that; but, no, I ain't looking for no sentence reduction.

(T. 1677)

The Government produced numerous documents with respect to this witness. Bates 00422-23 is the excerpt of the Customs Service ROI that was produced to defense counsel and used at trial. This document is significant in that, according to the Report, Jacques stated that he was unaware if Lyons was involved in drug trafficking and that he had never done any drug deals with Lyons. Other documents produced to the Court by the Government in its Supplemented Response show that Jacques presented several versions of what occurred, but it is not known whether the Government disclosed these reports to the defense team. *See* Bates 00378-80; Bates 00629-31; Bates 00370-73; Bates 00354-61. To the extent that the witness presented one version to the investigators and then changed his story, such information is possible *Brady* or *Giglio* material. The Court also notes that the documents themselves refer to many additional records which should have been produced, such as telephone records, documents from the Cocoa Police Department investigation, and notes from the numerous agents and agencies that are mentioned.

Of greater concern, however, is the appearance of prosecutorial misconduct that is revealed by a review of the records in Jacques' own criminal case. On July 25, 2000, over a year prior to the commencement of the *Lyons* trial, the Government filed a *sealed* motion to reduce his sentence pursuant to Rule 35, citing Jacques' "assistance in an ongoing investigation being conducted by the

United States Attorney's Office for the Middle District of Florida." *United States v. Jacques,* Case No. 98-6103-Cr-Seitz, Southern District of Florida, Doc. No. 67 (Sealed). The motion asks the Court to reduce Jacques' sentence but to defer consideration of the motion until the assistance was completed. Although the motion was sealed, it indicates that Jacques' attorney "agrees with the filing of this motion." District Judge Seitz reviewed the motion, and set a status conference for January 23, 2001 (*Id.,* Doc. No. 68-sealed). On that date, the Government and Jacques' counsel appeared and the Government informed the Court that cooperation is continuing, and an additional 120 days were requested and received. (*Id.,* Doc. No. 71-sealed). On May 23, 2001, at the next status conference, the Government requested a further continuance (Doc. No. 72). The Court granted the request, set a status conference for October 3, 2001 and "Ordered that *AUSA Bruce Hinshelwood* shall attend the October 3, 2001 status conference if the case in the Middle District has not been completed, so that he can further update the Court on the status of that case." *Jacques,* Doc. No. 73 [emphasis added]. The Court directed that a copy of the Order be sent to Hinshelwood. *Id.* Thus, Hinshelwood had direct notification of the May 23, 2001 Order requiring his attendance at the status conference regarding the pending Rule 35 motion for Jacques.

On October 2, 2001, Judge Seitz issued another Order, noting that the Court received "information concerning the status of the matter in the Middle District of Florida" and noting " no need for a status conference at this time." *Jacques,* Doc. No. 74. The Court reset the hearing for December 6, and directed Hinshelwood's appearance "if the case in the Middle District has not been completed." *Id.*, note copy to Hinshelwood.

On November 26, 2001, the very day the jury verdict was returned in *Lyons,* the Government served its "Final Motion to Reduce Sentence Pursuant to Rule 35(b)" in *Jacques,* citing his assistance in *Lyons. Id.* at Doc. No. 75.

The significance of the foregoing is apparent. At the time Jacques testified at trial that he was not looking for any sentence reduction, a motion for a sentence reduction *was pending*, and was expressly conditional on the continued cooperation of Jacques, and Jacques' counsel and AUSA Hinshelwood knew about it. This was not a mere promise of a reward, but the reward itself. Under such circumstances, where the prosecutor is aware of a secret deal with the witness, and the witness testifies falsely regarding that deal, it is the obligation of the prosecutor to correct that false impression. *See Giglio,* 405 U.S. at 153-154. Here, no such correction occurred.

The Court also notes that the Rule 35 motion was not produced to this Court by the Government, despite the April 17, 2003 Order calling for, among other things, the production of "agreements" with the named witnesses. As indicated above, Jacques' attorney "agreed" with the filing of the motion, and the motion itself evidences an agreement on the part of the Government to ask for a sentence reduction as long as Jacques continued to cooperate. No explanation is offered for the Government's failure to disclose this document.

