CLERK, U.S. DISTRICT COURT FLORIDA

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**UNITED STATES OF AMERICA**

**-vs-** **Case No. 6:01-cr-134-Orl-31DAB**

**ANTONINO EUGENE LYONS**

---

## SUPPLEMENTAL REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration without oral argument following the District Court's directive (Doc. No. 288) for a supplemental Report and Recommendation regarding documents produced on January 16, 2004, by the Government, under seal and *ex parte*.[1]

### *BACKGROUND*

The factual and procedural history of this matter is detailed in prior Orders, the Eleventh Circuit's unpublished opinion, and this Court's *In Camera Ex Parte* Report and Recommendation (Doc. No. 282). The following matters are pertinent background, for present purposes.

On July 26, 2001, Defendant Antonio Lyons was indicted on one count of conspiracy to possess and distribute cocaine base (also known as "crack") and cocaine hydrochloride ("powder cocaine") (Doc. No. 1). On August 22, 2001, the Government filed a Superseding Indictment (Doc. No. 8), asserting numerous additional charges. On October 3, 2001, the Government filed a Second Superseding Indictment (Doc. No. 37), charging the following: Count 1–conspiracy to possess crack cocaine and powder cocaine with intent to distribute; Count 2–possession of a firearm during the

[1]The parties have filed a motion to stay this action for 45 days while they continue discussion of some unspecified resolution of the case. That motion has been set for hearing by the District Judge.

300

conspiracy alleged in Count 1; Count 3–attempted possession of crack cocaine and powder cocaine with the intent to distribute; Count 4–possession of a firearm during the crime alleged in Count 3; Count 5–attempted carjacking; Count 6–carjacking; Counts 7 through 17–trafficking in counterfeit goods; and Count 18–possession of counterfeit currency with the intent to defraud. Consistent with local practice and the Discovery Order entered by the Court (Doc. No. 18), the Government and Lyons agreed to exchange all *Brady*,[2] *Giglio*,[3] and *Jencks*[4] material.

Trial was held in November 2001. As summarized by the court of appeals:

> At trial, thirty witnesses testified to Lyons' numerous drug dealings in central Florida from 1989 to 2000. One witness testified that he bought two kilograms of crack and eight kilograms of powder cocaine from Lyons every two or three weeks from mid-1994 through May 1996; one witness testified that he bought about eighteen ounces of powder from Lyons about every two weeks from January 1997 through September 1998; three witnesses testified that they bought cocaine from Lyons on four occasions; two witnesses testified that the[y] bought cocaine from Lyons on three occasions; two witnesses testified that they bought nine ounces of crack from Lyons on two different occasions; two witness[es] testified that they bought cocaine from Lyons at least ten times; one witness testified that he twice sold a kilogram of powder to Lyons; one witness testified that he sold kilograms of powder cocaine to Lyons on four different occasions. Their testimony as well as the testimony of other witnesses described how Lyons bought and sold cocaine in varying quantities and different forms (i.e., powder and crack cocaine) through this extended period.

*United States v. Lyons*, Case No. 02-13452 (unpub.) (11th Cir. Mar. 4, 2003) (Doc. No. 259). All of the witnesses who testified with respect to the drug charges were convicted felons or close associates or relatives of the convicted felons. The Government did not introduce any wiretap

---

[2] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

[3] *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972).

[4] Jencks Act, 18 U.S.C. § 3500.

evidence, tape recordings, telephone records, evidence of undercover transactions, physical evidence or testimony from investigating officers with respect to the drug charges.

At the close of the Government's case, the Court granted the Government's motion to dismiss Count 18 and granted a judgment of acquittal as to Counts 2, 5, and 17, reserving ruling on Defendant's Motion for Judgment of Acquittal as to Count 6 (Doc. Nos. 98 and 100). The jury returned a verdict of Not Guilty as to Counts 3 and 4, and Guilty as to Counts 1 (drug conspiracy), 6 (carjacking), and 7 through 16 (trafficking in counterfeit merchandise) (Doc. No. 118). Defendant filed a timely Motion for Judgment of Acquittal Notwithstanding the Verdict and a Motion for New Trial (Doc. No. 125), which the District Court denied (Doc. No. 138).

On February 27, 2002, Lyons filed a Second Motion for New Trial, based on asserted violations of *Brady* and *Giglio* with respect to the testimony of one of the felon witnesses – David Mercer (Doc. No. 144). The motion was denied (Doc. No. 155), and Lyons moved for reconsideration (Doc. No. 165). The Court granted the motion for reconsideration (Doc. No. 172) and held a hearing on April 9, 2002 (Doc. No. 174). During the hearing, Lyons filed a Motion for Production of Investigative Notes and Reports (Doc. No. 175), which sought investigative notes with regard to David Mercer and "with regard to each and every witness called to testify for the Government." *Id.* The District Court granted the motion, in part, and ordered the Government to produce the investigative notes and summaries as to David Mercer, but did not rule on Lyons' request for the Government to produce documents as to "each and every witness called to testify for the Government." (Doc. No. 179). Pursuant to that Order, the Government produced certain materials, including tapes, transcripts, agent reports and notes, and after review, the Court ordered some of these submissions (but not all) be disclosed to Lyons (Doc. Nos. 186 and 190). After oral argument and

a review of the documents, the District Court concluded that there were *Brady* and *Giglio* violations and granted Lyons' motion for a new trial as to Counts 1 and 6 (Doc. No. 208).

The Government appealed, and argued that the records were not *Brady* or *Giglio* material, or, alternatively, that the records were not material to Lyons' convictions or prejudicial to him. The Eleventh Circuit agreed that the disclosed records were, indeed, *Brady* material, but, citing to the "overwhelming" evidence provided by the thirty witnesses, held that there was no reasonable probability that the jury's verdict would have been different if this material had been disclosed to Lyons prior to trial. *Id.* at 9-11. The Eleventh Circuit reversed the order granting a new trial and remanded for appropriate proceedings consistent with the jury verdict and the opinion (Doc. No. 259).

Following the issuance of the appellate opinion and mandate, Lyons filed an Amended Motion for Disclosure to Defendant or for *In Camera* Review by the Court of Government Interview Notes and Reports of all Government Witnesses (Doc. No. 258). The Government filed a Response (Doc. No. 261), and a Motion to Rule on Forfeitures and to Set Date for Sentencing (Doc. No. 262). Following a hearing, the District Court deferred ruling on the Government's motion, granted Lyons' motion and ordered the Government to produce for *in camera* review by the United States Magistrate Judge, the following:

> (a) any and all investigative, debriefing, and written trial preparation materials for Gerald Crayton, Larry Frazier, Eric Berger, Curtis Wyns, Darren Johnson, Altrevious Byrom, Dwight Bouey, Stephanie Godfrey, Brian Watkins, Marcus Randolph, Louis Pimentel, William Collins, Frederick Ward, Gregory King, F. Franz Jean-Mary, Curtis Murray, Roderick Smith, Michael Tukes, Robert Britton, Cory Wilson, Carlos Ridley, Odell Williams, Torey Clements, Daniel Beauvis, Antonio Holley, Baxter Watts, Lorenzo Taylor, Roosevelt Thomas, Laverne Harvey, David Sejour, Karlis Fenelus, Jonathan Holley, and Jeanty Jacques. Such materials shall include, but are not limited to notes, reports, intra-and inter-office correspondence or memoranda, inter-agency memoranda, documents, summaries, tape recordings, CD Roms, transcripts, electronic communications, agreements and use immunity orders, etc., made by any Government

agency, including but not limited to the Drug Enforcement Administration, U.S. Customs, Secret Service, Federal Bureau of Investigation, U.S. Marshals Service, Bureau of Alcohol, Tobacco, and Firearms, the U.S. Attorney's Office, and any other state, federal, or local authority acting on the Government's behalf, such as but not limited to, the Orange County Sheriff's Office, Orlando Police Department, Metropolitan Bureau of Investigation, Cocoa Police Department, Organized Crime Drug Enforcement Task Force, Florida Department of Law Enforcement, High Intensity Drug Trafficking Area Money Laundering Task Force, and Brevard County Sheriff's Department.