**C. Other Witnesses**

Item 1(c) of the April 17, 2003 Order asked for documents regarding interviews or meetings with any witnesses or potential witnesses against Lyons conducted by Chisari. To the extent documents were produced relating to the witnesses above, they are discussed *supra*. The Government did produce a limited number of documents that do not relate to the identified witnesses.

The documents include background information about Lyons obtained from Denise McCord, (Bates 460-65; 547-50); Dwayne Thompson (Bates 00466; 00522-23); and Roderick Daniel (Bates 00473-74; 00475-77), which appear to be of limited interest. Other information was obtained from Quincy Howard (Bates 00467-71), Randall Atwell (Bates 00478-83), and Daniel Alpizar (Bates 00484). These documents do not appear to contain any information that could be construed as helpful to the defense.

Three of the items, however, are worth noting. In an interview with Amin Jones at the Lake County Jail, Jones told Chisari that "some of the guys didn't really know Nino but they made up stories." Bates 00485. This document contains some very unsavory things about Lyons, as well. To the extent this witness appears to have information which may cast doubt on the credibility of other felon witnesses, it may be *Giglio/Brady* material. The Court notes that Mr. Jones testified at the hearing held on the motion to reconsider bond (Doc. No. 216). At that time, the Court ordered the Government to produce "any notes taken by the agents or the government with respect to interviewing this witness concerning this matter in camera." (Doc. No. 216, at 90). The Government did not produce these notes in response to the Court's Order but apparently produced other notes. *See* Doc. No. 217. No explanation is offered as to why these notes were not produced previously.

The second item of interest is an Investigative Report of an interview with David Mercer's uncle, Floyd Mercer (Bates 00490-91). While this Court was not charged with the task of evaluating the testimony of witness David Mercer[34] it notes that this document does not appear to have been produced previously to the Court, in connection with the Court's review of Mercer.

[34]The District Court has already thoroughly evaluated Mercer's testimony, and the Government's failure to produce all relevant *Brady* material with respect to Mercer.

Finally, the Court notes the compact disc and report of an encounter between Dwayne Thompson and Lyons, orchestrated by the FDLE, Melbourne Police Department, and Chisari (Bates 00492-94 and Bates 00632). According to the report, the purpose of the meeting was to locate Mark Alston, but Lyons offered no assistance in that regard. The Declaration of Melbourne police detective Tony Gaskew (S-42) states that the report inaccurately identifies Lyons as the subject of the investigation. This information does not appear to be relevant one way or the other with respect to the defense, except to the possible extent it may evidence a failed attempt to inculpate Lyons through an undercover investigation.

## *IV. Findings and Recommendations*

Analysis of the significance of the Government's conduct here requires consideration of the materiality of the failures to disclose exculpatory and impeaching material. As this case now stands, the analysis of materiality and the reliability of the Government's evidence is significant as to the merits of the drug conspiracy charge as well as due process considerations and the Defendant's right to a fair trial. In addition, the Court is ultimately charged with determining the scope of Lyons' unlawful activity for purposes of sentencing and forfeiture.

As stated in a previous order, it was the intention of the Court to proceed with the review on a complete record. Unfortunately, for the reasons detailed above, the Court finds that the Government's submission is incomplete, and the limited explanations offered by the Government are inadequate. Considering that the Government has had numerous opportunities to provide a complete record, or adequate explanation regarding any omissions, its failure to do so is inexplicable.

The effect of the inadequate record is profound. While the Court can, and has, reviewed the limited documents presented, it cannot certify to the District Court that its findings are in any way

complete. The absence of whole categories of information such as grand jury testimony and proffer letters renders it virtually impossible to reassure all concerned that the Defendant received a fair trial. While the numerous missing items may well reveal nothing of interest pertinent to this case, the Government's refusal to produce the documents, despite Court orders to do so, leaves the Court with nothing but an inference that the documents are being withheld because they indicate prosecutorial misconduct or other improprieties that would embarrass the Government.[35] The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. *Smith v. Phillips*, 455 U.S. 209, 219 , 102 S.Ct. 940, 947, 71 L. Ed. 2d 78 (1982). Absent a thorough review of the complete record, the fairness of the trial cannot be fully analyzed.