(b) any and all statements by the witnesses in paragraph (a) as defined in the *Jencks Act,* 18 U.S.C. § 3500 (e) (1), (2), & (3) and Federal Rule of Criminal Procedure 26.2(f)(1), (2), & (3).

(c) any and all interviews or meetings with any witnesses or potential witnesses against Lyons conducted by or in the presence of Special Agent Frank Chisari including but not limited to, any and all notes, records, intra- and inter-office correspondence or memoranda, inter-agency memoranda, documents, summaries, tape recordings, CD Roms, transcripts, electronic correspondence, agreements and use immunity orders, etc.

(d) any and all attempted or completed drug transactions with Lyons [footnote omitted] leading up to and encompassing any planning sessions or debriefings, including but not limited to any notes, records, intra- and inter-office correspondence or memoranda, inter-agency memoranda, documents, summaries, tape recordings, CD Roms, transcripts, videotapes, electronic correspondence, etc.

(Doc. No. 272).

Pursuant to this Order, the Government produced a submission, consisting of 494 pages of documents (Bates stamped) and a general index, all filed under seal. Upon review of the submission, the undersigned noted that "the relatively slim production, considered in light of the history of this case, creates a concern that not all responsive material has been produced and appropriately identified." (Doc. No. S-20). The Court identified particular examples to support its conclusion that the submission was incomplete. The Court then ordered the Government to supplement its response

by submitting *ex parte and under seal* a statement, sworn or verified by an appropriate and authorized representative of the Government, including the following:

1. Certification that the response (as supplemented) completely and accurately complies with the requirements of the April 17, 2003 Order (Doc. No. 272).

2. Identification and indexing of any previously submitted documents (whether under seal or otherwise) relied on by the Government as part of its compliance with the Order.

3. A narrative specifically detailing the steps taken to assure that all agencies, agents, officers and attorneys involved in the case have made appropriate searches and produced all materials required by the Order.

4. As to any document or other item the omission of which raises doubts about the completeness of the response, an explanation of the absence or non existence of the item. *Id.*

The Court made it clear that it expected to review a complete record and noted:

> While the Court has listed several examples of the omissions apparent from the documents themselves, the list is not exhaustive. The Court expects the Government to review the Order requiring production and to review each and every document produced to date in order to verify that appropriate steps have been taken to locate *all* referenced and related items and to explain the absence of any that have not been submitted as well as the reasons for any lack of reports that would be expected in the usual course of interviewing witnesses and preparing them to testify at trial.

(Doc. No. S-20).

On August 11, 2003, the Government submitted its Ex Parte Response to Court Order of June 6, 2003 Submitted Under Seal ("the Supplemented Response"). The Supplemented Response included additional materials, Bates stamped (attached to Doc. No. S-31); a general index, witness by witness (attached to Doc. No. S-30); a Summary of Actions Taken in Response to Court's Order (Doc. No. S-31); and thirty-two Declarations of Assistant United States Attorneys, law enforcement

agents of various state and federal agencies and related personnel, regarding the sufficiency of the Government's Supplemented Response (Doc. Nos. 32 to 63).

The Court undertook a careful review of the documents and issued an *In Camera Ex Parte* Report and Recommendation (originally filed under seal as Doc. No. S-64, later unsealed and docketed as Doc. No. 282). In that Report, the undersigned determined that the Government's submissions were incomplete, and the limited explanations offered by the Government were inadequate. Among other findings, the Court identified numerous documents that were responsive to the Orders requiring production, but were not produced by the Government. The Court recommended, among other things, that "[t]he Government be ordered to submit the materials identified above as missing from the government's responses (*e.g.*, prosecution memoranda, Rule 35 memoranda, additional correspondence and reports or notes as to witnesses Frazier, Watkins, Ward, Jean-Mary, Tukes, Ridley, Clements, Holley, Watts and documents referenced in reports as to Pimentel and Jacques) for *in camera* review and subject to further orders of the Court."

Objections to the Report and Recommendation were due December 8, 2003. On that date, the Government moved, under seal, for additional time in which to file its objections (Doc. No. S-65). The time for response was extended by the Court until January 5, 2004 (Doc. No. S-66). On that date, the Government moved for additional time to file objections or, in the alternative, a motion to reconsider the Report and Recommendation (Doc. No. S-69). By Order filed in the public record, the District Court denied that request, confirmed and adopted the Report and Recommendation, and ordered that "[t]he additional documents referred to in paragraph 1 at pg. 65 of the Report and Recommendation shall be produced to the Court for in camera inspection by January 20, 2004." (Doc. No. 280).

On January 16, 2004, the Government produced *ex parte*, under seal and objection, numerous additional documents (Bates stamped 757 to 3488) (Doc. No. S-75).

On January 23, 2004, the District Court granted, in part, two Government motions filed under seal: 1) a Motion for Reconsideration of the Court's January 6, 2004 Order (Doc. No. S-77) and 2) a Motion to File Objections to the Report and Recommendation (Doc. No. S-78) (Doc. No. 285). The District Court allowed the Government to file, in the public record, its objections to the Report and Recommendation. Defendant was given until February 20, 2004 in which to file a response. (Doc. No. 285). The Government made no filing; however, at status hearing on January 27, 2004, and in a later Order, the District Court ordered that the motion for reconsideration and the motion to file Objections to the Report and Recommendation be unsealed and docketed in the public record. (Doc. Nos. 287 and 288). The Court also ordered the Government to serve upon the Defendant and file with the Court redacted copies of the Government's initial productions (pre-dating the Report and Recommendation),[5] and directed the undersigned to review the additional documents produced by the Government and to issue a Supplemental Report and Recommendation.

The Court has reviewed the additional documents and makes the following findings and recommendations.

## *ISSUES PRESENTED*

Prior to in-depth review of the documents, the Court clarifies its present task. It is not the function of this Court, at this stage of the proceedings, to pass on the existence *vel non* of violations of *Brady, Giglio* or *Jencks,* or to establish that prosecutorial misconduct has or has not occurred, as

---

[5]Defendant filed objections to the proposed redactions. Those objections were addressed in a separate Report and recommendation, which has since been adopted by the District Court.

that analysis necessarily involves an evaluation of the materiality of the matters in question. As noted in prior opinions, ultimate issues of the materiality of any Governmental omission or questionable conduct, the scope of appropriate relief (if any), and the weight of any mitigating factors must be determined in an adversarial context and not upon an *ex parte* review of a paper record. This Report and Recommendation is intended to do no more than complete the analysis of papers submitted by the Government in response to the Court's Orders. The Government's repeated failures to make complete submissions is noted but is not the subject of any specific recommendations at this time. Rather, this is a catalog of the supplemental submission, described in light of the matters tried, those to be tried and the previous submissions. Thus, this Report sets forth the tenor and apparent significance of the newly produced material so as to allow framing of appropriate issues for full resolution of the case. As such, this Court offers no recommendation regarding the ultimate weight to be assigned to its findings. That said, the Court proceeds to the documents themselves.

## ***THE DOCUMENTS***

### *The Completeness of the Record*

In prior opinions, the Court found that the submission by the Government was incomplete both in the sense that documents which the Court knew or believed to exist were not produced,[6] and in the sense that the absence of documents one would expect to exist in the normal course of investigation and trial preparation was never acknowledged or explained.[7] While the Government has taken pains

[6]Rule 35 memoranda, documents referred to in produced documents, correspondence and other documents located by the Court on review of the public record, for example.