The detailed analysis of the material that has been submitted as summarized herein provides a disquieting picture of the prosecution of the drug charges in this case. The grand jury returned a bare bones, yet expansive, indictment vaguely[36] charging a multi year drug conspiracy (Count 1). To prove this single, 12 year long conspiracy, the Government organized a parade of witnesses under its control, most of whom had little in common, other than serious criminal records and a willingness to testify that at some point they engaged in cocaine transactions with Lyons.

If the many drug witnesses are believed, then Lyons bought and sold substantial quantities of drugs over a period of years. Yet, it is hard to discern evidence supporting a single overarching

---

[35]Of course, as Judge Carnes recently noted in another context: "Any other litigant might be embarrassed, but in litigation the government never blushes." *United States v. Brown*, 342 F. 3d 1245,1247 (11th Cir. 2003) (concurring opinion).

[36]The trial jury acquitted Lyons as to the only specific drug related charges in the superseding indictment, Counts 3 and 4.

conspiracy as alleged in the superseding indictment.[37] Most of the transactions testified to were simple buy-sell transactions, with little or no indication of an agreement or plan that would rise to the level of a conspiracy. *See United States v. Mercer,* 165 F.3d 1331 (11th Cir. 1999) and *United States v. Toler,* 144 F.3d 1423 (11th Cir. 1998). If, as the Government urged in its closing argument, the jurors believed only one of the felon witnesses, it is even harder to find a basis for this conspiracy charge.[38]

---

[37]*See* the discussion of standards for conspiracy charges in Part II, *supra.*

[38]*See Kotteakos v. United States,* 328 U.S. 750, 766-74, 66 S.Ct. 1239, 90 L.Ed.2d 1557 (1946):

> Guilt with us remains individual and personal, even as respects conspiracies. It is not a matter of mass application. There are times when of necessity, because of the nature and scope of the particular federation, large numbers of persons taking part must be tried together or perhaps not at all, at any rate as respects some. When many conspire, they invite mass trial by their conduct. Even so, the proceedings are exceptional to our tradition and call for use of every safeguard to individualize each defendant in his relation to the mass. Wholly different is it with those who join together with only a few, though many others may be doing the same and though some of them may line up with more than one group.
> Criminal they may be, but it is not the criminality of mass conspiracy. They do not invite mass trial by their conduct. Nor does our system tolerate it. That way lies the drift toward totalitarian institutions. True, this may be inconvenient for prosecution. But our Government is not one of mere convenience or efficiency. It too has a stake, with every citizen, in his being afforded our historic individual protections, including those surrounding criminal trials. About them we dare not become careless or complacent when that fashion has become rampant over the earth.
>
> Here toleration went too far. We do not think that either Congress, when it enacted s 269, or this Court, when deciding the Berger case, intended to authorize the Government to string together, for common trial, eight or more separate and distinct crimes, conspiracies related in kind though they might be, when the only nexus among them lies in the fact that one man participated in all. Leeway there must be for such cases as the Berger situation and for others where proof may not accord with exact specifications in indictments. Otherwise criminal conspirators never could be brought to halt. But if the practice here followed were to stand, we see nothing to prevent its extension to a dozen, a score, or more conspiracies and at the same time to scores of men involved, if at all, only separately in them. The dangers for transference of guilt from one to another across the line separating conspiracies, subconsciously or otherwise, are so great that no one really can say prejudice to substantial right has not taken place. Section 269 had no purpose to go so far. The line must be drawn somewhere. Whether or not Berger marks the limit, for this sort of error and case, we are clear that it must lie somewhere between that case and this one. [Footnote omitted.]