[7]Grand jury testimony of the felon witnesses in this case, for example, and the failure to produce any document pertaining to witness Torey Clements.

in the instant submission to explain why some documents were not produced, those explanations are unsatisfactory in several respects, as noted below.

As before, the Court will address the completeness of the record, as now supplemented, and conclude with a witness by witness analysis of the new material produced (if any).

*Trial Preparation and Rule 35 materials*: Item (1) (a) of the April 17, 2003 Order called for investigative, debriefing and trial preparation materials from all state, federal and local agencies. The prior Report noted that the Government had not submitted *any* prosecution memoranda regarding Lyons or any of the felon witnesses; intra or inter-office memoranda or correspondence regarding recommendations for Rule 35 reductions for substantial assistance for the felon witnesses; or any correspondence.

In the instant response, the Government has submitted, under protest, the prosecution memoranda for Lyons and, to a certain extent, for some, but not all, of the felon witnesses. Similarly, it appears that some, but not all, of the sentence reduction materials were submitted. AUSA Bruce Hinshelwood, the lead prosecutor in this case, submitted a declaration that addresses these omissions:

> **Missing records from U. S. Attorney's files**
> In my review of U. S. Attorney's files, I was unable to locate certain documents in each file. I attempted to retrieve for submission to the Court all case intake sheets, prosecution memoranda, correspondence, and sentence reduction motion materials. These documents were not present in every file. In my experience I know that in certain instances prosecution memoranda have not been filed in every case. At times, memoranda and correspondence materials are either not filed, are misfiled, or are misplaced.

(Bates 3421-22). While the Court appreciates the prosecutor's candor, and understands that mistakes do happen and items do get misplaced, in the context of criminal prosecutions, inaccurate files should

be the rare exception and *not* the general rule.[8] As further noted below, the character and number of documents related to this investigation that have gone missing or were never even created in the first instance is remarkable.

With respect to the prosecution and sentence reduction memoranda that were produced, the Government belatedly asserts the deliberative process privilege against disclosure. (*See* Bates 3438-41). As explained in the prior Report, this privilege is inapplicable in this context. Moreover, the documents reflect no "deliberation" per se, but are mostly bare bones recitations of the evidence, which, in all cases relevant here, have already been disclosed through indictment and/or trial. Additionally, in every case pertinent here, the sentence reduction memorandum resulted in a motion which sets forth the identical basis asserted in the memorandum, verbatim. Thus, to the extent any privilege can still be said to have existed, it has been waived or rendered moot by subsequent events.

With respect to correspondence, the Court noted previously the unexplained dearth of any correspondence sent or received by anyone in connection with this investigation. The prior Report was critical of the Government's failure to produce correspondence, especially since a review of the public records revealed relevant instances where defense counsel for the felon witnesses or the witnesses themselves had corresponded with the Prosecutor or agent regarding sentence reduction for testimony in *Lyons*. Specifically, the Court took DEA Special Agent Frank Chisari to task for declaring that "[t]hroughout this investigation I did not engage in written correspondence with any government witness, whether incarcerated or not" when the public record revealed that he was sent pertinent correspondence. The Government has now provided new Declarations, which apparently

[8]The well known problems and perils associated with extensive use of jailhouse witnesses are exacerbated when documentation of their dealings with agents and prosecutors and of the prosecutors' own contemporaneous considerations is not maintained.

seek to clarify that the word "correspondence" means only letters *written to* a person, and not *received by* a person. Thus, DEA Special Agent Frank Chisari, now declares:

> By that I mean that I did not exchange letters with witnesses or their representatives. I have received correspondence throughout the years, but I am barred by DEA policy from writing to witnesses. To my mind, "engage" contemplates an exchange of letters, as opposed to mere receipt of written materials. (Bates 3388 at 3394).

The Order requiring production did not ask for "all letters you wrote to witnesses"– it directed production of correspondence. The term "correspondence" includes both letters sent *and* received. To the extent the Government asserts that it was only obligated to provide correspondence sent and not "mere receipt of written materials," its position is untenable.

Additional correspondence has been produced by the Government, including correspondence from defense counsel for the felon witnesses. The Government has filed declarations from several defense lawyers, uniformly noting that "Bruce Hinshelwood has never made promises or guarantees prior to completion of the cooperation and the filing (if any) of a sentence reduction motion in the case." *See* Declaration of Terrence E. Kehoe (Bates 3423-25); Declaration of Neil M. Schuster (Bates 3448-50); Declaration of Thomas Hunter Dale (Bates 3401-03); and Declaration of Charles M. Greene (Bates 3404-05). These sentiments are contrary to other correspondence produced from some of these attorneys, which reference the future filing of such motions (Kehoe correspondence, Bates 3428-31); the "promised downward departure motion" (Dale correspondence, Bates 3402); and that a felon witness was "promised a Rule 35 motion would be filed." (Greene correspondence, Bates 3405). In their current declarations, Mr. Dale and Mr. Greene attempt to represent to the Court that "promised" does not really mean "promised," but rather some version of "hoped for." To the extent the Government was trying to reassure the Court that no promises were made, it is not so persuaded

by these Declarations, which contradict the correspondence and numerous other notations and documents relating to "promised" reductions for felon witnesses.[9]

*Investigative Materials:* In the latest submission, the Government has produced some additional investigative materials, including certain reports identified by the Court as missing in the prior Report. Accepting for present purposes the Government's latest representation that its production of documents is complete, the disparity between the Government's theory regarding Lyons' drug dealing and its documentation and evidence yawns wider than ever. Given the scope and seriousness of the drug charges and the absence of any hard evidence, the Government's apparent failure to document its case carefully suggests a considered effort to avoid accountability.

Of particular concern is the Declaration of former Middle District prosecutor Edward C. Nucci (Bates 3434-37). Nucci avers that in his capacity as an Assistant United States Attorney, he signed and filed an application for a pen register order on December 5, 1996, in which he referred to "an ongoing investigation of Antonio Lyons and others as yet unknown, in connection with possible violations of 21 U.S.C. § 841." Specifically, in the application Mr. Nucci "certifies that the Brevard County Drug Task Force and the Federal Bureau of Investigation are conducting a criminal investigation of Antonio Lyons and others as yet unknown. . . ." (Bates 1626).[10] Although this application was filed in December 1996, and an application for extension was filed February 14, 1997, Nucci now states that, in fact, there was no formal investigation of Lyons within the United States Attorney's Office at the time of the applications and not necessarily any formal investigation outside

---

[9] *See, for example,* the discussion of felon witnesses Wyns, Collins, King and Jacques, detailed in the prior Report.

[10] The application is filed in a 1996 sealed miscellaneous case (Case No. Misc. OS-96-122). In view of the subsequent history of this case, the reasons for the seal are now moot and it is recommended that the Court unseal the file.

the USAO. Indeed, according to the Declaration of Frank Chisari, "[t]he Federal Bureau of Investigation had no role in this investigation other than interviews of various government witnesses conducted in connection with unrelated cases." (Bates 3392). Moreover, according to the Second Declaration of Michael Hill, during this period of time "I would have been aware of any investigation conducted by the Brevard County Sheriff's Office regarding alleged narcotics distribution" by Lyons and "*there was no ongoing investigation of Antonino Euguene Lyons' drug distribution activities by the BCSO*" (Bates 3410, emphasis added; Bates 3444, accord). That is confirmed with respect to the Brevard County Drug Task Force, as Lieutenant Michael Wong avers in declaration that he personally conducted a search of the records of the now disbanded task force and "was unable to find any records pertaining to a 1996 and 1997 federal pen register order" regarding Lyons (Bates 3481-82).