This weakness in the government's approach to proving its case is exacerbated by the dubious credibility of the witnesses.[39] Nearly all of the felon witnesses had a penal incentive to provide testimony, satisfactory to the Government, implicating Lyons. Many of them had failed to provide such evidence in earlier opportunities to cooperate with the authorities. The Government failed to offer any specific or even general corroboration of their rendition of events.[40] The post trial submissions show that, as to many of the witnesses, their credibility was even more questionable than their circumstances and admissions indicated.

In this context, the requirements of due process and the proper functioning of the adversary system dictate that Defendant be provided with all available information needed to formulate cognizable challenges to the Government's case and to make his arguments with respect to sentencing and forfeiture issues. The degree to which the Government failed to fulfill its pretrial duties[41] and the incompleteness of its post trial submissions undercut any presumption of compliance that would ordinarily limit the kinds of information the Government is compelled to make available.

It is therefore specifically recommended as follows.

1. The Government be ordered to submit the materials identified above as missing from the government's responses (*e.g.*, prosecution memoranda, Rule 35 memoranda, additional correspondence and reports or notes as to witnesses Frazier, Watkins, Ward, Jean-Mary,

---

[39]The perils and possible pitfalls of a case built on the testimony of criminal informants, especially in the absence of corroborating evidence, has long been a topic of frequent discussion in cases and law journals. *See, e.g., United States v. Bernal-Obeso,* 989 F.2d 331, 333 (9th Cir. 1993) (citing cases) and "Symposium" beginning at 23 Cardozo Law Review 747 (2002).

[40]The Government argued that the presence of cash and guns is corroborative of Lyons' drug dealings. However, it made no showing that those items had any association with the drug deals in this case.

[41]In addition to the violations already determined with respect to Mercer, substantial questions are presented in these materials as to more than a dozen of the Government's witnesses (Frazier, Wyns, Byrom, Godfrey, Watkins, Collins, Ward, Ridley, Antonio Holley, Thomas, Harvey, and Jacques).

Tukes, Ridley, Clements, Holley, Watts and documents referenced in reports as to Pimentel and Jacques) for *in camera* review and subject to further orders of the Court.

2. All the notes, reports, memoranda and other background material produced to date be supplied to counsel for Defendant, along with this Report and Recommendation and any Order dealing with the same.[42]

3. The Defendant be allowed a period of time following receipt of these materials to seek additional material (including transcripts of proceedings in other cases) and to seek to take depositions as may be appropriate to address inconsistencies, ambiguities and gaps in the record.

4. The Defendant be allowed to file additional motions and present additional arguments in support of pending matters based on Items 2 and 3, which may include a request that the Court draw adverse inferences with respect to information missing from the Government's submissions.

Proceeding in this fashion will allow the Defendant, through his counsel, to raise concerns about the witnesses and the government's conduct in the specific context of issues to be decided in the case. The Court will then be able to address materiality and appropriate relief in an adversarial rather than an *ex parte* setting.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Respectfully recommended in Orlando, Florida on this 21st day of November, 2003.

DAVID A. BAKER
UNITED STATES MAGISTRATE JUDGE

[42]Because some of the government's submissions involve other prosecutions, the Court may wish to consider notifying the Courts involved with those Rule 35 proceedings of any ultimate findings in this proceeding.

Copies furnished to:

Presiding District Judge
United States Attorney

F I L E  C O P Y

Date Printed: 01/13/2004

Notice sent to:

Gregory W. Eisenmenger, Esq.
Eisenmenger, Berry & Peters, P.A.
The Huntington Bank Bldg., Viera
8226 N. Wickham Rd., Suite 202
Melbourne, FL 32940

6:01-cr-00134 jrm

___ Robert R. Berry, Esq.
Eisenmenger, Berry & Peters, P.A.
The Huntington Bank Bldg., Viera
8226 N. Wickham Rd., Suite 202
Melbourne, FL 32940

6:01-cr-00134 jrm

___ Ashley M. Ferrell, Esq.
Eisenmenger, Berry & Peters, P.A.
The Huntington Bank Bldg., Viera
8226 N. Wickham Rd., Suite 202
Melbourne, FL 32940

6:01-cr-00134 jrm