Nucci acknowledges the "preferred practice" of the USAO to initiate an intake procedure and open a matter file using the names set forth in pen register applications, but no matter file concerning Lyons was opened in the USAO until 1999, according to Prosecutor Hinshelwood (Bates 3414). Mr. Nucci states that he has no independent recollection concerning these applications, does not recall specific conversations with agents, and has no recollection of the results of the pen register applications or any follow-up on his part (Bates 3435-36). Thus, notwithstanding the representations made in the applications of a 1996-97 criminal drug investigation of Lyons by the FBI and the task force, neither the FBI, the Brevard County Sheriff's Office Task Force, nor the United States Attorney's Office *knows anything about it.* No independent files or documents exist (if, in fact, they ever did), and no one remembers a thing.

The Court leaves to another day assessment of the significance of this 1996-97 aspect of the matter. It may be assumed that the agents (whoever they were) considered the pen register sufficiently productive to justify seeking an extension in authorization. Yet, the "investigation" apparently resulted in no documentation, leads or even memories of its existence. These circumstances are strongly inconsistent with the multi-year, high volume drug conspiracy alleged by the Government.

*Jencks material*: The Court has previously commented on the Government's failure to produce any grand jury testimony of the felon witnesses pertaining to Lyons, or to explain the absence of any Grand Jury testimony. The Court surmised that the felon witnesses must have been presented to the grand jury, based on filings made by some of the witnesses in the public record indicating that they had, in fact, been writted out to testify and in view of the fact that there is no other evidence, either physical or through law enforcement agents, on these counts. The Government now makes the astonishing admission that, in fact, *none of the felon witnesses testified before the grand jury in this case.* (Bates 03418).[11] This, of course, raises the question: if there is no physical evidence and no first hand law enforcement agent evidence or felon witness testimony, just what, if anything, *was* presented to the grand jury, sufficient to warrant indictment for a twelve year drug conspiracy? While it is true that information could have been presented by way of hearsay summaries from an agent, the near absence of any agent notes from witness interviews that pre-date the indictment make the reliability of such hearsay upon hearsay statements highly suspect. This Court has not been tasked to review the grand jury proceedings in this case at this time. The grand jury proceedings are only

[11]The contradiction between this statement and that of the Government's witness Wyns (Bates 1056) that he did in fact testify before the grand jury is not explained.

at issue here to the extent they may have included *Jencks* material. As the prosecutor has declared that he presented none of the felon witnesses to the grand jury, no *Jencks* material relating to the non-existent testimony is apparent.

**New Material**

The Government has submitted additional materials as directed by the Court, as well as an abundance of materials not requested and of no relevance.[12] The relevant new material is discussed in the context of the individual witnesses. For present purposes, the Court concludes that it is now reasonably assured that the Government has produced all of the documents it has been able to locate that bear on the issues at hand.

In finding that the Government has now produced all of the documents it can locate, the Court does not mean to imply that it is satisfied with the production. The Government acknowledges that certain documents were "not filed," "misfiled," or "misplaced;" documents have been destroyed, or are otherwise missing; and, as is the case with the 1996 pen register application, large gaps in the record are present, with no acceptable explanation. The Court finds only that it accepts the Government's representation that no other known documents exist and the record is now as complete as it will ever be.

***Witness by Witness***

The Government has presented additional materials pertaining to the felon witnesses and to Defendant. Much of the production adds nothing to the prior analysis. To the extent relevant

[12]The Government, for example, has produced a copy of the docket sheets for each of the felon witnesses, printed from the PACER system maintained by the Court. As should have been evident from the prior Report, the Court is familiar with the dockets of the underlying criminal cases of the witnesses. The Court sought the *Government's* records, not a copy of its own.

documents were produced in the most recent submission that bear on the issues at hand, they are discussed below.

***Antonino Lyons***

The Government has produced the matter initiation form and the prosecution memoranda and related papers pertaining to Defendant (Bates 761-827). There are several prosecution memoranda, none of which contain anything irregular that the Court can ascertain, save for the fact that the initiation form says nothing regarding drug charges and indicates that a file was opened in January 1999 regarding Lyons, with a lead charge of violation of Title 18 U.S. Code § 2320 [counterfeit goods].

The prosecution memoranda set forth various drug transactions in a "statement of the evidence" section, but does not detail the source of the information, other than a generalized reference to "numerous law enforcement agencies." As such, the unaccredited, hearsay summaries of the evidence contained in the memoranda are impossible to evaluate. Suffice it to say that the Government mentions some, but by no means all, of the felon witnesses.

The "checklist of evidence" section includes the puzzling notation "cocaine seized." Contrary to this listing, the Government presented *no* evidence that any cocaine was seized in connection with the arrest and prosecution of Lyons. No mention of any such seizure is made in any other papers produced by the Government; no law enforcement agent noted finding any cocaine; and no evidence of any cocaine was introduced as an exhibit at trial. This anomaly is unexplained.

***1. Gerald Crayton***

The Government has indicated that new documents Bates 757-869 relate to Mr. Crayton (Doc. S-75, Index A). The Government has misidentified the documents. While Bates 757-60 (the matter

initiation form) relates to Crayton, Bates 761-827 include the matter initiation form, prosecution memoranda and papers related to Defendant Lyons. Bates 828-69 are cover or "blue" sheets, and docket sheets for the Crayton case and contain nothing of note.

*2. Larry Frazier*

The Government has identified new documents Bates 870-1023 and 3335-39 as pertaining to Mr. Frazier. Included in the production are various records for which no relevance is apparent,[13] and other documents (such as the prosecution memorandum and the substantial assistance departure request), which are relevant, but add nothing to the prior findings. Of interest, the prior Report remarked upon the failure of the Government to produce notes or reports from Agent Hill, as Frazier testified that he briefed the agent in 1993 about Lyons. In the new submission, the Government has tendered a Second Declaration of Michael Hill (Bates 3409-12) in which Agent Hill states that he knew Frazier since approximately 1988 and spoke with him by telephone on several occasions prior to his going to prison. Hill states that he does not recall whether or not Frazier mentioned Lyons during those conversations. Hill does not recall if he prepared notes or reports of these interviews and does not have any such notes or reports or know of their existence. (Bates 3411-12).

*3. Eric Berger*

As the Court's inclusion of Mr. Berger on the felon witness list was in error, no additional documents were produced by the Government.

[13]Bates 870-81, for example, is a criminal matter initiation form listing six suspects, but not Frazier.

*4. Curtis Wyns*

The additional submission relating to Wyns is contained in Bates 1024-1159. The Court has already reviewed some of the additional documentation, such as the docket sheet and filings in Wyns' criminal case, including the Government's January 9, 2003 motion to reduce Wyns' sentence based, in part, on his testimony in *Lyons* (Case No. 6:95cr218(22), Doc. No. 159). The submission also includes notes and reports of undercover activities and the like relating to Wyns. The papers reveal no obvious connection to Lyons.[14]

*5. Darren Johnson*

The Government has tendered Bates 1160-1204 as additional material pertaining to Mr. Johnson. While the new material is not particularly relevant, the Court notes that subsequent to the latest submission, the Government filed a motion for reduction in sentence for Mr. Johnson, based, in part, on his testimony in *Lyons*. *See United States v. Darren Johnson,* Case No. 6:96-cr-32-Orl-19JGG, Doc. No. 295. As this motion was filed March 5, 2004, it was not produced by the Government in the instant submission, nor, however, did the Government seek to supplement the submission to include the document, or any sentence reduction memoranda or other related papers.[15] Thus, Mr. Johnson has been added to the list of felon witnesses who have already received a Rule 35 motion based on their testimony in *Lyons*.

---

[14]There does appear to be a page missing following Bates 1105, but the document is in reference to an undercover purchase that, on its face, does not involve or implicate Lyons. As such, the omission is of no moment.

[15]The motion to reduce the sentence coincidentally follows the Government's submission of the Declaration of Johnson's attorney, Mr. Kehoe – dated January 2004 – and discussed above.

*6. Altrevious Byrom*

The Government has identified new material at Bates 1205-48, as pertaining to Mr. Byrom. The Court has reviewed the material (consisting of docket sheets and various other items) and sees nothing pertinent to *Lyons*. The Court notes, however, that as with Mr. Johnson, the Government saw fit to file a motion for reduction in sentence for Mr. Byrom, shortly *after* the January 16 production, and produced neither the related memorandum or a copy of the motion to this Court. *See United States v. Byrom*, Case No. 6:98 cr 98- Orl-22-JGG (Doc. No. 34 – filed Feb. 2, 2004). The asserted basis for the motion includes Byrom's testimony in *Lyons*.[16]

*7. Dwight Bouey*

The Government notes that it has no additional submission with respect to Mr. Bouey. While not indexed as relating to Bouey, the Second Declaration of Bruce Hinshelwood (Bates 3413) addresses the Court's concern raised in the prior Report regarding the lack of information produced regarding Bouey, and the fact that he was apparently writted out of state prison to testify without any documented basis for believing he would be willing and able to offer material and reliable testimony regarding Lyons (Report at 31-2). Prosecutor Hinshelwood explains the anomaly:

> **Lack of explanation as to how Dwight Bouey came to testify**
>
> At various times during the investigation of this case, investigators received random information which prompted writs to be issued for interview and possible testimony. In my experience, it is frequently impractical to conduct an interview of witnesses at their place of incarceration, prior to making the determination as to whether they should be brought in to testify.

(Bates 3418-19).

[16]The motion does not explain the lengthy delay in seeking reduction for this witness.

This explanation, such as it is, does nothing to assuage the Court's concerns. As set forth in the Report, Bouey testified that he had not spoken with *anyone* representing the United States with regard to *Lyons* until he was brought to the federal courthouse Monday (November 5), the first day of trial. The only documentation produced by the Government are handwritten interview notes of November 7, 2001, the very day Bouey testified. Although Hinshelwood's declaration appears to suggest that Bouey was writted out for interview purposes in that it is frequently impractical to interview some witnesses at state prison[17], in the Petition for Writ of Habeas Corpus Ad Testificandum filed by the Government (Doc. No. 54, filed October 24, 2001), Mr. Hinshelwood stated that Mr. Bouey was a witness for the Government and "it is necessary to have said witness before this Court . . . on November 5, 2001 . . . for the purpose of testifying." If Bouey's testimony is accurate (as the lack of documentation seems to suggest), the Government saw fit to writ out a state prisoner *for testimony* based only on unspecified "random information" from unnamed "investigators" that did *not* include any actual interview – no matter how informal – of the prisoner himself.

The Court also notes that information regarding Bouey (spelled Bouie) is contained in the prosecution memoranda prepared by the Government prior to the superseding indictment (Bates 767). Although, as noted earlier, the prosecution memorandum contains only summaries and not sources, it sets forth statements apparently made by Bouie to his "accomplice" Antonio Holley which are not consistent with his testimony.[18] If Bouey testified truthfully that he spoke to no federal agent

[17]The prosecutor's statement that it is often impractical to question witnesses at their place of incarceration is dubious as applied in this case. Numerous felon witnesses in *Lyons* testified that Agent Chisari interviewed them while they were being held in the Lake County Correctional facility.

[18]According to the prosecution memorandum, Bouie told Holley that Lyons was Bouie's source of supply and "Bouie was obtaining one half to one kilogram per week from Lyons." (Bates 0767). Note that this is almost verbatim from previously produced Bates 241, a February 14, 2000 interview of Antonio Holley conducted by Frank Chisari. This, however, is completely inconsistent with Bouie's testimony, which described only three isolated transactions for lesser amounts and no

regarding Lyons until he was writted out to testify, and no documents of interviews or reports regarding Bouey were produced by the Government, then the basis for the (apparently inaccurate) statements in the prosecution memorandum could only have come from Holley, and were presented at trial without any attempt to verify the hearsay with Bouey. Further, if the Government believed the statements in the prosecution memoranda to be true, why did it allow Bouey to testify inconsistently with those statements?

***8. Stephanie Godfrey***

No additional submission has been made with respect to Ms. Godfrey.

***9. Brian Watkins***

The Government has produced numerous additional documents with respect to Mr. Watkins, including a motion for reduction of sentence based, in part, on Watkins' testimony in *Lyons* (Bates 1280-82), filed in Watkins' criminal case on November 24, 2003, three days after this Court issued its Report.

The Government has also produced the omitted Report of Investigation prepared by Agent Jones and referenced in the earlier Report (Bates 1297-98). The ROI details an October 13, 1999 interview with DEA Agent Jones. It is significant in that it references Watkins' various sources of supply – with no mention made of Lyons. According to the ROI, from the middle of 1993 until 1998, Watkins bought two kilos of powder cocaine and was fronted two kilos every other month from Damon Carwise. To the extent this is inconsistent with Watkins' testimony that he purchased from Lyons in 1995, it is possible impeachment material.

---

mention at all of Mr. Holley.

*10. Marcus Randolph*

The Government has submitted Bates 1299-1421 and Bates 3340-46 as pertaining to Randolph. The Court finds nothing of interest in the production with respect to this witness.

*11. Louis Pimentel*

The Government has identified additional documents (Bates 1422-76) as pertaining to Pimentel. Significantly, the Government has now produced legible copies of handwritten notes previously produced with what appeared to be unintended redactions. To the extent these documents are legible copies, it is recommended that they be substituted for the illegible copies previously tendered and provided to the defense, as previously ordered (to the extent the Government has not already done so.) The other documents add nothing new or pertinent to the discussion.

*12. William Collins*

As set forth in the prior Report, the testimony of Collins and the subsequent filing by the Government of a Rule 35 motion based on the testimony is peculiar. The additional information produced this time around by the Government (identified as Bates 1477-1646) does nothing to quiet the Court's unease.

Collins was the recipient of several sentence reduction motions filed by the Government. In memorandum dated January 28, 1997, Prosecutor Nucci requests authorization to file a Rule 35 for Mr. Collins based, in part, on the following: "He [Collins] gave information relative to a large scale cocaine trafficker in the Brevard County area who has been a target of law enforcement for several years. Based in part upon Collins' information, an investigation is underway and there are currently pen registers operating on that individual's home and business." (Bates 1560). Included in the documents identified by the Government as relating to Collins are the pen register applications for

Lyons discussed above. It is therefore assumed that Lyons was the subject "trafficker"and Collins had briefed the Government with respect to his knowledge regarding Lyons' activities.

In that memorandum, the prosecutor recommended a four level reduction and noted that Collins had substantially completed his cooperation. (Bates 1560-61). A motion was filed with the Court consistent with the above (Bates 1568-70). Notwithstanding the above, Prosecutor Hinshelwood sought an additional two level departure in his June 9, 2003 sentence memorandum, noting Collins' testimony in *Lyons*, and his identifying of other "potential trial witnesses." (Bates 1565). Although Collins had already received a sentence reduction based, in part, on his tip regarding Lyons, the prosecutor in his memorandum (and in the motion to the Court) stated that "Collins' cooperation in the Lyons prosecution, which is the basis of this application, is totally independent of these previous motions." (Bates 1566). Thus, Collins received not one, but *two* reductions for what the Court has previously characterized as relatively innocuous testimony.[19]

***13. Frederick Ward***

The Government has identified Bates 1647-1712 as pertaining to Mr. Ward. Of particular interest are Bates 1693-1700. This is a handwritten document, authored by Fred Ward and stamped "Received U.S. Attorney Aug. 20 1999," setting forth Mr. Ward's summary of all of his cooperation, with respect to the Government filing a motion for reduction. Ward takes great pains to set forth the particulars of five separate cases or instances where Ward believes he provided, or states he is willing to provide, substantial assistance. Notably, this statement, which is in Ward's own hand, *makes no*

[19]Collins did not testify to any direct dealings with Lyons, nor did any occur in his presence, and the total amount of drugs Collins says he purchased from Harvey was less than a kilo.

*mention of Lyons*[20]. This, despite an obvious and expressed willingness to deliver any testimony that Ward believed would aid in securing a reduction. The Government offers no explanation as to why this document should not have been produced as a prior written statement of the witness.

Bates 1701 is also of interest. This purports to be a handwritten letter to Mr. [Agent] Tim Jones from Ward, dated August 19, 1999. In that letter, Ward asks Jones to contact, among others, inmate Larry Fasier (sic) at Coleman Prison to confirm Ward's cooperation in an unrelated case. Again, no mention is made of Lyons. The mention of Larry Frazier is interesting, however, as the Government moved for reduction of Frazier's sentence, noting that he brought forth three other (unnamed) witnesses to testify. Thus, apparently Mr. Frazier was talking about the Lyons investigation and was in contact with Mr. Ward. The documents reveal that Ward started to sing about Lyons only shortly before Lyons' trial, in his October 16, 2001 interview with Agent Chisari.

Also of note (though not directly relevant) is Bates 1706, which is a June 20, 2002 letter from Agent Willie Hawkins of the DEA to AUSA Gibbs requesting a reduction in sentence for Mr. Ward. Contrary to Hawkins' declaration that it is not his practice to correspond with "or about" witnesses (Bates 3407), this is such a letter.

***14. Gregory King***

The Government has produced additional documentation pertaining to Mr. King (Bates 1713-69). The production consists mainly of documents the Court has already reviewed pertaining to Mr. King's criminal case. Nothing new is apparent.

---

[20]Ward testified at trial that he dealt with Lyons in 1997, within the time period covered by these notes.

*15. Franz Jean-Mary*

The Government has identified additional documents pertinent to this witness (Bates 1770-1825 and 3330-34). The additional documents are the initial prosecution memoranda and DEA reports relating to this felon. Law enforcement had a plethora of evidence against this witness, including taped conversations, buys orchestrated with confidential informants, surveillance, and physical evidence. Considering the fact that Jean-Mary testified that he began selling drugs to Lyons in 1994 and continued to sell 10 kilos to Lyons every two to three weeks until May 1996, which is within the time period he was under surveillance, the absence of corroborating incriminating evidence against Lyons is noteworthy. Moreover, Jean-Mary and his co-defendants were arrested after a series of relatively minor buys (all under a kilo). When searched, only two kilos were found. This is hardly the hallmark of an operation that moved, according to Jean-Mary, 20 kilos a month to Lyons alone.

*16. Curtis Murray*

The Government has produced additional documents with respect to Mr. Murray (Bates 1826-1913). The Court sees nothing of interest in the new papers, which do nothing to indicate a connection between the felon witness and Lyons.

*17. Roderick Smith*

The additional submission pertaining to Mr. Smith is identified at Bates 1826-67 and Bates 3347-54. The documentation on Smith is interesting to the extent that it indicates that a search warrant was executed on Smith's residence on July 23, 1998 and, after the search, Smith "agreed to help assist law enforcement by acting as a confidential informant on drug transactions." Bates 1831. The prosecution memorandum reveals that Smith would sell cocaine to a customer and then turn the customer in as part of his confidential informant work. Despite his apparent willingness to "flip" his

customers, there is no documentary evidence that Smith acted (or was asked to act) as a confidential informant on any sale to Lyons.

***18. Michael Tukes***

The Government has produced additional documents identified as Bates 1914-2146 and 2151-61 as pertaining to this felon. In reviewing the documents, the Court notes that Bates 1938 appears to be a sentence reduction memorandum dated January 15, 2001, referencing Tukes' testimony in *Lyons*. It is presumed that this is a typographical error and the memorandum was prepared in 2002, as the case was not tried until November 2001 and the motion was filed January 16, 2002.

Of note are Bates 2139-46, which consist of ROI's prepared by Agent Hawkins, with respect to correspondence received by Tukes (Bates 2151-61) pertaining to the Williams brothers. Lyons is not mentioned or implicated in the ROI's or correspondence. In Declaration (Bates 3406), Hawkins notes that Tukes mentioned Lyons in conversation, but his reports do not reflect the reference because Lyons "was not my case."

***19. Robert Britton***

The Government has identified Bates 2162-365 as additional information pertaining to this witness. Nothing of note appears, except the absence of any mention of Lyons in the extensive investigation of the witness' drug dealings.

***20. Cory Wilson***

Bates 2366-406 are the Government's new submissions with respect to Mr. Wilson. The Court sees nothing new of interest in the additional submission.

*21. Carlos Ridley*

The Government has submitted Bates 2407-75 as additional material relating to Mr. Ridley. Of interest is the Rule 35 memorandum (Bates 2425-29) in which the prosecutor requests a three level departure for Mr. Ridley. At Bates 2424 are two handwritten notes, to wit: "Why did we give others 2 levels and this guy 3" with a response by "BH": "I request 3 levels because Ridley is a close family member of the defendant – his family relationships have been disrupted." Indeed, Ridley did receive a three level departure, as requested by the Government.

Bates 2430 is a letter dated December 23, 2002, from Ridley to Mr. Hinshelwood, asking for a Rule 35 motion to be filed on his behalf. In that letter, Ridley notes his cooperation in *Lyons* and other cooperation against Randy Atwell. Ridley states: "Although I was not used in Mr. Atwell's trial, I was told that my cooperation would not be overlooked." The letter acknowledges, however, that filing such a motion is at the prosecutor's discretion. The document is notable as further evidence of the ambiguous way prosecutors deal with snitches. Assuring a witness that his cooperation would not be overlooked while at the same time disclaiming any promise of a motion being filed sends a mixed message, at best.

Bates 2432-34 is the Rule 11 proffer, noted as missing in the prior production. The proffer, dated September 21, 1999, says nothing about Lyons, which is consistent with Ridley's testimony that he did not talk about Lyons to investigators until 2001. The Government has also produced information about Ridley's attempts to set up drug buys (Bates 2435-52), none of which were relevant to Lyons. The Government has also provided the missing pages from the handwritten notes referenced in the prior Report, which contain nothing substantial to add to the prior analysis.

***22. Odell Williams***

Additional documents have been identified by the Government as pertaining to Mr. Williams (Bates 2476-513). The documents add nothing of present interest, save for Bates 2509, which is a February 12, 2002, letter from attorney Charles Greene to prosecutor Hinshelwood, noting:

> At your request, Odell Williams testified for the government in a successful prosecution. For doing so, he was promised a Rule 35 motion would be filed. Please advise if you have filed such a motion and, if not, why you have failed to do so.

Although Mr. Greene now states that Mr. Hinshelwood did not and does not make such promises (Bates 3404), he offers no explanation for why he would state precisely the opposite in this letter.

***23. Torey Clements***

The Court noted its dissatisfaction with the lack of production with respect to Mr. Clements, in the prior Report. The Government now produces Bates 2514-94 and Bates 2147-50, as pertaining to this witness. The documents include a very rough draft of the prosecution memorandum relating to Clements, which mentions nothing about any involvement with Lyons. The document also includes notes dated March 9, 2000 (Bates 2518) which do not mention Lyons by name and appear to be too vague to ascertain their relevancy.

Of interest is the Rule 35 motion request (Bates 2529-33) prepared by Prosecutor Savell on February 18, 2000. In this request, the AUSA notes that Clements agreed to cooperate shortly after his arrest and provided information to law enforcement officers about his drug dealing in Leesburg, Florida and West Palm Beach, Florida. Notably, Clements "also testified before the federal grand jury about six individuals he dealt with in the past." The Government has provided the grand jury

testimony, which is silent with respect to Lyons, but includes detailed testimony regarding Clements' sources and customers.

The Government has also produced Bates 2591-94 and 2147-50 (duplicate), which is a Report of Investigation prepared by Agent Hawkins, indicating that Clements was purchasing drugs from the Williams brothers in the Magic Mall in Orlando, for part of 1998. No mention of Lyons is made in the report. Although Hawkins previously declared that he provided notes of his interview to the USAO, he now states, in supplemental declaration, that he did not provide notes of the interview as he was unable to locate the notes (Bates 3408).

In the prior Report, the Court chastised prosecutor Anita Cream for her policy of generally not taking notes in favor of relying on her apparently spotty memory. Previously, Ms. Cream declared that she did not recall who she had interviewed with respect to *Lyons*. In supplemental declaration, Prosecutor Cream now states that she does recall attending an interview of Torey Clements prior to his testimony in the Lyons trial (Bates 3400). No further details are provided, although Cream avers that to the best of her recollection, Special Agent John Bianchi attended the interview with her. For his part, Bianchi, in prior Declaration, avers generally that he participated in several interviews for this case, in which he did not take notes (Bates 646-51). No mention is made of Clements.

Thus, despite the new production, the Court is just as troubled regarding Mr. Clements' testimony as before. There is absolutely nothing, not one report, note or document of any kind that would indicate that *any* Government official interviewed this witness about the Lyons case, prior to putting him on the stand. Prosecutor Savell states that she does not recall any discussion of Lyons with Mr. Clements (Bates 3446-47). Hawkins says Clements mentioned Lyons to him, but that the report does not reference Lyons because Lyons "was not my case." (Bates 3406-08). Instead,

Hawkins passed the information on (apparently orally) to Chisari. Chisari, however, has provided no notes, and has not acknowledged interviewing Clements (if, in fact, he did), nor has he provided any declaration regarding Clements (if, in fact, he did not), and Cream states that she does not recall Chisari interviewing Clements (Bates 3400). Not only did the Government not check out Clements' story, it did not even bother to document it, prior to putting him on the stand. The Court confirms its prior inference that Clements' testimony was nothing but an afterthought, given to bolster the pending Rule 35 motion.

***24. Daniel Beauvis***

Additional documents 2595-620 and 3321-24 relate to this witness, according to the Government. The additional documents, including the Rule 35 memorandum, add nothing of interest with respect to this witness' participation in *Lyons.*

***25. Antonio Holley***

The Government has produced additional information with respect to Mr. Holley (Bates 2621-3048). Bates 2731-37 is notable as what appear to be handwritten notes from an interview with Holley in March 2000. Although the majority of the notes relate to Holley's involvement with Officer Ladoczky, Bates 2736 includes a reference to "Nino Lions" in connection with Holley's use of powder cocaine.

The Government has now produced the 1999 ROI's and reports regarding Holley's debriefing with Agent Madeam. Holley's Rule 11 proffer report has also been produced (Bates 2807-13), which makes no mention of Lyons. The other documents have already been reviewed by the Court and discussed in the prior Report.

***26. Baxter Watts***

The Government has provided Bates 3049-109 with respect to this witness. It is worth noting that the Government had filed a motion for Rule 35 consideration, to be determined upon the completion of unspecified cooperation (Doc. No. 85 in Case No. 98-cr-261-Orl 18KRS), which was filed prior to the testimony, and Watts had corresponded with Prosecutor Hinshelwood on May 5, 2001, regarding the status of that motion (Bates 3071). As noted in the prior Report, Watts was promptly rewarded with the filing of the motion on December 3, 2001.

***27. Lorenzo Taylor***

The Government has identified additional submission Bates 3110-75 as pertinent to this witness. The Prosecution Memorandum (3110-39) prepared May 22, 1997 by the same lead prosecutor as to this witness is in marked contrast to the one he prepared as to Lyons. As to Taylor, the Prosecutor details dates of witness interviews and the identity of the interviewer, in addition to a summary of the evidence. Moreover, in the special problems/weaknesses section, the Prosecutor states: "All of the witnesses are convicted felons, self admitted drug dealers, or both. The witnesses are very impeachable. There are, however, a lot of them." Bates 3138. As to Lyons, the prosecutor makes no mention of the special weakness of relying on such witnesses.

***27. Roosevelt Thomas***

The Government has produced Bates 3176-209 and 3355-84 as being related to this witness. The Court noted in prior Report its concern that the Government had withheld information regarding Thomas' Rule 35 proceedings and allowed him to testify falsely regarding the status of those proceedings. The Government has objected to this characterization, arguing that the defense already knew that a Rule 35 motion had been filed by the Government for Thomas, and that it was due to be

heard soon. The motion filed by the Government and produced to defense counsel, however (Doc. No. 235 in Case No. 8:99-cr-128-T-24EAJ; and at Bates 3382-84), did not mention Thomas' cooperation in *Lyons* as a basis for relief. In the instant production, the Government has now tendered Bates 3199-204 (the Rule 35 authorization) and Bates 3205-9 (the transcript of the November 8, 2001 sentence reduction hearing). The transcript reveals that *in addition to* the matters raised in the Rule 35 motion and disclosed to the defense, Mr. Thomas' cooperation in *Lyons* was argued to the sentencing court as a basis for an additional reduction (Bates 3205-8), and Thomas received a reduction of two additional levels downward *based solely on his cooperation in the Lyons matter.*[21] Thus, at the time of Thomas' testimony in *Lyons*, he had *already received* his sentence reduction for *Lyons* and, as he was present at the time, he knew it. As this additional matter was not contained in the motion, nor mentioned in the minutes, and the Order granting the motion was delivered orally, it would be impossible for the defense counsel to "discover" it without transcribing the proceedings. At no time did the Government disclose to Lyons that, despite the language of the Rule 35 motion, the Government would seek at hearing an additional two level departure based on *Lyons*. The Court stands by its previous conclusion that the Government should have disclosed the fact that it intended to and, in fact, did reward Thomas for his testimony in *Lyons,* and should have corrected Thomas' false statement to the contrary. There is no question that the information is material and would likely have made a difference to the jury in evaluating Thomas' testimony.

---

[21]He received additional reductions for other cooperation, but Judge Bucklew specifically granted a two level reduction for *Lyons*. Bates 3208.

***29. Laverne Harvey***

The Government has identified additional documents as pertaining to Mr. Harvey (Bates 3210 -31). Of interest is the Pacer docket sheet produced, which is dated as of July 18, 2003. The Government neglects to mention that on February 2, 2004, the Government filed a Rule 35 motion with respect to this witness, based on his *Lyons* cooperation. Although the motion was filed *after* the Government made its last production, the Government has not supplemented the production to include the motion or related memoranda.

Of interest among the other documents is the stated basis for the 1997 motion for reduction, set forth in the motion and in Rule 35 memoranda (Bates 3221). Ed Nucci notes, inter alia, that Harvey provided information relative to a large scale cocaine trafficker in the Brevard County area, and references the pen registers operating on that individual's home and business. (Bates 3224). Although Lyons is not named, the description is verbatim from Collins' Rule 35 memorandum. *See above.* Thus, it appears that Harvey was already rewarded for his cooperation with the Lyons prosecution, years prior to his actual testimony. This information (which did not name Lyons so the defense could not reasonably assume it from the public record) should have been disclosed to the defense.

***30. David Sejour***

The Government has identified additional submissions at Bates 3232-61 as pertaining to this witness. The Court finds that these documents (a docket sheet, a prosecution memorandum and a

copy of notes already produced and analyzed in the prior Report) add nothing to the prior analysis of Sejour's testimony.[22]

***31. Karlis Fenelus***

The Government has provided no additional submission with regard to Mr. Fenelus.

***32. Jonathan Holley***

The Government has identified Bates 3262-9 as additional material relating to Mr. Holley. The document represents the handwritten notes of a May 9 interview. As the Government had previously produced the ROI from that interview, and this document is consistent with the formal report, no additional discussion is warranted.

***33. Jeanty Jacques***

The Government has identified Bates 3270-315 and 3483-88 as additional submittals pertaining to Mr. Jacques. In the prior Report, the Court expressed its concern that a secret deal had been brokered with Mr. Jacques and not disclosed to the defense. The Court finds additional evidence of the deal in the instant submission.

Bates 3291 is an August 29, 1998 letter from AUSA Edward Stamm of the Southern District to Joseph Gibson, Esq., Jacques' attorney. The letter states in pertinent part:

> Following up on our conversation of last week, I am enclosing a standard "prospective substantial assistance" plea agreement for your client.
> * * *
> The agreement also holds out the prospect of a 5K1 motion or a Rule 35 motion to reduce his sentence if he does in fact go forward and render substantial assistance. Obviously, because he has not yet rendered this assistance . . . I cannot yet promise that he will receive such a motion or specify what the recommendation would be. The

[22] In Declaration, Chisari states that the only interview he conducted of Sejour was on November 9, 2003. (Bates 3399). This is believed to be a misstatement, as the trial was held in November 2001, and the notes previously produced are dated November 9, 2001 (Bates 303).

> key to these decisions is, of course, the quality and quantity of the cooperation he renders.
> * * *

Thus, as of August 1998, the United States Attorney could not "*yet* promise" a Rule 35, but the likelihood of such a motion was obviously discussed and acknowledged, and was dependent on the quality and quantity of information this felon provided.

Bates 3305 is a Request for Protective Rule 35 motion dated July 7, 2000, from AUSA Stamm to AUSA Nucci. This document, with attached emails from AUSA Hinshelwood, asks for a protective Rule 35 motion for Jacques, noting that the Government "plan[s] to use Jacques as a witness in the grand jury, and then as a witness at [Lyons'] trial." [23] The memo notes that Jacques had been debriefed "extensively." As stated in the prior Report, a Protective Rule 35 motion was filed for Jacques, and placed under seal. Despite Stamm's acknowledged discussions with Jacques' counsel regarding a Rule 35 motion and Hinshelwood's notice and involvement in the filing of a protective Rule 35 motion based on *Lyons,* the Government allowed the witness to testify that he knew of no discussions with Government agents regarding getting his sentence reduced.

Indeed, AUSA Hinshelwood wasted no time in seeking an immediate reduction for Jacques. Bates 3309 is a copy of emails from AUSA Hinshelwood to AUSA Stamm. Note that Hinshelwood emailed Stamm to "please do what you can" for Jacques at 6:07 p.m. on November 15, 2001, *the very day Jacques testified.* The reduction sought by Hinshelwood was significant in that he opined that a 50% reduction would be appropriate. Bates 3309. These circumstances bolster the conclusion that a deal had been worked out for Jacques and should have been disclosed to the defense. The significance of this failure is heightened because, in Prosecutor Hinshelwood's own words,

[23] Despite this notation, AUSA Hinshelwood now states that none of the felon witnesses were presented to the Grand Jury.

"[Jacques'] testimony was the centerpiece of the government's prosecution . . ." and Jacques "did a great job!" Bates 3309.

Bates 3314-15 are hard to read handwritten notes, appearing to be of conversations regarding Jacques' assistance. They appear pertinent on their face, but they are mostly illegible. As such, the Court cannot effectively evaluate them.

***Other Witnesses and Documents***

The Government has produced notes from a June 18, 2002 interview with Amin Jones (Bates 3316-20) which appear to be a duplicate of the notes discussed in the prior Report (Bates 485). As such, no additional analysis is needed.

The Government has also produced what appear to be other documents pertaining to unrelated prosecutions (Bates 3321-24); letters from felons to the Court (Bates 3325-29); docket sheets; and additional Declarations (Bates 3385-450). Other than as discussed herein and above, these documents merit no further comment.

## ***CONCLUSION***

The Government's latest supplemental submission does little in assuaging the concerns identified in prior Orders and Reports entered by the Court in this case. Indeed, in some respects, the supplement raises new or heightened concerns. However, only a small portion of the supplementary papers need be made available to Defendant, as follows: All correspondence referencing the felon witnesses should be produced, including the letters discussed herein from other defense attorneys and from AUSA Ed Stamm. Moreover, in view of its importance, the Declaration of former prosecutor Nucci must be produced, along with the pen register application and extension request. The previously omitted ROI for Brian Watkins should be provided. The handwritten correspondence of

Frederick Ward (Bates 1693-1700) discussed herein should be produced, as well as the transcript the November 8, 2001 sentence reduction hearing for Roosevelt Thomas (Bates 3205-9). Finally, the defense team has already received copies of the prior Declarations, the new Declaratio submitted in this production should also be produced, in the interest of completion.

The previously identified concerns including whether Lyons received a fair trial and tl remaining tasks of sentencing and forfeiture remain for resolution. It is now appropriate to allow t parties to present these issues to the Court in an adversarial context, to allow for a final resolution this matter. Subject to the pending motion for stay, it is **respectfully recommended** that the Co order production of the papers identified above, set a deadline for filing any additional motions, a proceed to the remaining issues of sentencing and forfeiture.

Failure to file written objections to the proposed findings and recommendations contained this report within ten (10) days from the date of its filing shall bar an aggrieved party from attack the factual findings on appeal.

Respectfully recommended in Orlando, Florida on this 23d day of April, 2004.

DAVID A. BAKER
UNITED STATES MAGISTRATE JU

Copies furnished to:

Presiding District Judge
Counsel of Record
Courtroom Deputy

F I L E   C O P Y

Date Printed: 04/23/2004

Notice sent to: [handwritten initials]

___ Ian B. Hinshelwood, Esq.
U.S. Attorney's Office
Middle District of Florida
501 W. Church St., Suite 300
Orlando, FL 32805

6:01-cr-00134 hsh

___ Anita M. Cream, Esq.
U.S. Attorney's Office
Middle District of Florida
501 W. Church St., Suite 300
Orlando, FL 32805

6:01-cr-00134 hsh

___ Arthur Lee Bentley III, Esq.
U.S. Attorney's Office
Middle District of Florida
400 N. Tampa St., Suite 3200
Tampa, FL 33602

6:01-cr-00134 hsh

___ Gregory W. Eisenmenger, Esq.
Eisenmenger, Berry & Peters, P.A.
The Huntington Bank Bldg., Viera
8226 N. Wickham Rd., Suite 202
Melbourne, FL 32940

6:01-cr-00134 hsh

___ Robert R. Berry, Esq.
Eisenmenger, Berry & Peters, P.A.
The Huntington Bank Bldg., Viera
8226 N. Wickham Rd., Suite 202
Melbourne, FL 32940

6:01-cr-00134 hsh

___ Antonino Eugene Lyons
811 S. Kentucky Ave.
Rockledge, FL 32955

6:01-cr-00134 hsh

— GAP

— Anita